Christopher S. Tretola, Esq., Of Counsel
Bar Id: 033471998
HARTMAN DUFF, LLC
3500 Quakerbridge Road, Suite 202
Hamilton, NJ 08619
P:  609-586-9000 x110
F:  609-586-9404
ctretola@hartmanduff.com
Attorneys for Defendants Edward C. Bertuccio,
and Kalavruzos, Mumola, Hartman, Lento & Duff, LLC,

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| RANDY C. THOMPSON, | HON. EDWARD S. KIEL, U.S.D.J. |
|  | HON. ELIZABETH A. PASCAL, U.S.M.J |
| Plaintiff, |  |
|  | Case No.: 1:23-CV-20468-ESK-EAP |
| v. |  |
|  | Civil Action |
| NEW JERSEY ATTORNEY GENERAL, et. als. | Motion Return Date: October 20, 2025 |
|  | **CERTIFICATION OF COUNSEL IN SUPPORT OF MOTION** |

**CHRISTOPHER S. TRETOLA**, of full age hereby certified as follows:

1.      I am an attorney at law duly admitted to practice in the State of New Jersey and the District of New Jersey.  I am of counsel to Hartman Duff, LLC, attorneys for the Defendants Edward C. Bertuccio, (improperly pleaded as Ted Bertuccio) and Kalavruzos, Mumola, Hartman, Lento & Duff, LLC (improperly pleaded as KMHL&D Law Firm).  As such I am fully familiar with the statements made herein.

2.      Attached hereto as Exhibit A is a true copy of Plaintiff's Second Amended Complaint in this action.

3.      Attached hereto as Exhibit B is a true copy of the January 7, 2021 Order Relieving Kalavruzos, Mumola, Hartman, Lento & Duff, LLC as Counsel for Randy Thompson.

4.      Attached hereto as Exhibit C is a true copy of the Return of Service for KMHL&D Law Offices, as previously filed with the Court by Plaintiff.

5.      Attached hereto as Exhibit D is a true copy of the Return of Service for Edward (ted) Bertuccio, Jr., as previously field with the Court by Plaintiff.

6.      Attached hereto as Exhibit E is a true copy of the unpublished opinion Galicki v. New Jersey, No. 14-169 (JLL) (D.N.J. June 29, 2015).

7.      hereto as Exhibit F is a true copy of the unpublished opinion Peabody v. Griggs, No. 08-243-ML (D. RI October 6, 2009).

8.      Attached hereto as Exhibit G is a true copy of the unpublished opinion Wesley v. Vaughn, No. 99-1228, 99-1229 (E.D.Pa. 2002).

9.      I hereby certify that the foregoing statements made by me are true.  I understand that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: September 19, 2025

/S/ Christopher S. Tretola
CHRISTOPHER S. TRETOLA

# EXHIBIT A

## SECOND AMENDED COMPLAINT – COUNTS

**COUNT I**
**42 U.S.C. § 1983 and 1985(3) CONSPIRACY TO VIOLATE CIVIL RIGHTS………………Page 37**

**COUNT II**
**42 U.S.C. § 1983 MALICIOUS PROSECUTION…….Page 41**

**COUNT III**
**42 U.S.C. § 1983 FOURTH AMENDMENT – UNLAWFUL SEIZURE CONTINUING SEIZURE/FALSE IMPRISONMENT………..Page 44**

**COUNT IV**
**42 U.S.C. § 1983 SUPERVISOR LIABILITY/FAILURE TO INTERVENE…….Page 46**

**COUNT V**
**42 U.S.C. § 1983 ABUSE OF PROCESS………Page 51**

**COUNT VI**
**42 U.S.C. § 1983 FIRST AMENDMENT RETALIATION & DEPRIVATION….Page 53**

**COUNT VII**
**42 U.S.C. § 1983 MONELL LIABILITY – CUSTOM, POLICY OR PRACTICE & FAILURE TO TRAIN AND SUPERVISE / SUPERVISOR LIABILITY……Page 56**

**COUNT VIII**
**STATE COMMON LAW: MALICIOUS PROSECUTION…….Page 60**

**COUNT IX**
**CIVIL CONSPIRACY……….Page 62**

**COUNT X**
**FACIAL & AS-APPLIED CONSTITUTIONAL CHALLENGE TO "NOT ESTABLISHED" FINDING……Page 64**

**COUNT XI**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS…….Page 68**

**COUNT XII**
**VIOLATION OF THE NEW JERSEY CIVIL RIGHTS ACT (N.J.S.A. 10:6-2)……Page 72**

**COUNT XIII**
**LEGAL MALPRACTICE……Page 74**

**United States District Court**
**District of New Jersey**

Randy C. Thompson
An Individual Citizen of the United States of America

      PLAINTIFF
      Pro Se

      vs.

NEW JERSEY ATTORNEY GENERAL,
A governmental entity,

NEW JERSEY DEPARTMENT OF CHILDREN AND
FAMILIES, a governmental entity,

MONMOUTH COUNTY PROSECUTORS OFFICE
(MCPO), A governmental entity,

CITY OF ASBURY PARK & THE ASBURY PARK
POLICE DEPARTMENT
(APPD), governmental entities,

TOWNSHIP OF OCEAN &
THE OCEAN TOWNSHIP POLICE DEPARTMENT
(OTPD), governmental entities,

CHRISOPHER GRAMMICCIONI, Monmouth
County Prosecutor (former) in his personal and professional
capacity,

LAURA LINSKI, Acting Monmouth County Prosecutor
(former), Monmouth County Prosecutor's Office in her
personal and professional capacity,

THOMAS FICHTER, Assistant Prosecutor,
Monmouth County Prosecutor's Office
In his personal and professional capacity,

MONICA DO OTEIRO, Director of the Appellate Division
And Assistant Prosecutor,
Monmouth County Prosecutor's Office
In her personal and professional capacity

CHRISTOPHER DECKER, Assistant Prosecutor
In his personal and professional capacity

Civil Action No. _____

**COMPLAINT AND JURY DEMAND**

KAYLA SANTIAGO, Detective, Monmouth
County Prosecutor's Office, in her personal and
professional capacity,

SERGEANT MICHAEL MAGLIOZZO, Detective, Monmouth
County Prosecutor's Office, in his personal and professional
Capacity,

JASON GOLD, Detective, Monmouth
County Prosecutor's Office, in his personal and professional
Capacity,

JOSHUA RIOS, Detective, Monmouth
County Prosecutor's Office, in his personal and professional
Capacity,

ELIZABETH PINSON, Investigator, New Jersey Division
Of Child Protection & Permanency, in her personal and professional
Capacity,

LOVETTE WRIGHT, Supervisor, New Jersey Division
Of Child Protection & Permanency, in her personal and professional
Capacity,

CAPTAIN AMIR BERCOVICZ, Asbury Park
Police Department Badge #152, in his personal and professional
Capacity,

ALON BERCOVICZ, Ocean Township
Police Department, in his personal and professional
Capacity,

UNNAMED SUPERVISOR BADGE #134, Monmouth County
Prosecutor's Office (signature illegible), in his personal and professional
capacity

DONNA VIERO, City Manager, City of Asbury Park
In her personal and professional capacity,

SERGEANT STEVEN RAMSEUR, Asbury Park Police Officer
personal and professional capacity,

OFFICER MICHAEL, Asbury Park Police Officer
In his personal and professional capacity,

MICHAEL GRISWALD, Asbury Park Police Officer
In his personal and professional capacity,

2

OFFICER CADET, Asbury Park Police Officer
In his personal and professional capacity

MICHAEL SPALLINA, Asbury Park Police Officer
In his personal and professional capacity

OFFICER MCDONOUGH, Asbury Park Police Officer,
In his personal and professional capacity

OFFICER BOMENBLIT, Asbury Park Police Officer
In his personal and professional capacity

ANGELA RACHEL PERRY
In her personal capacity

TATIANA BURGOS
In her personal capacity

JOHN PERONNE, ESQ.
In his personal and professional capacity

EDWARD C. BERTUCCIO, ESQ.
In his personal and professional capacity

KALAVRUZOS, MUMOLA, HARTMAN, LENTO
& DUFF, LLC
In their personal and professional capacity

JOHN DOE POLICE OFFICERS 1- 10,
Fictitious individuals,

ABC ENTITIES 1-10, fictitious entities,

3

DEFENDANTS

I, Randy Thompson (herin referred to as plaintiff) bring this action for damages and other legal and equitable relief against Defendants The New Jersey Attorney General, The New Jersey Department of Children and Families, The Monmouth County Prosecutor's Office, The City of Asbury Park, The Asbury Park Police Department, The Township of Ocean, The Ocean Township Police Department, Former Monmouth County Prosecutor Christopher Grammiccioni, Former Acting Monmouth County Prosecutor Laura Linski, Assistant Prosecutor Thomas Fichter, Assistant Prosecutor Monica Do Oteiro, Assistant Prosecutor Christopher Decker, Detective Kayla Santiago, Sergeant Michael Magliozzo, Detective Jason Gold, Detective Joshua Rios, DCP&P Investigator Elizabeth Penson, DCP&P Supervisor Lovette Wright, Captain Amir Bercoviz, Unnamed Supervisor Bade #134, City Manager Donna Viero, Sergeant Steven Ramseur, Officer Michael, Officer Michael Spallina, Officer McDonaugh, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq. Edward C. Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff LLC , John Doe Police Officers and ABC Entities.

4

# LOCAL CIVIL RULE 10.1 STATEMENT

The mailing address of the parties to this action are:

Randy C. Thompson
1130 Springwood Avenue
Asbury Park, NJ 07712

ANGELA RACHEL PERRY
110 Cabello Street, Port Charlotte, FL 33983

TATIANA BURGOS
258 Clubhouse Drive, Middletown, NJ 07748

New Jersey Attorney General
Richard J. Hughes Justice Complex, 25 Market St, Trenton, NJ 08611

New Jersey Department of Children and Families
50 East State Street, 2nd floor. PO Box 729. Trenton, NJ 08625-0729

Monmouth County Prosecutor's Office
132 Jerseyville Ave, Freehold, NJ 07728

City of Asbury Park & The Asbury Park Police Department
One Municipal Plaza, Asbury Park, NJ 07712

The Township of Ocean & The Ocean Township Police (OTPD)
 399 Monmouth Rd, Oakhurst, NJ 07755

Monmouth County Prosecutor Christopher Grammiccionni
132 Jerseyville Ave, Freehold, NJ 07728

Acting Monmouth County Prosecutor Laura Linski
132 Jerseyville Ave, Freehold, NJ 07728

Prosecutor Thomas Fichter
132 Jerseyville Ave, Freehold, NJ 07728

Prosecutor Monica do Oteiro
132 Jerseyville Ave, Freehold, NJ 07728

Prosecutor Christopher Decker
132 Jerseyville Ave, Freehold, NJ 07728

Detective Kayla Santiago
132 Jerseyville Ave, Freehold, NJ 07728

Sergeant Michael Magliozzo
132 Jerseyville Ave, Freehold, NJ 07728

Detective Jason Gold
132 Jerseyville Ave, Freehold, NJ 07728

Detective Joshua Rios
132 Jerseyville Ave, Freehold, NJ 07728

DCP&P Investigator Elizabeth Penson
50 East State Street, 2nd floor PO Box 729 Trenton, NJ  08625-0729

DCP&P Supervisor Lovette Wright
50 East State Street, 2nd floor PO Box 729 Trenton, NJ  08625-0729

Captain Amir Bercovicz
One Municipal Plaza Asbury Park, NJ 07712

Officer Alon Bercovicz
399 Monmouth Rd, Oakhurst, NJ 07755

Unnamed Supervisor Badge #134
(MCPO)
32 Jerseyville Ave, Freehold, NJ 07728

Donna Vieiro
One Municipal Plaza Asbury Park, NJ 07712

Sergeant Steven Ramseur
One Municipal Plaza Asbury Park, NJ 07712

Officer Michael
(First name unknown)
One Municipal Plaza Asbury Park, NJ 07712

Officer Michael Griswald
One Municipal Plaza Asbury Park, NJ 07712

Mr. Cadet (APPD)
(First name unknown)
One Municipal Plaza Asbury Park, NJ 07712

Officer Michael Spallina
One Municipal Plaza Asbury Park, NJ 07712

Officer McDonaugh
One Municipal Plaza Asbury Park, NJ 07712

Officer Bomenblit
One Municipal Plaza Asbury Park, NJ 07712

6

John Perrone, Esq.
464 Broadway, Long Branch, NJ 07740

Edward C. Bertuccio, Esq.
2681 QUAKERBRIDGE RD
Hamilton Township, NJ 08619

KALAVRUZOS, MUMOLA, HARTMAN, LENTO & DUFF LLC &D Law Firm
2681 Quakerbridge Road
Hamilton Township, NJ 08619

John Dow Police Officers 1-10 & ABC Entities
(Fictitious Individuals and entities)

## JURISDICTION AND VENUE

1.      This Court has subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343.

2.      Plaintiff brings this action to redress the deprivation of Plaintiff's constitutional rights under the First, Fourth, Sixth, and Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983, 1985, and 1988, which provide for attorneys' fees in civil rights claims.

3.      This Court also has supplemental jurisdiction over Plaintiff's related state claims pursuant to 28 U.S.C. § 1367(a), as such claims are so related to Plaintiff's federal claims that they form part of the same case or controversy and arise out of a common nucleus of operative fact.

4.      Venue is proper in this district pursuant to 28 U.S.C. 1391(b)(1) & (b)(2), as all Defendants reside or resided in this district and the events giving rise to the claims occurred in this district.

## PREFACE TO LITIGATION

5.     At all times plaintiff was illiterate of the law not able to read, write or speak its language. This made plaintiff completely dependent on the actors within the legal system to act lawfully. When they did not act lawfully and chose to act unlawfully to cause a single irreparable injury to plaintiff's person despite knowing he was innocent and others were harming his child, plaintiff was helpless.

6.     Sir William Blackstone's Maxim carried over to our legal system from English Common Law states the importance of protecting the innocent within our legal system from prosecution "for the law holds, that it is better that ten guilty persons escape, than that one innocent suffer." Our founding father Benjamin Franklin expanded on this critical mandate saying "That it is better 100 guilty Persons should escape, than that one innocent Person should suffer.." in his letter to Benjamin Vaughn in 1785 maintained by the National Archives. The compelling issue behind these maxims is that when the innocent can be prosecuted it is tyranny.

7.     Many of the defendants listed in this civil action were the very people that plaintiff went running to for help when he knew the welfare of his only child was being endangered. Instead of addressing those doing harm to his child, defendants instead aided those abusing his daughter, concealed the child abuse and used the situation as an opportunity to target plaintiff.

8.     Since his prosecution plaintiff has done everything humanly possible to slowly eliminate his illiteracy of the law. He has completed one year of law school and his plan is to continue his legal education despite obstacles.

8

## STANDARD OF REVIEW FOR PRO SE LITIGANTS

9.      Courts must liberally construe pleadings that are filed *pro se. Erickson v. Pardus*, 551 U.S. 89, 94 (2007)

(quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Thus, "a *pro se* complaint, however inartfully pleaded,

must be held to 'less stringent standards than formal pleadings drafted by lawyers.' " *Id.* (internal quotation marks

omitted). "Court personnel reviewing *pro se* pleadings are charged with the responsibility of deciphering why the

submission was filed, what the litigant is seeking, and what claims she may be making." *See Higgs v. Atty. Gen.*

*of the U.S.*, 655 F.3d 333, 339-40 (3d Cir. 2011) (quoting Jonathan D. Rosenbloom, *Exploring Methods to*

*Improve Management and Fairness in Pro Se Cases: A Study of the Pro Se Docket in the Southern District of*

*New York*, 30 Fordham Urb. L.J. 305, 308 (2002)).

## STATUTE OF LIMITATIONS

10.     For any defendant raising a statute of limitation defense, plaintiff asserts that all parties actively

cooperated and worked hand-in-glove to deprive plaintiff of his civil rights. Plaintiff asserts that all parties acted

under the color of state law as In fact the state actors could not have accomplished their goal of malicious

prosecution without the very real and ongoing cooperation of other defendants. Furthermore, Malicious

Prosecution cannot be a cause of action in New Jersey until the criminal charges are disposed of. The case was

not disposed until September 20, 2021.

11.     Plaintiff asserts that the harm of each defendant's action was ongoing until the case was dismissed. The

Trinity Church v. Lawson-Bell, 394 N.J. Super. 159  New Jersey Superior Court ruled that a contractual statute

of limitations clause was still subject to equitable tolling, though the requirements were "exacting." It cited the

general recognition in New Jersey courts that equitable tolling may apply where a defendant's misconduct

caused a plaintiff to delay filing suit.

9

12.    Likewise when factors such as those listed are missing, is when equitable tolling is not to be allowed. Rodriguez v. Singleton, 2023 N.J. Super. Unpub. LEXIS 1932 In Rodriguez v. Singleton, the New Jersey Superior Court, Appellate Division affirmed the dismissal of a personal injury lawsuit filed outside the two-year statute of limitations. The court found equitable tolling did not apply because plaintiff failed to show defendant misconduct, extraordinary circumstances preventing timely filing, or mistaken filing in the wrong forum.

13.    Counter analogous to *Rodriguez v. Singleton* In this case due to the actions of each defendant, plaintiff was caught in a trap of their collective design. No matter which way he turned, no matter how much money he spent for counsel or what authority he pleaded for help to, plaintiff was unable to understand the laws being broken, misrepresented and misapplied to him and therefore was paralyzed in asserting his rights through any avenue by way of a functional output from all defendant's actions. More to this point of extraordinary circumstances and deceit being the defining line to support tolling, Joseph R. McFadden v. Pentagon Fed. Credit Union, 2023 N.J. Super. Unpub. LEXIS 1298 In Joseph R. McFadden v. Pentagon Fed. Credit Union, the New Jersey Superior Court, Appellate Division held plaintiff's lawsuit was barred by the six-year statute of limitations. It rejected plaintiff's equitable tolling arguments, finding no evidence of trickery by defendant or extraordinary circumstances warranting tolling.

14.    Therefore, "[an SOL] may be equitably tolled [only] under very limited circumstances . . . ." *Barron v. Gersten, 472 N.J. Super. 572, 577, 277 A.3d 502 (App. Div. 2022)* (quoting *F.H.U. v. A.C.U. 427 N.J. Super. 354, 379, 48 A.3d 1130 (App. Div. 2012)*). "Absent a showing of intentional inducement or trickery by a defendant, [equitable tolling] . . . should be applied sparingly and only in the rare situation where it is demanded by sound legal principles and in the interest of justice." *Ibid.* (quoting *Binder v. Price & Co., LLP, 393 N.J. Super. 304, 313, 923 A.2d 293 (App. Div. 2007)* (quoting *v. State, 347 N.J. Super. 11, 31, 788 A.2d 867 (App. Div. 2002)*)).

15.    The evident intention of the section was to apply the limitation when an adverse interest was asserted. In

10

such a case it was only reasonable that a statute of limitation should exist. To apply it to an interest concealed, and of which the assignee could have no knowledge, would be unreasonable. *Bailey v. Glover*, 88 U.S. 342 at 11.

16.    Plaintiff did not discover the true meaning of the Division of Child Protection and Permanency's investigative finding until well after the case was dismissed. Plaintiff asserts that It was at this time that it became clear that although plaintiff knew in his gut that the police, prosecutors, judges and attorneys were wrong, plaintiff now (after the case was dismissed) understood that the view of the law confirmed his feelings.

17.    Plaintiff did not discover the conspiracy in the Ocean Township Police Report by Defendant Officer Alon Bercovicz (including Defendants Angela Perry, Officer Steven Ramseur and Officer McDonaugh because it was withheld unlawfully by the defendants during discovery. Similarly, plaintiff never received the bodycam video recording that was confirmed to exist of the initial interview of S.T. Lastly, Defendant Officers Ramseur and McDonaugh omit from their police report that they threatened plaintiff and his mothers (as part of the conspiracy). These unlawful actions by defendants delayed the plaintiff's knowledge and therefore the filing.

18.    The New Jersey Supreme Court ruled in Grunwald v. Bronkesh_131 N.J. 483 that legal malpractice has a six year statute of limitations and expressed that it did not want to give "Scoundrels" in the legal system an incentive to further conceal facts by allowing the accrual and statute of limitations to run from the date of the injury. Rather when the plaintiff has knowledge of injury and fault is when the accrual and statute of limitations begin: "The discovery-rule elements, knowledge of injury and of fault, were satisfied ….. At that time the cause of actionaccrued and the six-year limitations period began to run" Gunwald at 9.

19.    The New Jersey Supreme Court states further "Without the discovery rule, the limitations period would run from the occurrence of the negligent act. Therefore, a scoundrel would have an incentive to conceal material facts from or to misrepresent those facts to the client so that a malpractice claim would be time-barred" Id at 7. District courts have also applied the Discovery Rule to Personal Injury Claims: "The Court concluded that the

11

"discovery rule" applied to the case and held that the cause of action for personal injury did not accrue, and the two-year statute of limitations did not begin to run, until the injured party discovered, or by an exercise of reasonable diligence and intelligence should have discovered, that she had a basis for an actionable claim. The doctrine applies in an appropriate case whenever equity and justice call for its application." Keezer v. Taxation Div. Director, 9 N.J. Tax 264 (Tax 1987) District courts have also applied the Discovery Rule to Personal Injury Claims: "The Court concluded that the "discovery rule" applied to the case and held that the cause of action for personal injury did not accrue, and the two-year statute of limitations did not begin to run, until the injured party discovered, or by an exercise of reasonable diligence and intelligence should have discovered, that she had a basis for an actionable claim. The doctrine applies in an appropriate case whenever equity and justice call for its application." Keezer v. Taxation Div. Director, 9 N.J. Tax 264 (Tax 1987)

20.   The Laches Doctrine would not be a defense for defendants as there is no prejudice against defendants. As explained in the unpublished opion of In re Estate of Semple, Docket No. A-3415-21 (N.J. App. Div. Jul. 31, 2024) "Whether laches should be applied depends upon the facts of the particular case and is a matter within the sound discretion of the trial court." Fox v. Millman, 210 N.J. 401, 418 (2012). "The doctrine of laches applies when there is neglect for an unreasonable and unexplained length of time, under circumstances permitting diligence, to do what in law should have been done." Zilberberg v. Bd. of Trs., Tchrs.' Pension & Annuity Fund, 468 N.J. Super. 504, 513 (App. Div. 2021). "[L]aches is the failure to assert a right within a reasonable time resulting in prejudice to the opposing side . . . . The key factors are the length of delay, reasons for delay, and change of position by either party during the delay." Clarke v. Clarke ex rel. Costine, 359 N.J. Super. 562, 570 (App. Div. 2003). "Laches may only be enforced when the delaying party had sufficient opportunity to assert the right in the proper forum and the prejudiced party acted in good faith believing that the right had been abandoned." Knorr v. Smeal, 178 N.J. 169, 181 (2003). The time requirements for laches to apply "are not fixed but are characteristically flexible." Lavin v. Bd. of Educ. of Hackensack, 90 N.J. 145, 151 (1982). Id. at 7-8.

21.    Affirming the trial court in denying plaintiff's motion based the doctrine of laches: "By the time plaintiff filed this motion, the case had been dismissed for nearly six years, the closing attorney had died, his firm had been dissolved for nearly three years, and none of the other attorneys contacted had a copy of the file. The prejudice is palpable, and plaintiffs delay is unexplained." Id. at *10. Counter-analogous to In re Semple, this complaint was filed only a few years after representation ended with all the attorneys, the law firms and the attorneys are still practicing and in existence, and attorneys are required to keep the case file for a period of seven years.

## FAMILY HISTORY LEADING TO TRANSFER OF CUSTODY OF S.T. IN 2010

22 .    S.T. was born to her biological parents Angela Rachel Perry and Randy Thompson in 2003 in Sarasota Florida. Plaintiff has lived in New Jersey the entire time. Perry lived in Florida at the time but later moved to New Jersey. Perry has a history of being mentally unstable and attempted suicide even leaving a suicide-note addressed to the then 7-year old daughter S.T. as is detailed in the police report available to the public. Both have significant substance use histories.

23.    An unplanned pregnancy that was forced on plaintiff through deception during a visit by Perry to New Jersey. Plaintiff none-the-less committed to becoming the best man and father he could be. This included completing his Associates Degree at Brookdale Community College and forming a relationship with his daughter S.T., which at the time required abandonment of recreational use of any substances. Plaintiff reoriented his entire life to be the best father he could be.

24.    Plaintiff was met with immediate resistance to exercising his most basic rights as a parent by the mother Angela Perry, including but not limited to, preventing him from seeing his daughter during the most crucial years

13

of bonding; preventing communication; preventing his family members from contact and visitation; and hiding information about S.T. from plaintiff.

25.     Perry also endangered the welfare of S.T.by allowing her then boyfriend Timothy Turcotte continued access to her home and allowing him to live with her. This is despite multiple police reports indicating that Timothy Turcotte was actively using drugs and committing crimes and then stealing her car with S.T. in the home. It is believed that many other police reports involving Timothy Turcotte and a "stolen red honda" was Perry's car, not just the police complaint that Perry signed in 2007.

26.     As Plaintiff continued to petition the courts to force Perry to end her unlawful blockade against Thompson, S.T. was also experiencing excessive absences from school - due to Perry's alienation efforts. S.T. missed approximately 150 days of school over two years.

27.     During one brief visitation that the court ordered, Plaintiff noticed that S.T.'s teeth were rotten, and she had a white discoloration all over her skin. Plaintiff's visitation then had to be spent addressing S.T.'s cavities and the skin fungus that had covered most of her torso. Plaintiff came to find that Perry had never brought S.T. to the dentist in her life, nor did she bring her to a doctor when needed as in the case of the skin fungus.

28.     When Perry eloped with their child (S.T.) during a scheduled visitation with plaintiff, three police departments in two different states were activated to locate her. It was approximately during this same time that the Sarasota School District pressed charges on Perry for extreme truancy issuing a warrant for Angela Perry.

29.     Perry remained defiant and in violation of multiple court orders, and along with her relatives, continued blocking Thompson from communication and pertinent information about his daughter. Plaintiff's only avenue of checking on his daughter was to ask police to conduct welfare checks.

30.     In 2010 the Sarasota Family Court (available for initial disclosures) recognized the gravity of these issues and stated:

14

*"Based upon* ▮▮▮▮ *'s continued absences from school, the lack of medical and dental care she was receiving while in the care of her Mother, ANGELA PERRY, the Court finds that it would be in the best interest of the child to reside with the Father, RANDY THOMPSON, 100% of the time."*

The court also recognized in the same order, the evasiveness of Ms. Perry towards its proceedings:

*"The Court noted for the record that at no time prior to the trial date, did ANGELA PERRY participate in these proceedings."*

In plaintiff's custody there followed an approximate (8) year period of stability where S.T. was available, accessible and visible to all family members and members of the community. S.T. thrived not only in school but in her family and personal relationships, as well as her extracurricular activities.

31.    S.T. was always encouraged to call her relatives on the Perry side of the family and they were welcomed to visit her. S.T.'s relationship with her father, flourished as did her relationship with her Paternal Grandmother. S.T. had many friends, especially the girl next door, J.L.   S.T. also excelled in her extracurricular activities including her sailing lessons, acting lessons, singing & piano lessons and figure skating. S.T. received perfect attendance awards at school and even published her own letter to the editor in the Asbury Park Press (available at initial disclosures) at the urging of her father.

**MOTHER'S CHAOTIC REENTRY INTO S.T.'s LIFE AND PREFACE TO ACCUSATIONS**

32.    Following her suicide attempt, Perry relocated to New Jersey. Despite plaintiff's objections to Judge Henry "Hank" Butehorn, that Perry still had an open warrant for her arrest for the truancy, EXHIBIT A he allowed her first supervised visitation, then unsupervised visitation under successive family court orders.

15

33.    Perry's chaotic reentry into their daughter's life was hallmarked with overt attempts at sexualization of S.T. Specifically, Perry would reference how S.T.'s "boobs" had changed so much, and often speak about "what boys would do if they got ahold of her" to plaintiff's dismay and would cause him to plead with her not to push S.T. to have sex before she is ready or overtly sexualize her. This behavior was also witnessed by Grace Rotundo.

34.    In 2017 S.T. had been dating H.T. (son of Tatiana Burgos). While they dated for some time, plaintiff welcomed H.T. into the home under the condition that he had to be picked up by 11:00 p.m. as he could not sleep over and S.T. could not stay over his home.

35.    Despite this, on several occasions Tatiana Burgos dropped off her son H.T. and never picked him up. Plaintiff would have to drive H.T. home when Tatiana Burgos was nowhere to be found and would not answer her phone. One time was in the bitter cold of winter so plaintiff was forced again to drive her son home.

36.    Near mid-December of 2017 S.T. told plaintiff that H.T. was mistreating her and stated that she ended the relationship – a statement confirmed by friends of S.T., in their words the relationship was very "controlling."

37.    S.T. also began engaging in a pattern of lying and deceit which got her grounded quite often. Plaintiff would ask her where she was and for reasons unknown to him, S.T. would state a location other than what was shown on the "find my iphone" app. With this information S.T. would regularly get herself in trouble for lying and be grounded.

38.    S.T.'s mother Angela Perry had seemingly disappeared. Perry had not scheduled any visitation or pickups to see S.T. in some time, prompting Thompson to ask on February 26, 2018 "when was the last time you saw your mother?" to which S.T. responded "I don't know." Soon after this date, plaintiff along with his long-time girlfriend Jeana Sager, plaintiff's mother Grace Rotundo and S.T. were going to walk down to the Asbury Park Boardwalk. S.T. stated that she was going to go ahead of them to meet her girlfriend. When plaintiff and the others arrived, S.T. walked up with Tatiana Burgos and H.T.. Tatiana was also holding another child. Plaintiff

16

asked Tatiana Burgos if S.T. and H.T. were dating again to which Burgos responded "not at all, we just happened to be here" a point that would become very relevant a short time later.

## CONSPIRACY ORIGINS:

## PLAINTIFF DISCOVERS CRIMINAL ACTIVITY AND CHILD ABUSE INVOLVING HIS DAUGHTER PROMPTING FALSE ALLEGATIONS

39.    In April of 2018, S.T. stated that she would be visiting her mother for her weekend visits with one notable exception, they did not need plaintiff to drop off S.T.at the residence where Angela Perry the mother lived. Plaintiff grew concerned as he was increasingly (again) prevented from communicating with his daughter or knowing her whereabouts during the mother's visitation, a violation of multiple court orders. Plaintiff would later learn that the mother had become homeless and was trespassing in an unoccupied home, squatting illegally and involving their daughter S.T. in the criminal activity, which prompted S.T.to lie in order to conceal their squatting and criminal trespass.

40.    Additionally, Defendant Perry and Defendant Burgos hid arranged sleepovers between S.T. who was 14 at the time and the daughter's boyfriend H.T., exploiting normal teenage impulses and grooming the daughter's trust in order to alienate plaintiff as the father. S.T. was caught in a lie when she concealed that her and Defendant Perry were squatting, when plaintiff questioned her about where she goes for visitation.  S.T. became defensive and threatened "I'll go live with my mom!" Then S.T. asked "What would it take for me to live with my mom?" to which plaintiff responded "because of everything that happened with your mom it would take something horrible to happen" then he explained that running away to live with her mother is not a way to get out of trouble. Shortly after, S.T made a false accusation to school counselors that plaintiff had "verbally abused" her – a functional output of Defendant's Perry and Burgos' efforts to alienate and separate plaintiff from his child by

17

abusing her and sexualizing her. The school contacted The New Jersey Division of Child Protection & Permanency (DCP&P) on May 9, 2018.

41.    Plaintiff contacted Defendant Angela Perry on April 15, 2018 via email asking if she did indeed move to the house in question without informing him. Both parents were ordered by the family court to inform the other parent of their addresses in case of emergencies and so that they know where their daughter will be during parenting time with each parent. Additionally, both parents were told to share information on plans for their childduring their time with the other parent. Defendant Angela Perry responded in emails attempting to both conceal that she is in the home unlawfully and also, she provides the wrong address. When plaintiff states he cannot locate the address given she finally gives the correct address – EXHIBIT B.

42.    Defendant Angela Perry targeted a vacant home owned by a woman with a disability who lived out of state. As detailed in the police report of EXHIBIT C  on page 3, "Angela came to look at the home on April 13, 2018, she brought her belongings into the home without her [the owner's] knowledge." She was told if she wanted to rent the home she would have to sign a lease, pay $5,000 deposit and $2,500 a month rent. Angela Perry did none of that and yet refused to leave the home. Angela Perry's stories as to why she would not leave kept changing from "getting back on her feet from separating from her ex-husband" [she was never married] to "she was not leaving because she has nowhere else to go." Angela Perry was told to leave on May 1, 2028 by the homeowner and police but returned to the property. Ultimately, she was removed from the property by police on May 19, 2018 and told if she returned she would be charged with trespassing – according to the police report.

43.    The police report clearly contradicts the deceptions of Defendant Angela Perry's emails to plaintiff and give a clear picture of the pattern of lies and deceit that Angela Perry made the minor child (plaintiff's daughter) a part of.

44.    On May 11, 2018 plaintiff called for a welfare check on his daughter because he again was not aware of her whereabouts. It was after this welfare check that he learned that his daughter slept over a "friend's house." Plaintiff contacted some of S.T.'s friends to see where she slept which is when he was told that his daughter "slept at her boyfriend's house" and that the relationship which was hidden along with the sleepovers was with H.T. the son of Defendant Tatiana Burgos.

45.    The next morning on May 12, 2018, Plaintiff was able to get in touch with Defendant Tatiana Burgos after learning that S.T. had a sleepover at her house with her son H.T. during the mother's visitation. Plaintiff asked Defendant Burgos to let him speak with his daughter but Burgos refused.

46.    After Defendant Tatiana Burgos repeatedly refused to allow plaintiff to speak with his daughter, he became alarmed and said he would contact police if he could not speak with S.T. to make sure she was ok and begin to understand what was going on. Defendant Burgos violently reacted by screaming "I'll put a restraining on you!" **This is a critical point as Defendants Perry and Burgos are on record running around to several police departments making a number of false allegations with S.T. and later H.T..** This includes following Defendant Burgos' threat, she and plaintiff's daughter (S.T.) followed through by walking into the Atlantic Highlands Police Department and attempted to file false allegation there .

47.    According to her own sworn statement, Defendnat Burgos was refused by the first police departments she contacted seeking her restraining order. The Second Police Department (Atlantic Highlands) also refused her request for a restraining order. The group did not stop as a collective whole in its attempts to make false accusations and to find willing law enforcement who would go along with them.

48.     After several failed attempt to make a wide variety of false allegations, the group successfully filed their retaliatory complaint with codefendants: Asbury Park Defendants and the Monmouth County Prosecutors – resulting in the stated goal, Defendant Burgos' restraining order against the plaintiff. According to defendant Burgos' sworn statement she explicitly provided co-defendants Monmouth County Prosecutor Investigators access to her minor child H.T. to reinforce the false allegation.

49.     Both The City of Asbury Park and the Monmouth County Prosecutor's Office have a prior history of empowering abusers to harm plaintiff's family while preventing plaintiff from protecting his family. In the years prior plaintiff signed a complaint against two juveniles to protect his daughter S.T. but Officer Stephen Love stated one of the minors is "the son of a cop" and plaintiff said that shouldn't matter to which Officer Love responded, "sure it doesn't." When the case never moved forward and his outreaches to Detective April Bird were ignored, he contacted city leadership. Plaintiff was given a complex web of lies from the senior detectives about the status of the case which had been unlawfully closed by Detective Bird when she lied and stated that plaintiff wanted it closed – to protect the cop's son and prevent plaintiff from protecting his daughter. Plaintiff detailed this publicly at the City of Asbury Park Council Meeting on April 25, 2018…which he believes humiliated the Asbury Park Police, The City of Asbury Park and the Monmouth County Prosecutor's Office, just shortly before those defendants lashed out against him as described in this lawsuit. An investigation into the actions of Asbury Park Detective April Bird were **SUSTAINED** that she violated departmental policies. Plaintiff believes that his longstanding and well-known activism and role in various coalitions to hold the criminal justice system and government accountable are the cause of retaliatory acts such as these.

50.     Tatiana Burgos in her sworn and notarized response EXHIBIT D to the original complaint, alleging the same exact actions by Burgos, in Plaintiff's view - and a reasonable juror may also conclude that -Burgos did the following in her sworn statement:

- Confirmed that she made allegations against plaintiff after threatening to do so;

20

- Admitted to having the 14 year old S.T. at her home for a sleepover for her son H.T.;

- Did NOT deny lying to plaintiff about her knowledge of his daughter S.T. and her son H.T. being in a relationship when plaintiff spoke to her at the Asbury Park Boardwalk – meaning her non-denial is an admission.

- Admits to working and communicating directly with the Monmouth County Prosecutors to provide them access to her son H.T. to provide information on an assault that was found not to have happened.

- Admits that she made arrangements with Angela Perry to have the sleepovers.

- Admits that she had no contact with plaintiff regarding the inappropriate sleepovers.

51.     It should be noted that it did not take even one day from when Tatiana Burgos screamed "I'll put a restraining order on you!" for there to be a restraining order placed on the plaintiff – coming from the group that had conspired to alienate the plaintiff from his child and maliciously prosecute him.

52.     The pattern is clear, each time plaintiff discovers wrongdoing he was prevented from accessing his daughter and allegations escalated. Following the incident, a complaint summons charging Tatiana Burgos with Harassment was issued by The City of Asbury Park EXHIBIT E. Plaintiff continued to diligently follow up with the courts, his lawyers and Prosecutor Fichter regarding the status of the harassment charge but was always stymied. He would not discover until after the close of the case that Defendant Prosecutor Fichter discharged the harassment complaint into legal limbo inside of the grand jury room – breaking protocol to help the false accuser and to harm the plaintiff. DCP&P later cleared plaintiff of all allegations of sexual assault and abuse issuing a finding of "not established." There are four categories of investigative findings for DCP&P: Established, Substantiated, Not Established and Unfounded. The first two mean the child was abused (including any sexual assault claims) and the latter two (not established + unfounded) mean that the child was not abused or sexually assaulted.

21

53.   This explanation is found in the Department of Children and Families own regulatory scheme – relevant

portion in bold:

> (d) A finding of either established or substantiated shall constitute a determination by the Department
> that a child is an abused or neglected child pursuant to N.J.S.A. 9:6–8.21. **A finding of either not
> established or unfounded shall constitute a determination by the Department that a child is not an
> abused or neglected child** pursuant to N.J.S.A. 9:6–8.21.
>
> [N.J.A.C. 3A:10-7.3(d).]
>
> The definition of an "abused or neglected child" pursuant to N.J.S.A. 9:6–8.21 expressly states
> "commits or allows to be committed an act of sexual abuse against the child" see EXHIBIT F.

Further the New Jersey Appellate Court reaffirmed that "not established" means that a child was not abused

**"Thus, it is not inconsistent to find that a child was placed at risk of harm and yet was not abused or

neglected."** Dep't of Children & Families v. D.B. 443 N.J. Super. 431 *; 129 A.3d 332 **; 2015 N.J. Super.

LEXIS 173 *** This is affirmed by The New Jersey Supreme Court ruled that a not established finding does not

find any child abuse (including sexual assault) despite the regulation stating that "some harm, or risk of harm"

was found: *"In so holding, it again must be noted that the "not established" finding dies not reach any conclusion

that child abuse occurred, unlike an "established" finding."* S.C. v. New Jersey Department of Children and

Families 242 N.J. 201 *; 231 A.3d 576 at 40. Also *"The department emphasized that 'no conclusion has been

drawn that S.C. did anything harmful to her children..."* *Id.* At 18.

54. Plaintiff spoke with DCP&P Defendant Investigator Elizabeth Pinson and Monmouth County Prosecutor's

Office Defendant Michael Magliazzo several times a week sometimes in consecutive days. Each time

reiterating the alarmingly dangerous information that plaintiff had learned of in addition to the history of abuse

by Defendant Perry, the sexualization of the 14 year old S.T., the concealed sleepovers & the concealed

relationship with H.T. by two adults (Defendants Perry and Burgos) as well as the violations of court orders, the

threat of a false allegation and the belief that the minor child was being involved in criminal activity and/or

exploited. When Plaintiff could not get straight answers, or any action, he hired Defendant Attorney John

Perrone (pre-indictment).

55.     When plaintiff continually asked Defendant Perrone about what action the investigators, police and

prosecutors are taking against Defendant Perry and Defendant Burgos Defendant Perrone stated "the prosecutor

is worried about the mother." When asked "why is the prosecutor worried about the mother?" Defendant

Perrone replied "because she is an unfit mother" this indicated to plaintiff that both Defendant Prosecutor

Thomas Fichter and Defendant John Perrone knew that S.T. was being abused and exposed to harm. Instead of

protecting plaintiff and his daughter S.T. he instead constantly spoke of how highly felt about Prosecutor

Fichter and what a good relationship they had.

56.     When at the direction of Defendant Attorney John Perrone, plaintiff was forced to surrender to the

Monmouth County Prosecutor's Satellite Office in Asbury Park and was redirected to the Asbury Park Police

Station, he was processed and charged with a complaint summons alleging inappropriate contact. Later

Prosecutor Thomas Fichter presented the allegation to a Monmouth County Grand Jury then claimed the Grand

Jury legally returned two indictments for: 1. Aggravated Criminal Sexual Contact and 2. Endangering the

Welfare of a Child by a Caretaker. Plaintiff repeatedly asked if the records were the full and accurate records

meaning the originals and his defendant attorneys, John Perrone, Ted Bertuccio and KMHL&D Law affirmed

repeatedly that they were True Bill Indictments and that the records reflected full discovery. The two charges

meant that Plaintiff was facing 15 years in prison and lifetime Meghan's Law notification. Though it was

Plaintiff's belief that if convicted, he would never survive the 15 years and this was in fact a possible death

sentence. Plaintiff would later discover that there is **NO LEGAL TRUE BILL of INDICTMENT.** What was

presented is a violation of Rules of the Court 3:6-4-Foreperson; Deputy Foreperson and 3:7-3-Nature and

Contents of Indictment or Accusation, both of which mandate that an indictment requires the endorsement of

the grand jury foreperson's signature and the latter requires the indictment to state it is a "true bill". The false

indictment's signature line for the grand jury foreman is left blank. The signature is missing from the entire

document as are the words "True Bill." This is not a "Public File" discrepancy that is tolerated as noted in State

v. Lombardo, 18 N.J. Super. 511, 87 A.2d 375 (County Ct. 1952) or U.S. v. Curls, 219 Fed. Appx. 746 (2007).

**PLAINTIFF WAS NOT INDICTED BUT WAS PROSECUTED FOR FOUR YEARS.**

57.     In addition to speaking with Defendant Elizabeth Pinson of DCP&P and Defendant Magliazzo of the

Monmouth County Prosecutor's Office plaintiff also had several 911 calls alerting law enforcement about the

suspected child abuse, sexualization of his child by the two defendant women, the secret relationship with H.T.

hidden by the defendant women, the actions by Defendant Perry and S.T. to conceal their presence at the home

in Wanamassa, the belief that S.T. was being involved in criminal activity and the threats to make false claims

to "put a restraining order on you!" by Defendant Burgos when plaintiff uncovered this, Also plaintiff ensured

that law enforcement knew of the previous history of abuse, violation of court orders and other occurrences

each time he spoke with law enforcement, child services or called 911. Plaintiff spoke with the Monmouth

County Prosecutor's Office Investigator Michael Maggliozzo on a daily basis, with Elizabeth Pinson on a daily

basis and made several calls to police. The 911 calls and subsequent bodycam videos were all embargoed by the

prosecutor but never disclosed via discovery. After the case plaintiff was told they "no longer exist."

Before any law enforcement actors took negative actions against plaintiff they were all alerted to the following

facts which plaintiff asserts a reasonable juror could also find that:

    A. Defendant Perry was trespassing in the vacant building with the minor child S.T. and concealing their

    presence there.

    B. Defendant Perry had a documented history of abuse with S.T. and was currently violating several

    court orders.

    C. Defendant Perry and Burgos were concealing a relationship with Burgos' son H.T. and arraigning

    secret sleepovers for him and S.T. and the minor children were also concealing the relationship and

    sleepovers.

24

D. The plaintiff had just been threatened in retaliation for uncovering some of the above and the threat was to go and get a restraining order against him.

E. The above equates to criminally endangering the welfare of a child, filing of false reports, conspiracy, false imprisonment, intentional infliction of emotional distress and malicious prosecution.

F. All of the above is shown in and also provable by government records in the state's possession.

58.    Despite this knowledge law enforcement deliberately ignored the child abuse & endangerment and false reporting of the accusers and deliberately denied plaintiff's innocence.

59.    Police deliberately concealed from plaintiff the fact that there were multiple calls to police from other persons about Perry trespassing on the property. These calls originated from Ken Perry, her father as well as the homeowner. The welfare check from Ken Perry on his daughter Angela Perry cites in the police report that he fears the situation "will get physical" because he expects Angela Perry to get kicked off the property. This call happened on May 1, 2018 before any of the DCP&P or Police Activity between Perry and plaintiff. It was since that date that the Ocean Township Police knew that Perry was trespassing on the property.  OTPD should have at minimum cited the housing issue from the prior call to plaintiff when he called for a welfare check. Even more egregious, is that on later calls it becomes an issue of the homeowner Penelope Toomin trying to get the trespasser Angela Perry out of her home, meanwhile the police know that a minor child S.T. is at the home.

60.    On May 13, 2018 plaintiff called police as his 14 year old daughter had not been dropped off as per court order. Responding were Captain Amir Bercovicz and Officers Griswald, Bomenblit and Michael. Defendant Amir Bercovicz immediately stated in front of plaintiff and his mother Grace Rotundo "We know about all the calls, we know everything that's going on…..its not some big conspiracy against you" Defendant Bercovicz then stated "The sex crime complaint looked retaliatory." None of the officers tell plaintiff about the trespassing. In fact it was Defendant Officer Griswald (standing there with Defendant Bercovicz) who just

hours earlier met with Defendant Perry and S.T. Defendant Griswald's report states nothing the narrative about any consideration of plaintiff's communications listed in subparagraphs A – F above. Plaintiff who is unaware of the report at the time immediately tells Jeana Sager about Defendant Bercovic's comments that he knows the report is a false allegation because it at least gave plaintiff some hope that law enforcement was going to address it – especially as he reported to this same police department that he was threatened by defendant Burgos that they were going to "get a restraining order on me" just one day earlier.

61.    On May14, 2018 plaintiff called for a welfare check on his daughter as he and his entire family knew something was wrong and knew that Angela Rachel Perry, Tatiana Burgos and S.T. had lied about the relationship with H.T. in addition to Angela Rachel Perry and S.T. lying about the residence in Wanamassa. Calling the police is protected activity under the First Amendment of the Constitution of the United States. As it turns out their family instincts are aligned with law enforcement reports citing the illegal trespass and ongoing conflict at the Records now reveal that Angela Rachel Perry was trespassing on the property/squatting there unlawfully and involving the minor child S.T. in the unlawful conduct – Defendant Officer Alon Bercovicz **who is believed to be the blood brother of Asbury Park Defendant Officer Amir Bercovicz,** responded to Angela Perry's location and Defendant Steve Ramseur and Defendant Officers McDonaugh responded to plaintiff's residence.

62.    In his police report Defendant Officer Alon Bercovicz states clearly that "I further investigated in Spillman…" which is a reference to the Spillman System which provides all of the police reports and activity to the officers utilizing it. Both police departments utilize the Spillman System. Plaintiff asserts and a reasonable juror could conclude, that Officer Bercovicz saw all the other police calls, police reports and police activity which occurred **before** plaintiff was threatened with false accusations led by Angela Perry and Tatiana Burgos who were exercising undue influence over the S.T. And H.T…..or that or that Defendant Officer Bercovicz lied about his investigation – either being in furtherance of the conspiracy. Specifically, it is not reasonable to conclude that Officer Bercovicz's investigation in the Spillman System would not show that Angela Perry was unlawfully staying on the property when a civilian is able to learn that exact information just from asking for

26

the police calls to that address. There is no evidence that he did not suppress plaintiffs stated concerns in subparagraphs A – F above either. Instead of him providing that information to the other officers and the civilian good-faith callers who knew something wrong was happening with S.T. at that address, - Defendant Officer Alon Bercovicz decides to conspire with Defendant Officers Steven Ramser and McDonaugh as well as Defendant Angela Rachel Perry and Defendant Burgos to further harass, intimidate, and deprive plaintiff of his constitutional rights as well as his mother's. Specifically, Defendant Alon Bercovicz records in his own report that he "I further advised Officer McDonaugh to advise Randy to stop requesting welfare checks of S.T. or he will be charged with harassment."

63.     Plaintiff alleges defendant Officers McDonaugh and Ramseur fulfilling their part of the conspiracy as they immediately became aggressive, told plaintiff that he couldn't even speak, took aggressive body postures with their hands on their weapon-belts, threatened arrest and also threatened harassment charges – in effect putting into place extrajudicial restraining order and punishment. As both plaintiff and his mother Grace Rotundo feared for their lives and believed that they were not free to leave due to the threats and aggressions of Defendant Officers Ramseur and McDonaugh and Officer Alon Bercovicz (behind the scenes). Plaintiff asserts that these aggressions would fail the Mendenhall Test -  United States v. Mendenhall 446 U.S. 544 (1980) The test for determining whether a seizure has occurred under the Fourth Amendment is whether, in light of the surrounding circumstances, "a reasonable person would believe he was free to leave." Plaintiff asserts that the actions and words spoken by these defendant officers would shock the conscience of any reasonable person learning of them and were also the direct and proximate cause of harm – intentional infliction of emotional distress.

64.     Neither Defendant Officer McDonaugh or Ramseur at any point informed us of the unlawful activity that plaintiff's 14 year old daughter was being involved in. Nor does plaintiff believe that Defendant Officers Alon Bercovicz, Steven Ramseur or McDonaugh ever complied with the mandatory reporter law which mandates that any person knowing if abuse or neglect is occurring (which can be debauching the morals of a minor) or subjecting them to danger, is mandated to contact the Division of Child Protection & Permanency.

27

65.    Plaintiff filed a complaint regarding Officer Ramseur's threat of violence against him and his mother but believes it was a waste of time. The Monmouth County Prosecutor's Office oversees the Internal Affairs System and the Office of the Attorney General is above them. Neither have shown interest in enacting the most significant reforms to address prosecutorial misconduct or police crime. Plaintiff has met with Attorney Generals previously in addition to their staff and petitioned them directly including while this prosecution was ongoing.

66.    Plaintiff asserts and a reasonable juror could find that Assistant County Prosecutor Thomas Fichter, Head of the Sex Crimes Unit, MCPO:

A.   Deliberately told grand jurors that the allegation was conveyed to DCP&P for corroborative value but did not tell them the outcome of that investigation – that the alleged victim was not abused or sexually assaulted. This practice is expressly prohibited by the New Jersey Supreme Court (*State v. Hogan*).

B.   Suborned Perjury in grand jury by eliciting testimony that he knew was untrue.

C.   Despite deliberate subversion of the grand jury, Defendant Prosecutor Fichter could not produce a True Bill of Indictment and instead presented a FALSE INDICTMENT.

D.   Brady/Giglio/N.J.A.G. Directive No. 2019-6 Violations – disclosed a single police report in discovery in support of the prosecution's narrative but concealed more than a dozen other police reports which showed the illegal actions of the false accusers during the time of the false accusations. These reports would have definitively impeached the credibility of the witnesses.

E.   Never disclosed or violated MCPO policies to make video recordings of victim and witness interviews.

F.   Never disclosed via discovery the "victim" interview video made at the Asbury Park Police Department that plaintiff just learned exists on the week of August 1, 2024.

28

G. Rearranged dates of incidents in order to conceal wrongdoing of false accusers and make defendant look guilty (captured on audio in plaintiff's possession) at motion to dismiss hearing.

H. Lied about the status (said it was dismissed) of a charge of harassment on one of the false accusers (Defendant Tatiana Burgos) who had threatened plaintiff when he uncovered them endangering the welfare of his child (captured on audio in my possession).

67. Assistant County Prosecutor Monica do Oteiro, Director of the Appellate Division, MCPO Submitted falsified statements in a signed response motion to the court in furtherance of the MCPO's attack on the credibility of the DCP&P finding. Specifically Prosecutor do Oteiro in tandem with Prosecutor Fichter lied in stating that DCP&P did not know about the sexual assault allegation. Prosecutor do Oteiro submits deliberately perjured statements as part of the official proceeding of the court stating:

*"what she spoke to DCP&P about was "completely" separate from defendant's sexual contact with her."*

*"As such, the results of the DCP&P investigation do not squarely refute an element of defendant's criminal sexual contact….. because DCP&P was not aware the sexual contact was even occurring."*

- *MCPO Response to Motion to Dismiss Indictment*

68. MCPO Investigative files created by MCPO's own detectives state that they initiated their investigation by calling DCP&P to discuss the sexual assault allegation. The above perjured statements are also factually refuted by responses from MCPO Kayla Santiago in grand jury testimony: Santiago Direct Pg. 5 Lines 21 – 24 "Q: And the case was assigned to you, and you initiated the case by reaching out to a DCP&P worker, to discuss the situation, correct? A: Correct." Santiago Direct Pg. 15 Lines 16-19 "Q: And this information was reported to DCP&P, and later to the police, by S.T. and her mother, correct? A: Yes."

69.    Judge Joseph Oxley abused his power to exclude exculpatory evidence by ignoring the records in possession

of the state, he could have made an in camera review of the DCP&P file but chose not to. Even more egregious

he disregarded a NJ Supreme Court decision which spoke to the ambiguity of "not established" required that

DCPP going forward to determine and declare if the "some evidence" indicating the child was placed at harm

was <u>credible,</u> list it and state <u>which person</u> it was attributed to. The Judge did not know if "some evidence" of

harm was due to Thompson or the accusers. The Judge's order also contains a complete fabrication that defense

wanted psychiatric records to "demonstrate that the victim's mother is not competent to testify" - defense never

stated that. Judge Oxley repeats Prosecutor Do Oteiro's "Completely Separate" false claim regarding the DCP&P

report. Instead of protecting the facts and truth available to him, Judge Oxley ruled on his prejudice against

plaintiff.


70.    Furthermore, the report states that the "investigation was conferenced with Director Thomas Fichter"

meaning he is involved in his investigative/administrative role in the investigation. Each fault and fallacy of the

investigation and its refusal to address those threatening Plaintiff, the fact that S.T. stated in her complaint that

her goal was to go live with her mother just as she threatened previously to plaintiff….these are all knowingly,

purposefully and maliciously done in order to maliciously prosecute Thompson.


71.    Defendant Donna Brazile as the supervisor and Kayla Santiago both sign and submit as evidence an

Investigative Report with falsified information. They attribute a birthdate to plaintiff that is not his birthdate, yet

both certify that the statement is true. It is not clear if the information is attributable against Plaintiff or the

person whose actual birthdate is on the report.


72.    Furthermore, the report states that the "investigation was conferenced with Director Thomas Fichter"

meaning he is involved in his investigative/administrative role in the investigation. Each fault and fallacy of the

investigation and its refusal to address those threatening Plaintiff, the fact that S.T. stated in her complaint that

her goal was to go live with her mother just as she threatened previously to plaintiff….these are all knowingly, purposefully and maliciously done in order to maliciously prosecute Thompson.

73. Defendant Kayla Santiago inserts more false dates into her report to create a timeline of events that never occurred and Defendant Donna Brazile as the supervisor approves it.

## PLAINTIFF HAS CALCULATED 163 SEPARATE ACTIONS TAKEN BY THE COLLECTIVE DEFENDANTS IN FURTHERANCE OF THEIR GOALS TO HARM PLAINTIFF.

74.    Plaintiff asserts that involving the child in unlawful trespass, exploitation of other adults and deceptions would easily meet satisfies the criteria for child abuse. Plaintiff's child was being abused, and law enforcement were FOREWARNED about it. Also, law enforcement knew of additional information that plaintiff did not know at the time (police calls by others before Plaintiff contacted police) and still acted to conceal the child abuse from the biological father and empower the abusers.

## LEGAL BASIS OF CHILD ABUSE

New Jersey Attorney General, New Jersey Department of Children and Families, Monmouth County Prosecutor's Office, City of Asbury Park and the Asbury Park Police Department, Township of Ocean & The Ocean Township Police Department, Monmouth County Prosecutor Christopher Grammiccionni, Assistant Prosecutor Laura Linski, Assistant Prosecutor Thomas Fichter, Assistant Prosecutor Monica Do Oteriro, Assistant Prosecutor Christopher Decker, Detective Kayla Santiago, Sergeant Michael Magliozzo, Detective Jason Gold, Detective Joshua Rios, Investigator Elizabeth Pinson, Supervisor Lovette Wright, Captain Amir Bercovicz, Officer Alon Bercovicz, Unnamed Supervisor Badge #134, City Manager Donna Viero, Sergeant Steven Ramseur, Officer Michael, Officer Michael Griswald, Officer Cadet, Officer Michael Spallina, Officer McDonough, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq., Edward C. Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff, Llc, John Doe Police Officers 1-10 and ABC Entities 1-10.

75.    Plaintiff repeats and realleges all previous paragraphs as if fully incorporated in this section.

76.    Plaintiff includes references to child abuse statutes and related factual allegations to establish the legal context, and level of depravity behind Defendants' unconstitutional and tortious conduct cited here and in the successive Counts of this lawsuit.

77.    Each of the defendants New Jersey Attorney General, New Jersey Department of Children and Families, Monmouth County Prosecutor's Office, City of Asbury Park and the Asbury Park Police Department, Township of Ocean & The Ocean Township Police Department, Monmouth County Prosecutor Christopher Grammiccionni, Assistant Prosecutor Laura Linski, Assistant Prosecutor Thomas Fichter, Assistant Prosecutor Monica Do Oteriro, Assistant Prosecutor Christopher Decker, Detective Kayla Santiago, Sergeant Michael Magliozzo, Detective Jason Gold, Detective Joshua Rios, Investigator Elizabeth Pinson, Supervisor Lovette Wright, Captain Amir Bercovicz, Officer Alon Bercovicz, Unnamed Supervisor Badge #134, City Manager Donna Viero, Sergeant Steven Ramseur, Officer Michael, Officer Michael Griswald, Officer Cadet, Officer Michael Spallina, Officer McDonough, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq., Edward C. Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff, Llc, John Doe Police Officers 1-10 and ABC Entities 1-10., had prior knowledge of these events from their own actions, their own formal

32

reports and/or from direct communications from plaintiff and/or his numerous calls to 911 alerting him giving

defendants **FORESEEABILITY** of the harm to plaintiff's 14 year old daughter S.T.

78.    Title 9 initially looks for actual impairment to the child. However, when there is no evidence of actual

harm, the focus shifts to whether there is a threat of harm. Under those circumstances, "the Division must show

*imminent* danger or a substantial risk of harm to a child by a preponderance of the evidence." *Dep't of Children*

*& Families v. E.D.-O.* 223 N.J. 166 (N.J. 2015) citing *N.J. Dep't of Children & Families v. A.L.,* 213 N.J. 1,

22,59 A. 3d 576 (2013). Moreover,"[c]ourts need not wait to act until a child is actually irreparably impaired by

parental inattention or neglect." *E.D.-O.* citing *In re Guardianship of D.M.H.,* 161 N.J. 365, 383, 736 A. 2d

1261 (1999).

79.    To find abuse or neglect, the parent must "fail[ ] ... to exercise a minimum degree of care." N.J.S.A. 9:6–

8.21(c)(4)(b). The court affirmed that "minimum degree of care" denotes a lesser burden on the actor" and

continued that "...something more than ordinary negligence." The court concluded "Therefore, we believe the

phrase "minimum degree of care" refers to conduct that is grossly or wantonly negligent, but not necessarily

intentional."

80.    The New Jersey Supreme Court in E.D.-O. specified how Grossly or Wantonly Negligence is determined

to establish child abuse and neglect. The concept of willful and wanton misconduct implies that a person has

acted with reckless disregard for the safety of others. *Id* (Quoting) (*Fielder [ v. Stonack],* 141 *N.J.* [101], 123

[661 *A.* 2d 231 (1995) ]; *McLaughlin, supra,* 56 *N.J.* [at] 305 [266 *A.* 2d 284]). Thus, under a wanton and

willful negligence standard, a person is liable for the foreseeable consequences of her actions, regardless of

whether she actually intended to cause injury. *Id* (Quoting) [*G.S., supra,* 157 *N.J.* at 178–79, 723 *A.* 2d 612.]

81.     THE LEGAL TEST defined in *E.D.-O.* by the New Jersey Supreme Court follows: "Where an ordinary

reasonable person would understand that a situation poses dangerous risks and acts without regard for the

potentially serious consequences, the law *840 holds him responsible for the injuries he causes." *Id* at 8. The

Supreme Court of New Jersey reaffirmed that it is the totality of circumstances that is to be weighed in

determining whether to establish or not establish child abuse and neglect "this Court has emphasized that

whether a parent's conduct is negligent or grossly negligent requires an evaluation of the totality of the

circumstances." *Id* at 16.


82.     New Jersey's Mandatory Reporter Rule N.J.S.A. 9:6-8.10 states that anyone having reasonable cause

that child abuse occurred must report it to DCP&P and N.J. Stat 9:6-8.14 states that anyone who fails to do so is

a disorderly person.


83.     "Reasonable cause to believe" as used in N.J.S.A. 9:6-8.10 imposes a requirement that is subject to the

test for objective reasonableness as described in L.A. v. New Jersey Div. of Youth and Family Services, 217

N.J. 311 (2014). "N.J.S.A. 9:6–8.10 is the only statute that addresses the general requirement for reporting to

DYFS and it uses the familiar and well-understood standard of "reasonable cause to believe." We hold that the

phrase "reasonable cause to believe," as used in N.J.S.A. 9:6–8.10, imposes a requirement that is subject to the

test for objective reasonableness. The statutory duty to report child abuse requires a reasonable belief based on

the facts and circumstances known to the person on the scene. **In other words, was it reasonable for the**

**person who must decide whether to report to believe that abuse has occurred, taking into account the**

**background of that person and the facts and circumstances known to him or her at the time?** In each

instance, the reasonableness of forming, or not forming, a belief that an incident of child abuse has occurred

must be tested based on the circumstances of the case. In that review, the judgment and actions of the person on

the scene must survive the test of objective reasonableness." L.A. at 11.


34

84.    The New Jersey Supreme Court ruled that inclusion in the Central Registry for a single lapse in

judgement is reasonable as it refuted appellants claim of unreasonableness. Dep't of Children & Families v.

E.D.-O. 223 N.J. 166 (N.J. 2015) at 2, 16-17

85.    Plaintiff asserts and a reasonable juror may conclude that:

A) Defendant Perry's repeated and prolonged Grossly Negligent actions exceeded a single lapse in

judgement, did cause actual harm in addition to failing to provide a minimum degree of care to S.T. and

exposing her to repeated imminent risk.

B) Also, co-conspirators Defendants New Jersey Attorney General, New Jersey Department of Children

and Families, Monmouth County Prosecutor's Office, City of Asbury Park and the Asbury Park Police

Department, Township of Ocean & The Ocean Township Police Department, Monmouth County

Prosecutor Christopher Grammiccionni, Assistant Prosecutor Laura Linski, Assistant Prosecutor

Thomas Fichter, Assistant Prosecutor Monica Do Oteriro, Assistant Prosecutor Christopher Decker,

Detective Kayla Santiago, Sergeant Michael Magliozzo, Detective Jason Gold, Detective Joshua Rios,

Investigator Elizabeth Pinson, Supervisor Lovette Wright, Captain Amir Bercovicz, Officer Alon

Bercovicz, Unnamed Supervisor Badge #134, City Manager Donna Viero, Sergeant Steven Ramseur,

Officer Michael, Officer Michael Griswald, Officer Cadet, Officer Michael Spallina, Officer

McDonough, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq., Edward C.

35

Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff, Llc, John Doe Police Officers 1-10 and

ABC Entities 1-10., **did contribute to the abuse and knew of the alleged abuse constituting a**

**REASONABLE CAUSE TO BELIEVE that S.T. was in fact being abused thereby VIOLATING**

**THE MANDATORY REPORTER LAW.**  These actions of defendants were the direct and proximate

harm to plaintiff.

## COUNT I

### 42 U.S.C. § 1983 and 1985(3) CONSPIRACY TO VIOLATE CIVIL RIGHTS

New Jersey Attorney General, New Jersey Department of Children and Families, Monmouth County Prosecutor's Office, City of Asbury Park and the Asbury Park Police Department, Township of Ocean & The Ocean Township Police Department, Monmouth County Prosecutor Christopher Grammiccionni, Assistant Prosecutor Laura Linski, Assistant Prosecutor Thomas Fichter, Assistant Prosecutor Monica Do Oteriro, Assistant Prosecutor Christopher Decker, Detective Kayla Santiago, Sergeant Michael Magliozzo, Detective Jason Gold, Detective Joshua Rios, Investigator Elizabeth Pinson, Supervisor Lovette Wright, Captain Amir Bercovicz, Officer Alon Bercovicz, Unnamed Supervisor Badge #134, City Manager Donna Viero, Sergeant Steven Ramseur, Officer Michael, Officer Michael Griswald, Officer Cadet, Officer Michael Spallina, Officer McDonough, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq., Edward C. Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff, Llc, John Doe Police Officers 1-10 and ABC Entities 1-10.

86.    Plaintiff repeats and realleges all previous paragraphs as if fully incorporated in this section.

87.    Defendants New Jersey Attorney General, New Jersey Department of Children and Families, Monmouth County Prosecutor's Office, City of Asbury Park and the Asbury Park Police Department, Township of Ocean & The Ocean Township Police Department, Monmouth County Prosecutor Christopher Grammiccionni, Assistant Prosecutor Laura Linski, Assistant Prosecutor Thomas Fichter, Assistant Prosecutor Monica Do Oteriro, Assistant Prosecutor Christopher Decker, Detective Kayla Santiago, Sergeant Michael Magliozzo, Detective Jason Gold, Detective Joshua Rios, Investigator Elizabeth Pinson, Supervisor Lovette Wright, Captain Amir Bercovicz, Officer Alon Bercovicz, Unnamed Supervisor Badge #134, City Manager Donna Viero, Sergeant Steven Ramseur, Officer Michael, Officer Michael Griswald, Officer Cadet, Officer Michael Spallina, Officer McDonough, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq., Edward C. Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff, Llc, John Doe Police Officers 1-10 and ABC Entities 1-10 did under the color of state law and/or in their individual capacities did conspire and formulate a common plan to violate plaintiff's clearly established constitutional rights under the 1st, 4th, 5th, 6th and 14th Amendments and causing irreparable harm. 1st Amendment: Right to free speech, to call the police and

37

criticize government; 4th Amendment right to be free of unlawful search and seizure, 5th Amendment right to

Grand Jury Protections, 6th Amendment right to speedy trial and 14th Amendment right to family unity, due

process and equal treatment under the law.

88.    The 3rd Circuit's own publication [updated 2023] "Instructions for Civil Rights Claims Under Section

1983" states:

> " A conspiracy is an agreement between two or more people to do something illegal. A  person
>
> who is not a state official acts under color of state law when [he/she] enters into a conspiracy, involving
>
> one or more state officials, to do an act that deprives a person of federal  [constitutional] [statutory]
>
> rights.  To find a conspiracy in this case, you must find that [plaintiff] has proved both of the following
>
> by a preponderance of the evidence:  First: [Defendant] agreed in some manner with [Official Roe
>
> and/or another participant in  the conspiracy with Roe] to do an act that deprived [plaintiff] of
>
> [describe federal constitutional or statutory right]. Second: [Defendant] or a co-conspirator engaged in
>
> at least one act in furtherance of the conspiracy."

89.    There is no absolute legal bar to any type of civilian if engaged in a conspiracy to having "allegations

cast the color of state law over [petitioners] actions" Glover v. Tower, 700 F.2d 556 at 6. This questions has

been raised specifically for private attorneys when a successful claim of conspiracy with state actors is

alleged….a sufficient claim of conspiracy between a private lawyer and state actors….would support the

allegation that the private lawyer acted under the color of state law." Fisher v. Lynch, 531 F. Supp. 2d 1253,

1263 (D. Kan. 2008) (quoting Ellibee v. Fox, 244 F. App'x 839, 843 (10th Cir. 2007)).

90.    The 3rd circuit clearly states that conspiring with a state official to deprive another of constitutional rights

casts that non-state actor under the color of state law. This is backed up by a significant body of law.

91.     Furthermore, citizens and private attorneys have no claim of immunity "…conspiracy allegations 'cast the color of state law' over [petitioners'] actions" Tower v. Glover, 467 U.S. 914 (1984). That defense attorneys have no statutory immunity Ferri v. Ackerman 444 U.S. 193 …. 'The fear that an unsuccessful defense of a criminal charge will lead to a malpractice claim does not conflict with performance of that function. If anything, it provides the same incentive for appointed and retained counsel to perform that function competently."

92.     The defendants had a meeting of the minds where they understood there was a common plan to take action to deprive the plaintiff of his constitutional rights and forcibly separate him from his child. As other actors were engaged some joined the common plan to harm the plaintiff. The actions taken by defendants include the child abuse, sexualization of S.T., the alienation from her father, the systematic suppression of plaintiff's calls for help to stop the child abuse, the false allegations by the false accusers, the systematic false reporting and omissions in their reporting by the law enforcement & Child Protective Services community, intentional legal malpractice by the defense attorneys and law firm, the unlawful seizures by law enforcement, grand jury tampering and false indictments, malicious prosecution, and the prolonged abuse of process resulting in a loss of 48 months of plaintiff's life and the ultimate destruction of his family, his reputation, his finances and his personal well-being. Especially noting the communications and records that were **DISCOVERED** recently:

- Defendant Burgos's Sworn Statement December 1, 2023
- Defendant Ocean Townsip Police Officer Bercovicz's police report January 20, 2022
- False indictments discovered as per emergency letter to the court June 9, 2025
- Defendant Asbury Park Officers Ramseur and McDonaugh omitted from their police report their threats against plaintiff and his mother and the unlawful seizure.

93.    Defendant's conspiracy was also based upon invidious class-based discrimination by association or advocacy of the plaintiff as he attempted to protect his daughter (a female) and keep her from harm – as a class that has faced systematic discrimination – and from a system that notoriously abuses children and females.

94.    Defendants whether intentionally, knowingly, maliciously, recklessly, and/or negligently committed these acts and are the direct and proximate harm to plaintiff and did violate plaintiff's clearly established constitutional rights under the 1st, 4th, 5th, 6th and 14th Amendments.

## COUNT II

### 42 U.S.C. § 1983 MALICIOUS PROSECUTION

New Jersey Attorney General, New Jersey Department of Children and Families, Monmouth County Prosecutor's Office, City of Asbury Park and the Asbury Park Police Department, Township of Ocean & The Ocean Township Police Department, Monmouth County Prosecutor Christopher Grammiccionni, Assistant Prosecutor Laura Linski, Assistant Prosecutor Thomas Fichter, Assistant Prosecutor Monica Do Oteriro, Assistant Prosecutor Christopher Decker, Detective Kayla Santiago, Sergeant Michael Magliozzo, Detective Jason Gold, Detective Joshua Rios, Investigator Elizabeth Pinson, Supervisor Lovette Wright, Captain Amir Bercovicz, Officer Alon Bercovicz, Unnamed Supervisor Badge #134, City Manager Donna Viero, Sergeant Steven Ramseur, Officer Michael, Officer Michael Griswald, Officer Cadet, Officer Michael Spallina, Officer McDonough, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq., Edward C. Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff, Llc, John Doe Police Officers 1-10 and ABC Entities 1-10.

95.    Plaintiff repeats and realleges all previous paragraphs as if fully incorporated in this section.

96.    To prevail on his malicious prosecution claim under § 1983, Zimmerman must establish that "(1) the defendant[s] initiated a criminal proceeding; (2) the criminal proceeding ended in [his] favor; (3) the defendant[s] initiated the proceeding without probable cause; (4) the defendant[s] acted maliciously [**6] or for a purpose other than bringing the plaintiff to justice; and (5) [he] suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding."

97.    Continuation of a Criminal Proceeding is allowed the same as the "Initiation" of a criminal proceeding element of malicious prosecution see Palma v. Atlantic CounRestat F. Supp. 2d 743 at 16 "having at no time taken any effective action to prevent personnel from the Sheriff's Office from continuing to engage [**49] in such conduct." Palma survived a motion to dismiss on all of his Fourth Amendment claims in the District of New Jersey. See also Restat 2d of Torts, § 672 at Burden of Proof 1 (a) "the defendant initiated or continued the criminal proceedings against him;"

41

98.     Fed Civ. Pro Rule 9 (b) states Malice, intent, knowledge and other conditions of a person's mind may be alleged generally.

99.     As stated Defendants Perry and Burgos were actively abusing S.T. and when discovered by plaintiff they scrambled to make a retaliatory false accusation. Law enforcement defendants did not have probable cause to charge Plaintiff initially, after the investigation, nor to prosecute him as they could not produce a true bill indictment despite grand jury subversion. Law Enforcement & Child Protective Services engaged in the systematic suppression of plaintiff's calls for help to stop the child abuse, the false allegations by the false accusers, the systematic false reporting and omissions in their reporting by the law enforcement community, intentional legal malpractice by the defense attorneys and law firm, the unlawful seizures by law enforcement, grand jury tampering and false indictments, malicious prosecution, and the prolonged abuse of process were used by the defendants to create the illusion of guilt for the plaintiff and to protect the child abusers, in order to initiate and continue the criminal proceeding.

100.    If a law enforcement official contributed to the faulty and fallacious investigation thus influencing or participating in the decision to institute criminal proceedings, they are liable for malicious prosecution.

101.    When defendant attorneys could no longer mislead plaintiff and continue the prosecution – despite being his hired DEFENSE ATTORNEYS, plaintiff represented himself and the case swiftly terminated favorably by outright **DISMISSAL OF ALL CHARGES**.

102.    The defendants acted to initiate and continue the malicious prosecution for purposes other than to bring the plaintiff to justice – acting maliciously.

42

103.    Plaintiff as a result suffered a deprivation of liberty consistent with the concept of seizure as a result of the legal proceeding as the plaintiff was arrested and had a restraining order placed on him and suffered an continuing seizure for four years with pre-trial limitations of having to appear for well over 100 court dates.

104.    Defendants whether intentionally, knowingly, maliciously, recklessly, and/or negligently committed these acts and are the direct and proximate harm to plaintiff and did violate plaintiff's clearly established constitutional rights under the 1st, 4th, 5th, 6th and 14th Amendments.

## COUNT III

**42 U.S.C. § 1983 FOURTH AMENDMENT – UNLAWFUL CONTINUING SEIZURE/FALSE**

**IMPRISONMENT**

New Jersey Attorney General, New Jersey Department of Children and Families, Monmouth County Prosecutor's Office, City of Asbury Park and the Asbury Park Police Department, Township of Ocean & The Ocean Township Police Department, Monmouth County Prosecutor Christopher Grammiccionni, Assistant Prosecutor Laura Linski, Assistant Prosecutor Thomas Fichter, Assistant Prosecutor Monica Do Oteriro, Assistant Prosecutor Christopher Decker, Detective Kayla Santiago, Sergeant Michael Magliozzo, Detective Jason Gold, Detective Joshua Rios, Investigator Elizabeth Pinson, Supervisor Lovette Wright, Captain Amir Bercoviz, Officer Alon Bercovicz, Unnamed Supervisor Badge #134, City Manager Donna Viero, Sergeant Steven Ramseur, Officer Michael, Officer Michael Griswald, Officer Cadet, Officer Michael Spallina, Officer McDonough, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq., Edward C. Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff, Llc, John Doe Police Officers 1-10 and ABC Entities 1-10.

105.     Plaintiff repeats and realleges all previous paragraphs as if fully incorporated in this section.

106.     Plaintiff suffered several unlawful seizures arrest and deprivation of liberty without probable casue because of defendants' actions. Plaintiff remained on pre-trial conditions that limited his freedom but mandated that he be present for countless court dates spanning four years. When plaintiff asked for all the court dates from the court clerk she responded "my god there are hundreds of court hearings in your case." Each court date or hearing represented plaintiff's liberty being restricted and an unlawful seizure and also false imprisonment which confined plaintiff to boundaries set by the defendants that caused him distress and pain and he was painfully aware of it.

107.     Plaintiff and his mother who is in her 70's were unlawfully seized as a result of defendants Ramseur, McDonaugh and Bercovicz's conspiracy to harass and threaten him. In effect putting an extrajudicial restraining order in place for calling the police to check on his daughter who WAS being abused.

108.     Plaintiff suffered antoher unlawful seizure when he forced to surrender at the Asbury Park Police Station.

44

109.    These seizures are timely filed because: The ongoing seizure did not end until the case was dismissed in 2021 and plaintiff filed suit within 2 years.

110.    Omissions in reports and hiding records resulted in delays.  Plaintiff still to this day does not know who the arresting officer was at the Asbury Park Police Station because Defendant John Perrone took the summons and never shared it. Likewise it was never disclosed via discovery. Likewise plaintiff was delayed in filing earlier because Defendant Officers Ramseur and McDonough omitted the unlawful threats, intimidation and seizure from their official police report.

111.    These omissions would likely FAIL the conspiracy Legal Test: "..is whether what is omitted is something the intended reader would have expected to see included if it had occurred…"  Jutrowski at 13

112.    Defendants whether intentionally, knowingly, maliciously, recklessly, and/or negligently committed these acts and are the direct and proximate harm to plaintiff and did violate plaintiff's clearly established constitutional rights under the 1st, 4th, 5th, 6th and 14th Amendments.

=

## COUNT IV

### 42 U.S.C. § 1983 SUPERVISOR LIABILITY/FAILURE TO INTERVENE

New Jersey Attorney General, New Jersey Department of Children and Families, Monmouth County Prosecutor's Office, City of Asbury Park and the Asbury Park Police Department, Township of Ocean & The Ocean Township Police Department, Monmouth County Prosecutor Christopher Grammiccionni, Assistant Prosecutor Laura Linski, Assistant Prosecutor Thomas Fichter, Assistant Prosecutor Monica Do Oteriro, Assistant Prosecutor Christopher Decker, Detective Kayla Santiago, Sergeant Michael Magliozzo, Detective Jason Gold, Detective Joshua Rios, Investigator Elizabeth Pinson, Supervisor Lovette Wright, Captain Amir Bercovicz, Officer Alon Bercovicz, Unnamed Supervisor Badge #134, City Manager Donna Viero, Sergeant Steven Ramseur, Officer Michael, Officer Michael Griswald, Officer Cadet, Officer Michael Spallina, Officer McDonough, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq., Edward C. Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff, Llc, John Doe Police Officers 1-10 and ABC Entities 1-10.

145.    Plaintiff repeats and realleges all previous paragraphs as if fully incorporated in this section.

146.    There is a broad range of liability measures for supervisors "In fact, there is quite a spectrum of possible tests for supervisory liability: it could be imposed where a supervisor has actual knowledge of a subordinate's constitutional violation and acquiesces, see, e.g., Baker v. Monroe Twp., 50 F.3d 1186, 1194 (C.A.3 1995); Woodward v. Worland, 977 F.2d 1392, 1400 (C.A.10 1992); or where supervisors " 'know about the conduct and facilitate it, approve it, condone it, or turn a *694 blind eye for fear of what they might see,' " International Action Center v. United States, 365 F.3d 20, 28 (C.A.D.C.2004) (Roberts, J.) (quoting Jones v. Chicago, 856 F.2d 985, 992 (C.A.7 1988) (Posner, J.)); or where the supervisor has no actual knowledge of the violation but was reckless in his supervision of the subordinate, see, e.g., Hall, supra, at 961; or where the supervisor was grossly negligent, see, e.g., Lipsett v. University of Puerto Rico, 864 F.2d 881, "the term 'supervisory liability' is a misnomer," and *693 902 (C.A.1 1988). Ashcroft v. Iqbal, 556 U.S. 662 (2009) at 18.

46

147.   Defendants, acting under color of law, had knowledge of and a reasonable opportunity to prevent

violations of Plaintiff's constitutional rights, including the child abuse, sexualization of S.T., the alienation from

her father, the systematic suppression of plaintiff's calls for help to stop the child abuse, the false allegations by

the false accusers, the systematic false reporting and omissions in their reporting by the law enforcement &

Child Protective Services community, intentional legal malpractice by the defense attorneys and law firm, the

unlawful seizures by law enforcement, grand jury tampering and false indictments, malicious prosecution, and

the prolonged abuse of process resulting in a loss of 48 months of plaintiff's life and the ultimate destruction of

his family, his reputation, his finances and his personal well-being.

Notably at minimum:

- Christopher Grammiccionni, was appointed the Monmouth County Prosecutor in 2017 and served in that

  role until he resigned only a matter of weeks before plaintiff's case terminated via dismissal.

- County Prosecutor Grammiccionni was present at (2) protests in 2020. The Asbury Park Justice for

  George Floyd Protest which drew thousands of people to the City of Asbury Park. Plaintiff was an

  organizer and one of the speakers. At this event, plaintiff spoke about the systematic malicious

  prosecutions taking place at the Monmouth County Vicinage with the involvement of the MCPO, police

  and Judges. Roughly a week later there was a smaller protest/march which plaintiff attended with Jeana

  Sager. There Plaintiff saw Defendant Prosecutor Grammiccionni and approached him. As plaintiff

  introduced himself, Mr. Grammiccionni stated " I heard your speech last week....you did a good job."

  To which plaintiff responded, I want you to know that what I spoke about regarding prosecutors and

  police has impacted me as well.....your prosecutor Thomas Fichter has raped my life by lying at every

  stage of the process" to which Defendant Prosecutor Grammiccionni retreated after stating "we cannot

  talk about this." Grammiccionni as the head prosecutor deliberately ignored information about his

  subordinates breaking the law. The conversation was witnessed by Jeana Sager.

- Prosecutor Decker – Plaintiff having known Prosecutor Decker for nearly a decade through the Asbury Park Community Development Initiative, approached him while at a court date in Judge Joseph Oxley's Courtroom. Plaintiff stated the same as he did to Defendant Grammiccionni to which Defendant Acknowledged and stated "geez" then turned red in the face and walked away from plaintiff without saying another word.

- When Jeana Sager spoke directly with a partner at the Defendant law firm from KMHL&D Law about Defendant Bertuccio threatening plaintiff and his sabotaging of his legal defense.

- When plaintiff emailed several times and contacted partners at Defendant Law Firm KMHL&D Law about not being able to get in touch with Defendant Bertuccio and his representation – later that week Bertuccio's extension was changed to the #1 position.

- Defendants Jason Gold, Michael Magliozzo Joshua Rios, Deliza Brazile, all had direct involvement in the "investigation" of the false allegations. Including the taking of statements where specific forensic protocols were deliberately broken – namely the Model DCF/Law Enforcement Protocol. This policy mandated that any party that was going to close their side of the investigation must notify the others which either did not happen or was ignored or conspired against during the investigative/administrative stage because DCP&P closed their investigation before any grand jury presentation. Furthermore the protocol discourages asking juveniles follow up questions, yet that was common practice as was recorded in the investigative files.

- Those individuals also ignored the facts and concealed child abuse - that the minor child was being involved in criminal activity with the mother, as well as being sexualized. Each defendant had a duty and custom to protect the child as well as to follow rules and policies, not negligently, recklessly or maliciously break them.

- Defendant Prosecutor Laura Linski was present at a meeting post-indictment of plaintiff that was by invite to specific individuals to meet with Acting Attorney General Andrew Bruck. At that meeting plaintiff spoke to the issues above and specifically referenced the MCPO, recalling that he asked Defendant Linski to not allow systematic malicious prosecution take place and she instead of acknowledging or responding – she looked away to avoid eye-contact. Defendant Prosecutor Laura Linski's signature is seen on the false indictments manufactured by the Monmouth County Prosecutor's Office that HAVE NO SIGNATURE of the Grand Jury Foreman.

148.   As such all defendants named above engaged in actions that are the direct and proximate cause of harm to plaintiff including violations of his constitutional rights. As such the actions of the above named prosecutors would not be entitled to absolute immunity as it comes under administrative/investigative roles.

149.   Despite this opportunity, Defendant failed to intervene to prevent the misconduct, thereby enabling and contributing to the constitutional harm. As a direct and proximate result of Defendant's failure to intervene, Plaintiff suffered.

150.   Police Welfare Checks appear entirely unregulated. Open Public Records Act requests for guidelines, trainings, protocols and policies all returned negative results from the agencies involved and the following: New Jersey Attorney General, Police Training Commission, Monmouth County Police Academy, Monmouth County Sheriffs, Police Departments in Asbury Park, Ocean Township, Atlantic Highlands, Bradley Beach and Wall Township.

151.   This is a gross display of failure to supervise, failure to train or discipline and a complete betrayal of the public trust, which resulted in harm to plaintiff. Having no guidelines, trainings, protocols or policies for

49

welfare checks results in a custom, policy or practice with disregard for the wellbeing of how plaintiff was directly and proximately harmed by it as stated earlier. Plaintiff and his mother were threatened and suffered a Fourth Amendment Seizure for making an appropriate welfare check call. However, other people like Ken Perry who also made a welfare check on the residence and on Angela Perry and S.T., suffered no consequences.

152.    Plaintiff believes that the above named defendants acted negligently, recklessly or maliciously to violate his clearly established constitutional rights to a degree where a reasonable officer would not have acted in the same manner.

153. Defendants actions are the direct and proximate harm to plaintiff.

## COUNT V

### 42 U.S.C. § 1983 ABUSE OF PROCESS

New Jersey Attorney General, New Jersey Department of Children and Families, Monmouth County Prosecutor's Office, City of Asbury Park and the Asbury Park Police Department, Township of Ocean & The Ocean Township Police Department, Monmouth County Prosecutor Christopher Grammiccionni, Assistant Prosecutor Laura Linski, Assistant Prosecutor Thomas Fichter, Assistant Prosecutor Monica Do Oteriro, Assistant Prosecutor Christopher Decker, Detective Kayla Santiago, Sergeant Michael Magliozzo, Detective Jason Gold, Detective Joshua Rios, Investigator Elizabeth Pinson, Supervisor Lovette Wright, Captain Amir Bercovicz, Officer Alon Bercovicz, Unnamed Supervisor Badge #134, City Manager Donna Viero, Sergeant Steven Ramseur, Officer Michael, Officer Michael Griswald, Officer Cadet, Officer Michael Spallina, Officer McDonough, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq., Edward C. Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff, Llc, John Doe Police Officers 1-10 and ABC Entities 1-10.

154.    Plaintiff repeats and realleges all previous paragraphs as if fully incorporated in this section.

155.    Favorable termination is not an element of a Section 1983 abuse of process claim. See Rose, 871 F.2d at 351. Nor is a lack of probable cause. See Jennings, 567 F.2d at 1219. "To prove abuse of process, plaintiffs must prove three elements: (1) an abuse or perversion of process already initiated (2) with some unlawful or ulterior purpose, and (3) harm to the plaintiffs as a result." Godshalk v. Borough of Bangor, 2004 WL 999546, at *13 (E.D. Pa. May 5, 2004).

156.    Defendants, acting under color of law, had knowledge of and a reasonable opportunity to prevent violations of Plaintiff's constitutional rights, including the child abuse, sexualization of S.T., the alienation from her father, the systematic suppression of plaintiff's calls for help to stop the child abuse, the false allegations by the false accusers, the systematic false reporting and omissions in their reporting by the law enforcement & Child Protective Services community, intentional legal malpractice by the defense attorneys and law firm, the unlawful seizures by law enforcement, grand jury tampering and false indictments, malicious prosecution, and the prolonged abuse of process resulting in a loss of 48 months of plaintiff's life and the ultimate destruction of his family, his reputation, his finances and his personal well-being.

51

157.    Plaintiff would like to point out that as he was innocent and defendants knew he was innocent and that others were guilty of abusing S.T. The abuse of process allowed for his parental rights to be terminated, and a known abuser Defendant Perry was able to immediately gain custody of S.T. the same child she had harmed so badly just years before. Not long after the transfer of custody, the collective abuse of process allowed for Defendant Perry to move S.T. out of state….back to Florida where plaintiff believes S.T. was subjected to more harm, effectively bringing the story full circle – right back to where it began.

158.    Defendants whether intentionally, knowingly, maliciously, recklessly, and/or negligently committed these acts and are the direct and proximate harm to plaintiff and did violate plaintiff's clearly established constitutional rights under the 1st, 4th, 5th, 6th and 14th Amendments.

## COUNT VI

### 42 U.S.C. § 1983 FIRST AMENDMENT RETALIATION

New Jersey Attorney General, New Jersey Department of Children and Families, Monmouth County Prosecutor's Office, City of Asbury Park and the Asbury Park Police Department, Township of Ocean & The Ocean Township Police Department, Monmouth County Prosecutor Christopher Grammiccionni, Assistant Prosecutor Laura Linski, Assistant Prosecutor Thomas Fichter, Assistant Prosecutor Monica Do Oteriro, Assistant Prosecutor Christopher Decker, Detective Kayla Santiago, Sergeant Michael Magliozzo, Detective Jason Gold, Detective Joshua Rios, Investigator Elizabeth Pinson, Supervisor Lovette Wright, Captain Amir Bercovicz, Officer Alon Bercovicz, Unnamed Supervisor Badge #134, City Manager Donna Viero, Sergeant Steven Ramseur, Officer Michael, Officer Michael Griswald, Officer Cadet, Officer Michael Spallina, Officer McDonough, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq., Edward C. Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff, Llc, John Doe Police Officers 1-10 and ABC Entities 1-10.

159.   Plaintiff repeats and realleges all previous paragraphs as if fully incorporated in this section.

160.   "The elements of a retaliation claim under 42 U.S.C. § 1983 predicated on the First Amendment and under the Rehabilitation Act are the same. In both cases plaintiffs must show **(1) that they engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights**, and (3) **that there was a causal connection between the protected activity and the retaliatory action**. See Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir.2006) (First Amendment); Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir.2003) (First Amendment); Robinson v. Potter, 453 F.3d 990, 994 (8th Cir.2006) (Rehabilitation Act); Weixel v. Bd. of Educ. of N.Y., 287 F.3d 138, 148 (2d Cir.2002) (Rehabilitation Act).[6] A defendant may defeat the claim of retaliation by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity. See Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir.2002)". Lauren W. Ex Rel. Jean W. v. DeFlaminis, 480 F. 3d 259 - Court of Appeals, (3rd Circuit 2007))

53

161.    A retaliation claim requires a showing of a causal connection between the protected activity and the defendant's actions by proving either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. *See Krouse v. American Sterilizer Co.,* 126 F.3d 494, 503-04 (3d Cir.1997); *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920-21 (3d Cir.1997). In the absence of that proof the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of the fact should infer causation. *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 281 (3d Cir.2000)." Lauren at 5.


162.    Many of the defendants' actions that are harmful to the plaintiff came as an immediate reaction to his protected activity of petitioning the government & criticizing the response of public officials via his many telephone and 911 calls.


163.    Eamples of these would be at minimum when: 1) Defendant Burgos threatened plaintiff with a restraining order 2) when Defendant Asbury Park Officers Amir Bercovicz, Griswald, Bomenbilt and Michael responded to plaintiff's home and told him "its not a big conspiracy against you" and claimed that the allegations "looked retaliatory" when they knew they were false allegations, and 3) when Defendant Alon Bercoviz conspires with Defendants Perry, Ramseur and McDonaugh to harass and threaten Plaintiff and his 70 year old mother for calling the police again because government was not doing their job. Plaintiff asserts that this shows an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action.


164.    Also, the previous actions by Defendant City of Asbury Park and its detectives as well as Defendant Monmouth County Prosecutor's Office and its prosecutors and investigators including leadership, that had previously protected abusers of plaintiff's child S.T. prompting plaintiff to speak about this publicly criticizing those actors at the April 25, 2018 Council Meeting in the City of Asbury Park. Then those same Defendant Entities and the other MCPO Investigators take negative actions detailed in this suit. Plaintiff asserts this shows a pattern of antagonism coupled with timing to establish a causal link.

54

165. Defendants whether intentionally, knowingly, maliciously, recklessly, and/or negligently committed these acts and are the direct and proximate harm to plaintiff and did violate plaintiff's clearly established constitutional rights under the 1st, 4th, 5th, 6th and 14th Amendments.

## COUNT VII

### MONELL CLAIM
### CUSTOM, POLICY OR PRACTICE &
### FAILURE TO TRAIN AND SUPERVISE

New Jersey Attorney General, New Jersey Department of Children and Families, Monmouth County Prosecutor's Office, City of Asbury Park and the Asbury Park Police Department, Township of Ocean & The Ocean Township Police Department, Monmouth County Prosecutor Christopher Grammiccionni, Assistant Prosecutor Laura Linski, Assistant Prosecutor Thomas Fichter, Assistant Prosecutor Monica Do Oteriro, Assistant Prosecutor Christopher Decker, Detective Kayla Santiago, Sergeant Michael Magliozzo, Detective Jason Gold, Detective Joshua Rios, Investigator Elizabeth Pinson, Supervisor Lovette Wright, Captain Amir Bercovicz, Officer Alon Bercovicz, Unnamed Supervisor Badge #134, City Manager Donna Viero, Sergeant Steven Ramseur, Officer Michael, Officer Michael Griswald, Officer Cadet, Officer Michael Spallina, Officer McDonough, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq., Edward C. Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff, Llc, John Doe Police Officers 1-10 and ABC Entities 1-10.

166.    Plaintiff repeats and realleges all previous paragraphs as if fully incorporated in this section.

167.    A policy or custom upon which municipal liability under § 1983 may be based, may be found in edicts of a city's formal decision making body or in persistent practices of municipal officials having the de facto voice of law, or may be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, the court explained. Milligan v Newport News (1984, CA4 Va) 743 F2d 227

Defendants' maintained a custom, policy or practice that resulted in the following harms:

- Child Abuse.

- Widespread Inter-Agency False Reporting.

- Wide array of civil rights violations detailed in this lawsuit.

- Violating established investigative, administrative policies and norms.

56

- Blocking pleas from the public when they seek accountability for wrongdoing by public officials.

More specific detailed information is below:

### Grand Jury Tampering – False Indictments

### Monmouth County Prosecutors Office

168.    There is also no True Bill of Indictment in the discovery to plaintiff. The false indictment presented does not indicate anywhere that it is a True Bill nor does it have anywhere on it any signature of the Grand Jury Foreperson. The line allotted for the Grand Jury Foreperson is left **completely blank**. Please note this is not a "Public File" discrepancy that is tolerated as noted in State v. Lombardo, 18 N.J. Super. 511, 87 A.2d 375 (County Ct. 1952) or U.S. v. Curls, 219 Fed. Appx. 746 (2007). Furthermore, the false indictment does not have the name of the prosecuting attorney on it. Rather there is an electronic signature of a different prosecutor.

169.    Plaintiff is in possession of multiple other indictments unrelated to this case and his person, all of which leave the signature line of the Grand Jury Foreman to certify the indictment **completely blank** and also do not say it is a True Bill indicating of a custom, policy or practice to erode the constitutionally guaranteed Fifth Amendment right to indictment by a grand jury.

170.    These indictments are from 2018 for Sexual Assault, Endangering the Welfare of a Child and Criminal Sexual Contact; CDS and Tampering with Evidence. 2019 for Possession of a weapon and CDS; Conspiracy and CDS. 2020 for Murder; Possession of a weapon. 2021 for Aggravated Assault. 2023 for Sexual Assault and Criminal Sexual Contact. Furthermore, Prosecutor Fichter subverted the Grand Jury in his presentation as previously detailed.

57

171.    These additional indictments plausibly suggest the existence of an unconstitutional policy, custom or practice impacting a broad range of people over time which ensured that specific rights guaranteed by the United States Constitution were supplanted by the County and its Prosecutors. County prosecutors can be held liable under Monell, Custom, Policy or Practice 42 U.S.C.A. § 1983. McCray v. City of Dothan, 169 F. Supp. 2d 1260 (M.D. Ala. 2001).

### *Pattern of Constitutional Violations*
*City of Asbury Park, Ocean Township, Monmouth County Prosecutors Office*

172.    The City of Asbury Park has been petitioned by the public by some accounts for over 40 years for better oversight of the police (such as civilian review) due to a widespread pattern of constitutional violations that have been tolerated by the city. Plaintiff himself helped organize with other advocates a George Floyd Justice Rally drawing thousands to the city - at which he disseminated an action alert that over 1,500 people sent formal messages to the Asbury Park City Council to reform the police and institute a Civilian Review Board, but the Council ignored this latest request. By ignoring the issue, the City of Asbury Park's City Council has given formal sanction - adopting a policy, custom or practice of accepting police violations of civilians' constitutional rights.

173.    Plaintiff is aware of at least 44 civil lawsuits against the Asbury Park Police and The City of Asbury Park for constitutional violations ranging from false arrest, malicious prosecution, harassment and other egregious violations. These civil actions were filed from the time 2016 – 2020 which gives a plausible showing that the City Council has not implemented effective police oversight and training including a civilian review board and continues its custom, policy or practice to tolerate constitutional violations by its police.

174.    As stated earlier all defendant law enforcement agencies and their respective governmental bodies have no policy, protocols or standards for child welfare checks. This de facto harmful policy led to the dispatcher stating in the CAD Calls "talk to mother no need to speak with juvenile" when S.T.'s grandmother called for a welfare check - meaning that the agency called to do a welfare check for child abuse and concerns of criminal activity, is stating that they are only going to speak with the child abuser who is also the one committing the crime at that location.

175.    Defendants failed to train their subordinates as well and higher level public officials *(as detailed) participated in the constitutional violations.

176.    Defendants whether intentionally, knowingly, maliciously, recklessly, and/or negligently committed these acts and are the direct and proximate harm to plaintiff and did violate plaintiff's clearly established constitutional rights under the 1st, 4th, 5th, 6th and 14th Amendments.

## COUNT VIII

## NEW JERSEY COMMON LAW MALICIOUS PROSECUTION

New Jersey Attorney General, New Jersey Department of Children and Families, Monmouth County Prosecutor's Office, City of Asbury Park and the Asbury Park Police Department, Township of Ocean & The Ocean Township Police Department, Monmouth County Prosecutor Christopher Grammiccionni, Assistant Prosecutor Laura Linski, Assistant Prosecutor Thomas Fichter, Assistant Prosecutor Monica Do Oteriro, Assistant Prosecutor Christopher Decker, Detective Kayla Santiago, Sergeant Michael Magliozzo, Detective Jason Gold, Detective Joshua Rios, Investigator Elizabeth Pinson, Supervisor Lovette Wright, Captain Amir Bercovicz, Officer Alon Bercovicz, Unnamed Supervisor Badge #134, City Manager Donna Viero, Sergeant Steven Ramseur, Officer Michael, Officer Michael Griswald, Officer Cadet, Officer Michael Spallina, Officer McDonough, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq., Edward C. Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff, Llc, John Doe Police Officers 1-10 and ABC Entities 1-10.

177.    Plaintiff repeats and realleges all previous paragraphs as if fully incorporated in this section.

178.    The elements of the cause of action for malicious prosecution are well-defined: "plaintiff must prove (1) that the criminal action was instituted by the defendant against the plaintiff, (2) that it was actuated by malice, (3) that there was an absence of probable cause for the proceeding, and (4) that it was terminated favorably to the plaintiff." *Helmy v. City of Jersey City,* 178 *N.J.* 183, 190, 836 *A.*2d 802 (2003) (citing *Lind v. Schmid,* 67 *N.J.* 255, 262, 337 *A.*2d 365 (1975); *JEM Marketing, LLC v. Cellular Telecomm. Indus. Ass'n,* 308 *N.J.Super.* 160, 172, 705 *A.*2d 798 (App.Div.1998)). *See also Campione v. Adamar of New Jersey, Inc.,* 155 *N.J.* 245, 268, 714 *A.*2d 299 (1998) (same); *Paterson Tallow Co. v. Royal Globe Ins. Co.,* 89 *N.J.* 24, 35, 444 *A.*2d 579 (1982) (same).

179.    Defendants did initiate or continue a criminal proceeding against the plaintiff.

180.    The criminal proceeding was actuated by malice and there was no probable cause to justify the known false allegations. All charges were dropped after four years of prosecution even though plaintiff was cleared in 2018 by DCP&P.

181.    Specifically: Defendants, acting under color of law, had knowledge of and a reasonable opportunity to prevent violations of Plaintiff's constitutional rights, including the child abuse, sexualization of S.T., the alienation from her father, the systematic suppression of plaintiff's calls for help to stop the child abuse, the false allegations by the false accusers, the systematic false reporting and omissions in their reporting by the law enforcement & Child Protective Services community, intentional legal malpractice by the defense attorneys and law firm, the unlawful seizures by law enforcement, grand jury tampering and false indictments, malicious prosecution, and the prolonged abuse of process resulting in a loss of 48 months of plaintiff's life and the ultimate destruction of his family, his reputation, his finances and his personal well-being.

182.    Defendants whether intentionally, knowingly, maliciously, recklessly, and/or negligently committed these acts and are the direct and proximate harm to plaintiff and did violate plaintiff's clearly established constitutional rights under the 1st, 4th, 5th, 6th and 14th Amendments.

## COUNT IX

### CIVIL CONSPIRACY

New Jersey Attorney General, New Jersey Department of Children and Families, Monmouth County Prosecutor's Office, City of Asbury Park and the Asbury Park Police Department, Township of Ocean & The Ocean Township Police Department, Monmouth County Prosecutor Christopher Grammiccionni, Assistant Prosecutor Laura Linski, Assistant Prosecutor Thomas Fichter, Assistant Prosecutor Monica Do Oteriro, Assistant Prosecutor Christopher Decker, Detective Kayla Santiago, Sergeant Michael Magliozzo, Detective Jason Gold, Detective Joshua Rios, Investigator Elizabeth Pinson, Supervisor Lovette Wright, Captain Amir Bercovicz, Officer Alon Bercovicz, Unnamed Supervisor Badge #134, City Manager Donna Viero, Sergeant Steven Ramseur, Officer Michael, Officer Michael Griswald, Officer Cadet, Officer Michael Spallina, Officer McDonough, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq., Edward C. Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff, Llc, John Doe Police Officers 1-10 and ABC Entities 1-10.

183.    Plaintiff repeats and realleges all previous paragraphs as if fully incorporated in this section.

184.    In New Jersey, a civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." Morgan v. Union County Bd. of Chosen Freeholders, 268 N.J.Super. 337, 364, 633 A.2d 985 (App.Div.1993), certif. denied, 135 N.J. 468, 640 A.2d 850 (1994) (quoting Rotermund v. U.S. Steel Corp., 474 F.2d 1139, 1145 (8th Cir.1973)(internal quotations omitted)).

185.    Restated in elements from Thus, to state a claim for civil conspiracy, plaintiffs must allege that a defendant (1) entered into an agreement with at least one other person, (2) for the purpose of committing an unlawful act, and (3) one of the conspirators then took at least one overt act in furtherance of the agreement, and (4) plaintiff suffered some damage as a result. Matos v. LAIELLI, Dist. Court, D. New Jersey 2016 at 3.

62

186.    Defendants New Jersey Attorney General, New Jersey Department of Children and Families, Monmouth

County Prosecutor's Office, City of Asbury Park and the Asbury Park Police Department, Township of Ocean

& The Ocean Township Police Department, Monmouth County Prosecutor Christopher Grammiccionni,

Assistant Prosecutor Laura Linski, Assistant Prosecutor Thomas Fichter, Assistant Prosecutor Monica Do

Oteriro, Assistant Prosecutor Christopher Decker, Detective Kayla Santiago, Sergeant Michael Magliozzo,

Detective Jason Gold, Detective Joshua Rios, Investigator Elizabeth Pinson, Supervisor Lovette Wright,

Captain Amir Bercovicz, Officer Alon Bercovicz, Unnamed Supervisor Badge #134, City Manager Donna

Viero, Sergeant Steven Ramseur, Officer Michael, Officer Michael Griswald, Officer Cadet, Officer Michael

Spallina, Officer McDonough, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq.,

Edward C. Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff, Llc, John Doe Police Officers 1-10

and ABC Entities 1-10 did under the color of state law and/or in their individual capacities did conspire and

formulate a common plan to violate plaintiff's clearly established constitutional rights under the 1st, 4th, 5th, 6th

and 14th Amendments and causing irreparable harm. 1st Amendment: Right to free speech, to call the police and

criticize government; 4th Amendment right to be free of unlawful search and seizure, 5th Amendment right to

Grand Jury Protections, 6th Amendment right to speedy trial and 14th Amendment right to family unity, due

process and equal treatment under the law.


187.    Defendants' actions resulted in a loss of 48 months of plaintiff's life and the ultimate destruction of his

family, his reputation, his finances and his personal well-being.


188.    Defendants whether intentionally, knowingly, maliciously, recklessly, and/or negligently committed

these acts and are the direct and proximate harm to plaintiff and did violate plaintiff's clearly established

constitutional rights under the 1st, 4th, 5th, 6th and 14th Amendments.


63

## COUNT X

**FACIAL & AS-APPLIED CONSTITUTIONAL CHALLENGE TO "NOT ESTABLISHED" FINDING**

New Jersey Attorney General, New Jersey Department of Children and Families, Monmouth County Prosecutor's Office, City of Asbury Park and the Asbury Park Police Department, Township of Ocean & The Ocean Township Police Department, Monmouth County Prosecutor Christopher Grammiccionni, Assistant Prosecutor Laura Linski, Assistant Prosecutor Thomas Fichter, Assistant Prosecutor Monica Do Oteriro, Assistant Prosecutor Christopher Decker, Detective Kayla Santiago, Sergeant Michael Magliozzo, Detective Jason Gold, Detective Joshua Rios, Investigator Elizabeth Pinson, Supervisor Lovette Wright, Captain Amir Bercovicz, Officer Alon Bercovicz, Unnamed Supervisor Badge #134, City Manager Donna Viero, Sergeant Steven Ramseur, Officer Michael, Officer Michael Griswald, Officer Cadet, Officer Michael Spallina, Officer McDonough, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq., Edward C. Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff, Llc, John Doe Police Officers 1-10 and ABC Entities 1-10.

189. Plaintiff repeats and realleges all previous paragraphs as if fully incorporated in this section.

**190.** Justice Gorsuch speaking on Vague laws "invite the exercise of arbitrary power ... by leaving the people in the dark about what the law demands and allowing prosecutors and courts to make it up." **Sessions v. Dimaya, 584 US 148 - Supreme Court 2018.** "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352 (1983).

191. For constitutional challenges – facial or as applied – a plaintiff must accomplish both 1) Establish Standing and 2) Ripeness of the case must be shown. To establish Article III standing, a plaintiff must show (1) an *158 "injury in fact," (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) a "likel[ihood]" that the injury "will be redressed by a favorable decision." The Court of Appeals analyzed three factors to assess whether the case was ripe for review: (1) the likelihood that the alleged harm

64

would come to pass; (2) whether the factual record was sufficiently developed; and (3) the hardship to the parties if judicial relief were denied. Susan B. Anthony List v. Driehaus, 573 U.S. 149 (2014)

**192.** The "Not Established" investigative finding was overly vague in its formal communications to people who were targeted by child protective services investigations such as how the plaintiff was targeted. He did not understand that he had been cleared. This vagueness allowed for the exact scenario that Justice Gorsuch warned of "allowing prosecutors and the courts to make it up" because the people are "in the dark" as to what the law means.

**193.** The letter that was received from DCP&P stated explicitly:

*Pursuant to N.J.A.C. 10:129-7.3(c)3, the Division enters a finding of "Not Established" when some evidence indicates that a child was harmed or placed at some risk of harm, but there is not a preponderance of the evidence that the child has been abused or neglected per N.J.S.A. 9:6-8.21.*

194.    Plaintiff did not understand what the language indicating that his daughter S.T. was "harmed or placed at some risk of harm" meant and he relied on the professionalism of the courts, prosecutors and his own attorneys to not "make up" that this meant he was guilty when he a actually was innocent. Other cases have shown that the "some evidence of harm. Or risk of harm" is either from the target of the investigation actually ***protecting*** the child, or that the investigation was irreparably prejudiced:

65

Assistant family services worker was wrongly disciplined because of a near-accident that occurred while she was driving children home after supervised visitation. Her action in slamming on the brakes to avoid a collision with another vehicle prevented any significant injury to the children and the appointing authority offered no evidence showing that she had placed that children "at substantial risk of harm." In re Curtis, Dep't of Children & Families, OAL DKT. NO. CSV 8037-16, 2018 N.J. AGEN LEXIS 82, Initial Decision (February 15, 2018).

Division of Child Protection and Permanency erred in finding an allegation that a father abused or neglected his young daughter was "not established" rather than "unfounded," because this finding lacked sufficient support in the record; the evidence did not show the father placed his daughter at risk of harm, since he tried to stop her from throwing things during a tantrum by holding her arms, and she broke free and fell, but suffered no injury. New Jersey Dep't of Children & Families v. R.R., 2018 N.J. Super. LEXIS 45 (2018).

Division of Child Protection and Permanency's administrative finding that an allegation a father abused or neglected his young daughter was "not established" rather than "unfounded"--which meant there was some, but not a preponderance of evidence, he harmed her or "placed [her] at risk of harm--was unreasonable because its 0investigation was incomplete; the Division did not consider evidence related to an order to show cause the father's estranged wife filed in their pending divorce, or a video she took of the incident, and a matrimonial judge ordered it to investigate both parents, but it only investigated the father. New Jersey Dep't of Children & Families v. R.R., 2018 N.J. Super. LEXIS 45 (2018).

195.  Plaintiff could not have been expected to have done his own legal research in a timely manner when these events were unfolding, and he detrimentally relied on his attorneys and the promise of professionalism & integrity of prosecutors and the courts – causing a forebearance in plaintiff's actions. Plaintiff did not discover the inconsistency between the regulation and the investigative finding letter until March 3, 2022 when he

requested more information from The New Jersey Deapartment of Children and Families for his own investigation into the matter.

196.    On Standing: Plaintiff was irreparably injured from this vague rule. It was the vagueness that created the vulnerability in this aspect of plaintiff's case. Without it, plaintiff could've known in the moment that he was being deceived of the finding of his innocence. A favorable decision would help to heal and prevent further ongoing harm to plaintiff.

197.    On Ripeness: The previous cases show that harm had already occurred prior to the initiation of the investigation of the plaintiff. Therefore, left unaddressed the issue would ultimately reharm over and over again. The factual record is well developed. Plaintiff is still to this day being accused of being a child predator by the defendants in this civil suit and a key defense they are using is the vague language that they abused previously "child was harmed or placed at some risk of harm."

198.    The rule creating the investigative finding category "not established" is facially unconstitutional because there is no application where the target of the investigation will know for certain if the DCP&P has found him guilty or innocent simply by reading the investigative finding letter.

199.    The rule creating the investigative finding category "not established" is unconstitutional as applied to the plaintiff because it was definitively used to shove him into a category that he could not understand and it was central to the abusers (defendants) in claiming that the plaintiff was guilty when in fact he was innocent.

200.    The unconstitutionally vague rule a casual factor in the harm plaintiff suffered.

201.    Defendants whether intentionally, knowingly, maliciously, recklessly, and/or negligently committed these acts and are the direct and proximate harm to plaintiff and did violate plaintiff's clearly established constitutional rights under the 1st, 4th, 5th, 6th and 14th Amendments.

67

## COUNT XI

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)

New Jersey Attorney General, New Jersey Department of Children and Families, Monmouth County Prosecutor's Office, City of Asbury Park and the Asbury Park Police Department, Township of Ocean & The Ocean Township Police Department, Monmouth County Prosecutor Christopher Grammiccionni, Assistant Prosecutor Laura Linski, Assistant Prosecutor Thomas Fichter, Assistant Prosecutor Monica Do Oteriro, Assistant Prosecutor Christopher Decker, Detective Kayla Santiago, Sergeant Michael Magliozzo, Detective Jason Gold, Detective Joshua Rios, Investigator Elizabeth Pinson, Supervisor Lovette Wright, Captain Amir Bercovicz, Officer Alon Bercovicz, Unnamed Supervisor Badge #134, City Manager Donna Viero, Sergeant Steven Ramseur, Officer Michael, Officer Michael Griswald, Officer Cadet, Officer Michael Spallina, Officer McDonough, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq., Edward C. Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff, Llc, John Doe Police Officers 1-10 and ABC Entities 1-10.

202.    Plaintiff repeats and realleges all previous paragraphs as if fully incorporated in this section.

203.    This court in Severino v. N.J.Servst of Hum. Servs. recognized the elements of Intentional Infliction of

Emotional Distress (IIED) 1) that the defendant acted intentionally or recklessly, 2) the defendant's conduct was

"so 'extreme and outrageous ... as to go beyond all possible bounds of decency, and to be regarded as atrocious,

and utterly intolerable in a civilized community,'" 3) proximate causation, and 4) "distress that is 'so severe that

no reasonable man could be expected to endure it'

204.    Defendants New Jersey Attorney General, New Jersey Department of Children and Families, Monmouth

County Prosecutor's Office, City of Asbury Park and the Asbury Park Police Department, Township of Ocean

& The Ocean Township Police Department, Monmouth County Prosecutor Christopher Grammiccionni,

Assistant Prosecutor Laura Linski, Assistant Prosecutor Thomas Fichter, Assistant Prosecutor Monica Do

Oteriro, Assistant Prosecutor Christopher Decker, Detective Kayla Santiago, Sergeant Michael Magliozzo,

Detective Jason Gold, Detective Joshua Rios, Investigator Elizabeth Pinson, Supervisor Lovette Wright,

Captain Amir Bercovicz, Officer Alon Bercovicz, Unnamed Supervisor Badge #134, City Manager Donna

68

Viero, Sergeant Steven Ramseur, Officer Michael, Officer Michael Griswald, Officer Cadet, Officer Michael

Spallina, Officer McDonough, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq.,

Edward C. Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff, Llc, John Doe Police Officers 1-10

and ABC Entities 1-10 acted intentionally or recklessly when they had a meeting of the minds where they

understood there was a common plan to take action to deprive the plaintiff of his constitutional rights and

forcibly separate him from his child. As other actors were engaged some joined the common plan to harm the

plaintiff. The actions taken by defendants include the child abuse, sexualization of S.T., the alienation from her

father, the systematic suppression of plaintiff's calls for help to stop the child abuse, the false allegations by the

false accusers, the systematic false reporting and omissions in their reporting by the law enforcement & Child

Protective Services community, intentional legal malpractice by the defense attorneys and law firm, the

unlawful seizures by law enforcement, grand jury tampering and false indictments, malicious prosecution, and

the prolonged abuse of process resulting in a loss of 48 months of plaintiff's life and the ultimate destruction of

his family, his reputation, his finances and his personal well-being.

205.    The defendant's conduct was "so 'extreme and outrageous ... as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community, including:

206.    The **false accusations being the most vicious and disgusting** that would've resulted in the loss of

plaintiff's life was in reaction to Defendants Perry and Burgos being discovered abusing S.T.

207.    Defendant Burgos then screams **"I'll put a restraining order on you!"** at plaintiff when he simply calls

to speak to his daughter. That Defendant Burgos was charged with Harassment and Defendant Prosecutor

Fichter had to abuse the legal process to derail that charge from moving forward as part of their conspiracy.

69

208.    Law Enforcement Defendants knowing that the abuse is occurring and that plaintiff was threatened with false allegations by one of the abusers but **instead of protecting S.T. and her father the plaintiff they instead validate the false allegations of the abusers** exercising control over S.T.

209.    Captain Bercovicz saying **"We know about all the calls.....its not some big conspiracy against you"** when he knew the allegations were false and were retaliatory.

210.    Defendant Officer Steven Ramseur telling plaintiff to **"shut his mouth"** then taking **overly-aggressive body posture with his hand on his weapon and threatening to arrest plaintiff's 70 year old mother and him**, then threatening to charge the plaintiff – **all because they called for help as they believed S.T. was being abused and involved in something illegal.**

211.    Defendant Bertuccio **berating his own client in court as he is in agony over the forcible separation from his only child, and Bertucio threatening violence on plaintiff.**

212.    Both Defendant Bertuccio and Perrone **lying right in front of plaintiff to the court to make it sound like he is the cause of separation from counsel when they were engaging in coercion and legal malpractice as part of a conspiracy** to violate his rights and destroy his family.

213.    Defendant Ocean Township Officer Alon Bercovicz telling Defendant Asbury Park Officers Ramseur and McDonaugh to **threaten Plaintiff with harassment as retaliation for calling for help** when plaintiff believed his daughter was being abused.

214.    Defendant Monmnouth County Prosecutor Grammiccionni and Prosecutor Laura Linski for **deliberately shutting down plaintiff when he tried to complain about having his life raped by a lying prosecutor – Defendant Thomas Fichter and other MCPO defendants.**

215.    Defendant Detective Kayla Santiago for **fabricating dates which created an event on a date and time that never occurred in order to frame the plaintiff for child sexual abuse when plaintiff was innocent.**

216.    Defendant Prosecutor Thomas Fichter, **going behind closed doors with Plaintiff's 14 year old daughter and lying to the grand jury subverting their process, then still sending a FAKE INDICTMENT to be used to prosecute plaintiff for 4 years.** Defendant Fichter later **reverses dates to support Defendant Santiago's false event/dates.**

217.    Defendant Prosecutor Do Oteiro **submits falsified reports to the court to undermine the investigative finding from DCP&P which is clearly exculpatory.**

218.    Defendant Officer Griswald, **asks not one question of the false accusers when they come in to make their fasle accusation against the plaintiff in order to maliciously prosecute the innocent father,** despite him knowing about the abuse S.T. is exposed to with her mother .

219.    The permanent destruction of plaintiff's family results by the false accusers and conspirators.

220.    The defendants' actions are the direct and proximate cause of harm to plaintiff.

220.    The distress caused to plaintiff was so severe that no reasonable man could be expected to endure it.

## COUNT XII

### VIOLATION OF THE NEW JERSEY CIVIL RIGHTS ACT (N.J.S.A. 10:6-2)

New Jersey Attorney General, New Jersey Department of Children and Families, Monmouth County Prosecutor's Office, City of Asbury Park and the Asbury Park Police Department, Township of Ocean & The Ocean Township Police Department, Monmouth County Prosecutor Christopher Grammiccionni, Assistant Prosecutor Laura Linski, Assistant Prosecutor Thomas Fichter, Assistant Prosecutor Monica Do Oteriro, Assistant Prosecutor Christopher Decker, Detective Kayla Santiago, Sergeant Michael Magliozzo, Detective Jason Gold, Detective Joshua Rios, Investigator Elizabeth Pinson, Supervisor Lovette Wright, Captain Amir Bercovicz, Officer Alon Bercovicz, Unnamed Supervisor Badge #134, City Manager Donna Viero, Sergeant Steven Ramseur, Officer Michael, Officer Michael Griswald, Officer Cadet, Officer Michael Spallina, Officer McDonough, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq., Edward C. Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff, Llc, John Doe Police Officers 1-10 and ABC Entities 1-10.

221.   Plaintiff repeats and realleges all previous paragraphs as if fully incorporated in this section.

222.   Defendants New Jersey Attorney General, New Jersey Department of Children and Families, Monmouth County Prosecutor's Office, City of Asbury Park and the Asbury Park Police Department, Township of Ocean & The Ocean Township Police Department, Monmouth County Prosecutor Christopher Grammiccionni, Assistant Prosecutor Laura Linski, Assistant Prosecutor Thomas Fichter, Assistant Prosecutor Monica Do Oteriro, Assistant Prosecutor Christopher Decker, Detective Kayla Santiago, Sergeant Michael Magliozzo, Detective Jason Gold, Detective Joshua Rios, Investigator Elizabeth Pinson, Supervisor Lovette Wright, Captain Amir Bercovicz, Officer Alon Bercovicz, Unnamed Supervisor Badge #134, City Manager Donna Viero, Sergeant Steven Ramseur, Officer Michael, Officer Michael Griswald, Officer Cadet, Officer Michael Spallina, Officer McDonough, Officer Bomenblit, Angela Rachel Perry, Tatiana Burgos, John Perrone, Esq., Edward C. Bertuccio, Esq., Kalavruzos, Mumola, Hartman, Lento & Duff, Llc, John Doe Police Officers 1-10 and ABC Entities 1-10 did under the color of state law and/or in their individual capacities did conspire and formulate a common plan to violate plaintiff's clearly established constitutional rights under the 1st, 4th, 5th, 6th and 14th Amendments and causing irreparable harm. 1st Amendment: Right to free speech, to call the police and criticize government; 4th Amendment right to be free of unlawful search and seizure, 5th Amendment right to

72

Grand Jury Protections, 6th Amendment right to speedy trial and 14th Amendment right to family unity, due process and equal treatment under the law.

223.    Defendants whether intentionally, knowingly, maliciously, recklessly, and/or negligently committed these acts and are the direct and proximate harm to plaintiff and did violate plaintiff's clearly established constitutional rights under the 1st, 4th, 5th, 6th and 14th Amendments.

## COUNT XIII

### LEGAL MALPRACTICE

224.    The elements of a legal malpractice action are "(1) the existence of an attorney-client relationship creating a duty of care by the defendant attorney; (2) the breach of that duty by the defendant, and (3) proximate cause of the damages alleged by the plaintiff." Gilbert v. Stewart, 247 N.J. 421 (2021); Jerista v. Murray, 185 N.J. 175 (2005) (quoting McGrogran v. Till, 167 N.J. 424 (2001)); Garcia v. Kozlov, Seaton, Romanini & Brooks, P.C., 179 N.J. 343 (2004).

225.    Pursuant to the Supreme Court's guidance in Garcia, the trial court should permit a plaintiff to pursue either the suit within a suit, a reasonable accommodation of the suit within a suit, or lost settlement value. See also Lieberman v. Employers Ins. of Wausau, 84 N.J. 325 (1980); Kranz v. Tiger, 390 N.J. Super. 135 (App. Div. 2007).

226.    Plaintiff retained and hired defendants John Perrone, KALAVRUZOS, MUMOLA, HARTMAN, LENTO & DUFF LLC Law and Edward C. Bertuccio to represent him in the underlying case/matter State v. Randy Thompson. As a result of this retention or hiring, an attorney-client relationship was established between defendants John Perrone, KALAVRUZOS, MUMOLA, HARTMAN, LENTO & DUFF LLC Law and Edward C. Bertuccio, were required to represent plaintiff according to the standard of care for lawyers handling a matter of false allegation of sexual assault and family court issues.

227.    Here, plaintiff contends that the defendants John Perrone, KALAVRUZOS, MUMOLA, HARTMAN, LENTO & DUFF LLC Law and Edward C. Bertuccio were negligent, that is to say, breached or deviated from the standard of care, when defendants represented plaintiff in the underlying case/matter which involved alleged criminal conduct and family court matters. Plaintiff also contend that as a result of defendants' negligence, plaintiff suffered injury or damages.

74

228. Attorneys in New Jersey must provide services with reasonable diligence and must exercise that degree of reasonable knowledge and skill that lawyers of ordinary ability and skill possess and exercise.

229. The defendants in this case claim to be or hold themselves out as a specialists in the field of criminal defense law. Accordingly, a lawyers like defendants, who claim to be or hold themselves out as a specialist in in the field of law as *New Jersey Supreme Court Certified Criminal Defense Attorneys* must exercise the knowledge and skill ordinarily possessed by other specialists in this area of law.

230. Plaintiff asserts that Defendants John Perreone, Edward C. Bertuccio, John Perrone and Kalavrus, Mumola, Hartman, Lento & Duff, LLC acted as state actors by engaging in legal malpractice as part of the conspiracy to violate plaintiff's constitutional rights.

231. Defendants Bertuccio, Perrone and KMHL&D Law concealed from plaintiff to keep plaintiff ignorant of the meaning of the "not established" investigative findings (his innocence), and using coercive tactics to try and force him into a plea deal. Attorneys never told plaintiff he was CLEARED OF ALL CHILD ABUSE ALLEGATIONS by DCP&P and instead led him to believe the ambiguous language in the letter from DCP&P implied guilt and that law enforcement had a legitimate basis to continue separating him from his child and to prosecutor him for four years.

232. Defendants Bertuccio, Perrone and KMHL&D Law concealed from plaintiff that there was NO TRUE BILL INDICTMENT provided in discovery. What was presented at as true bill of indictment is not at all an indictment.

75

233.    Defendants Bertuccio, Perrone and KMHL&D Law concealed from plaintiff that Defendant Prosecutor Thomas Fichter violated case law grand jury rules set out in State v. Hogan 144 N.J. 216, by withholding the investigative outcome from the DCP&P specifically that prosecutors introducing that the allegation a grand jury is hearing has been reported to another investigative body but withholding

234.    Defendants Bertuccio, Perrone and KMHL&D Law concealed from plaintiff that defendants prorsecutor Monica Do Oteiro submitted false reports/perjured statements in her response to Plaintiff's motion to disnmiss on February 7, 2019.

235.    Defendants Bertuccio, Perrone and KMHL&D Law concealed from plaintiff that the totality of circumstances surrounding S.T. gives a legal basis for CHILD ABUSE.

236.    Defendants Bertuccio, Perrone and KMHL&D Law refused to take action when Defendant Perry and S.T. violated the restraining order and entered plaintiff's home when he was not there.

237.    Defendant John Perrone and Defendant Bertuccio and Defendant  Kalavrus, Mumola, Hartman, Lento & Duff, LLC all refused to address the witness intimidation by Defendant Perry against J.L a 12 year old girl which occurred right at the Monmouth County Courthouse. The threat by defendant Perry against the 12 year old witness was witnessed by plaintiff, Grace Rotundo, Jeana Sager, Don Lee and Leticia Lee.

238.    Defendants Bertuccio, Perrone and KMHL&D Law  also refused to address witness intimidation by Defendant Perry against T.F. another 14 year old girl. Plaintiff asserts this was deliberate and further proof of legal malpractice, conspiracy and defendants working as state actors.

239.    Defendant John Perrone concealed that he did not demand that the investigative finding be presented in grand jury even though he was hired to protect plaintiff's innocence through the investigative and pre-indictment phase.

240.    Defendant Bertuccio and KMHL&D Law concealed that Defendant Perrone did not demand the investigative finding be presented in grand jury.

241.    Defendants John Perrone and Edward C. Bertuccio violated Rule of Professional Conduct RPC 4.1 by making false statements to the court about client's communication.

242.    Defendant Bertuccio also lied to plaintiff stating he would "go after the prosecutor" and "had no problem attacking the government." Plaintiff asserts Defendant Bertuccio and KMHL&D Law were just saying what he wanted to hear in order to justify his demand for an upfront cash retainer of $40,000. Defendant Bertuccio also lied to Plaintiff stating that Pretrial Intervention was the same as an outright dismissal. Defendant Bertuccio then went on to tell plaintiff that the records were guaranteed to be sealed as if it had never happened in an effort to undermine plaintiff's will to go to trial. Plaintiff does not have the exact date but can locate it as Plaintiff deliberately asked Judge EXHIBIT H if it were true that records were sealed. Plaintiff asked this on the record because plaintiff believed his attorney was again, lying to him. Judge Lucas stated that the records would definitively remain available to the public which plaintiff already knew, as he read political news including when opposition candidates dug-up PTI deals of their opponents.

243.    Plaintiff maintains that he was falsely imprisoned again, when he had to submit to arrest at the Asbur Park Police Station and also to an excessive amount of court dates as he had over 100 appearances. Each day he was coerced under the threat of arrest and possible police violence if he did not report to the confinement defined by the defendants, for the duration of time defined by the defendants, which was often all day. Thompson was excruciatingly aware of the confinement and protested it several times on the record that the prosecutor was lying and that his own attorneys were helping to protect the prosecutor. This included a hearing before Judge Lourdes Lucas where Thompson had written to the Judge and also verbally pleaded with her at the hearing that his own attorney Ted Bertuccio of KALAVRUZOS, MUMOLA, HARTMAN, LENTO & DUFF LLC &D Law Firm was protecting the prosecutor as the prosecutor had lied in the grand jury room and then reversed dates at a hearing to

77

dismiss the indictment. Plaintiff protested his arrest at the APPD as well. All three: Judge Lucas, Ted Bertuccio

and Prosecutor Fichter visibly smirked and snickered at Thompson as he stood in agony in this situation. Each

actor has an ethical responsibility to report unlawful conduct which they violated. John Perrone, Esq. was fired

by Thompson for the similar conduct notably when he was actively protecting the prosecutor and not reporting

or addressing criminal and unlawful acts by the false accusers and the prosecutors.

244.    Similarly, Defendant Perrone refused to reject a PTI deal even though Plaintiff repeatedly instructed him

to do so.

245.    Following a hearing where Prosecutor Thomas Fichter (at minimum) reversed dates to conceal guilt of

false accusers and make plaintiff look guilty, lied about the status of the charge of harassment against defendant

burgos as well as fabricated his own definition of "Not Established" plaintiff pleaded with Defendant Bertuccio

to alert the court of these actions in emails dated:

> i.    March 12, 2020
>
> ii.    March 17, 2020
>
> iii.   April 4, 2020
>
> iv.    June 10, 2020

246.    As defendant Bertuccio refused to take any action, plaintiff then emails every named Partner at

KALAVRUZOS, MUMOLA, HARTMAN, LENTO & DUFF LLC  Law pleading for a response on August 28,

2020. Plaintiff pleaded with all named partners.

247.    At least one more time via email on November 2, 2020 to take action and legally defend plaintiff against

Prosecutor's latest fabricated evidence and suppression of evidence. Defendant Bertuccio (plaintiff believes

with Defendant KALAVRUZOS, MUMOLA, HARTMAN, LENTO & DUFF LLC  Law's permission or

acquiescence) begins to threaten plaintiff that if he "mentions the prosecutor again, I will recuse myself from

the case."

248.    By November 18, 2020 defendant Bertuccio (and Plaintiff believes defendant KALAVRUZOS,

MUMOLA, HARTMAN, LENTO & DUFF LLC  Law) begin using a motion for recusal as a tool of coercion.

See email to Judge Lourdes Lucas dated January 6, 2021 where plaintiff alerts the new Judge overseeing the

case that the motion to recuse is being used as a threat to silence me about the unlawful actions of Prosecutor

Fichter. Plaintiff repeats these assertions in the hearing before Judge Lucas as well.


249.    When defendant Bertuccio threatened Plaintiff, Plaintiff's girlfriend contacted KALAVRUZOS,

MUMOLA, HARTMAN, LENTO & DUFF LLC  Law partner of the firm regarding the threatening behavior in

an attempt to resolve the issue. Plaintiff will confirm the approximate dates of this occurrence. The contact with

the Law Partner did not result in any change in behavior by Defendant Bertuccio and plaintiff believes the law

firm approved or acquiesced to the threats and coercion against him.


250.    Defendant Bertuccio would not adjust the motion for psychiatric records of the false accusers: mother and

daughter......after Prosecutor Fichter responded stating that general records requests cannot be made but must

be narrowed. Plaintiff had records which would allow Defendant Bertuccio to narrow the request to comply

with law. However, plaintiff believes this shows Bertuccio was deliberately acting in concert with the state

against Plaintiff and engaging in legal malpractice to ensure that the motion failed. After Defendant Bertuccio

refused the information that was offered to cure the pronounced deficiency, the judge rejected the motion for

exactly the deficiency that the information Defendant Bertuccio rejected would have cured.


251.    As a final example, at a hearing before Judge Lucas, Plaintiff broke down hysterically crying having not

seen or heard from his daughter in close to (2) years at that point. **Shockingly** it was Plaintiffs own attorney,

Edward C. Bertuccio who verbalized his absolute disgust and disdain for plaintiff by disparaging him.

252.  Plaintiff complained to KALAVRUZOS, MUMOLA, HARTMAN, LENTO & DUFF LLC  law when he could not get in touch with Defendant Bertuccio or get information about my case. KALAVRUZOS, MUMOLA, HARTMAN, LENTO & DUFF LLC  Law then took action moving Ted Bertuccio to the Number 1 key prompt for any caller wanting to leave him a message.

253.    Plaintiff believes KALAVRUZOS, MUMOLA, HARTMAN, LENTO & DUFF LLC  Law hired Defendant Bertuccio knowing he is a problematic attorney, as he was a named partner at his previous firm with his name on all building signage but at the time plaintiff retained him he was operating as a regular attorney at KALAVRUZOS, MUMOLA, HARTMAN, LENTO & DUFF LLC  Law – an unusual career move for a New Jersey Supreme Court Certified Criminal Defense Attorney. Plaintiff asserts that Defendant Law Firm KMHL&D Law had FORESEEABILITY that Defendant Bertuccio was a problematic and dangerous employee and attorney.

254.  Defendant Perrone detailed his strategy to handle the pre-indictment proceedings as well as DCP&P. However, Perrone failed utterly to ensure that the clearly exculpatory evidence of the DCP&P Finding was presented in grand jury. I assert that this failure resulted in my being indicted unlawfully. Defendant Perrone then failed to identify the asserted unlawful actions of the prosecutor to bring up post indictment. Yet Defendant Perrone always spoke highly of his opinion of Thomas Fichter and also of his relationship with him. I assert that Defendant Perrone shows with his actions and his words that he favored conspiring with the prosecutors than he did defending his client who was innocent.

255.    The actions of the above defendants resulted in a severely protracted criminal justice malicious

prosecution that lasted for over 41 months, when there should have been no indictment or arrest to begin with –
plaintiff asserts a violation of my 6th Amendment Right to a speedy trial.


256.    Plaintiff includes Defendants Perrone and Bertuccio's disbarment and limited criminal history for the

court to consider. Apart from any normal criminal history of any individual these acts were committed as

officers of the courts.


Defendant Attorney John J. Perrone was:

- Convicted of Mail Fraud in the Federal Court for the District of New Jersey.

- Disbarred from the practice of law for 18 months.


Defendant Attorney Edward C. Berucci:

Foreseeability should be a significant factor in the court's review as plaintiff alleges that both,

KMHL&D Law knew that Defendant Bertuccio was a problematic attorney before hiring him, and they were

warned during the period of tortious activity by the plaintiff.

Furthermore the below may be of use to the court as it is allowed to use it "experience and common

sense" to weigh viability of civil claims:

**Defendant Bertuccio has active complaints open with the Office of Attorney Ethics:**

- **"Screamed, Berated and Insulted" Judge Basen** of Freehold Township while in court.

- **"Discourteous behavior"** towards **Judge Lourdes Lucas** while in court, Monmouth County

    Vicinage.

- Office of Public Defender's Complaint alleging (5) violations of the Rules of Professional Conduct

    and citing that **Judge Joseph Oxley "Threw him out of court and asked Sheriffs Officers to**

    **perform a sobriety check"** – Monmouth County Vicinage.

- Complaint generated from a **Freehold Police Report** stating that **Defendant Bertuccio Battered an Uber Driver over the head with his cane, then hid inside his office to avoid the police.**

Defendant Bertuccio was disbarred from legal practice June 20, 2022 by Supreme Court Justice Stuart Rabner as published in the SUPREME COURT OF NEW JERSEY Attorney Ineligibility Order Pursuant to Rule 1:28-2(a).

257. Plaintiff alleges that Defendant Attorneys either negligently or purposefully caused these harms.

258. Defendants whether intentionally, knowingly, maliciously, recklessly, and/or negligently committed these acts and are the direct and proximate harm to plaintiff and did violate plaintiff's clearly established constitutional rights under the 1st, 4th, 5th, 6th and 14th Amendments.

## Summation

259. Family Court Judge Gregory Acquaviva during the prosecution dismissed Thompson's concerns of his daughter's safety and the fact that Angela Perry was violating his most recent family court order in favor of feeding into the Prosecutor's narrative that Thompson posed a danger to his daughter and he hastily approved a motion by the mother to move the child back to Florida. This was based on the Prosecutor's deceptions resulting in an exacerbation of the family separation that Thompson and his other family members already endured. An enire lifetime of struggle to not only be the best father that the plaintiff could be but also to overcome the barriers of the legal system to get S.T. into a safe and stable environment was destroyed and reset with the child back in the hands of the unstable and abusive parent, all based on lies, fabrications and deceptions.

260.    The malicious actions listed above resulted in irreparable intergenerational harm, immense legal fees,

szimmense loss of revenue, immense loss of employment opportunities, loss of grant revenue, severe

psychological stress, severe emotional damage, severe spiritual damage, alienation and stigmatization from

friends, family, community, suffered public ridicule and harassment online. Many online posts and statements

had specific information about the case and the accusations. This makes me believe that the commentors, some

of which were fake accounts, were either law enforcement, the accusers themselves or somehow receiving

information from one of those two groups see EXHIBIT I. Most importantly though, was the utter destruction

of Thompson's relationship with his daughter.

261.    Thompson demanded trial from day one, despite this Police, Prosecutors continued their malicious

prosecution for 41 months. In the end Thompson stood alone after his attorneys betrayed him and stated he

would represent himself. Judge Lourdes Lucas admonished Thompson one last time then hastily agreed to

accept at a later date an unannounced motion by the prosecutor to drop the charges outright.

262.    Thompson can no longer enjoy holidays, visiting with family or friends or any activity of daily life

without the reminder of what has been purposefully destroyed. When others share the joy of their children's life

milestones, birthdays, going off to college, Thompson relives the pain of what he will never experience because

of the unlawful, criminal and malicious actors and actions listed above in this complaint.



## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Randy Thompson prays for relief as to all counts as follows:

•     1) For judgement against the Defendants jointly, severally, and alternatively, for general, compensatory,

punitive, and exemplary damages, with interest;

•     2) Reasonable attorney's fees and costs of suit pursuant to 42 U.S.C. 1988,

•     3) Injunctive Relief be ordered that when defendants give reasonable cause that there is prosecutorial

misconduct and/or malicious prosecution that a committee of civil rights attorneys review the allegation.

•     4) For a ruling by the Federal Court that Prosecutor Thomas Fichter violated case law in order to

unlawfully obtain an indictment against Plaintiff Randy Thompson who had been cleared by DCP&P and

Prosecutor Moica Do Oteiro attacked the credibility of the DCP&P report with false statements in order to

further harm plaintiff.

•     5) For such other and further relief as this Court may deem equitable and just.

**DEMAND FOR JURY TRIAL**

Plaintiff Randy Thompson demands a trial by jury on all issues so triable, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: September 16, 2023

2nd Amended Complaint Submitted: August 13, 2025

Respectfully Submitted,

Randy Thompson

# EXHIBIT B

**Edward C. Bertuccio, Esq. – Attorney ID# 031441983**
**KALAVRUZOS, MUMOLA, HARTMAN, LENTO & DUFF, LLC**
2681 Quakerbridge Road
Hamilton, New Jersey 08619
Phone No.: (609) 586-9000 Fax No.: (609) 586-9404
Attorney for Randy Thompson

| | |
|---|---|
| STATE OF NEW JERSEY<br><br>Plaintiff,<br><br>vs.<br><br>RANDY THOMPSON<br><br>Defendant. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION – MONMOUTH COUNTY<br>CRIMINAL PART<br><br>INDICTMENT NO.: 18-08-1053<br><br>**ORDER RELIEVING KALAVRUZOS,<br>MUMOLA, HARTMAN, LENTO & DUFF,<br>LLC AS COUNSEL FOR DEFENDANT<br>ON SHORT NOTICE** |

THIS MATTER having been brought before the Court upon the application of

Kalavruzos, Mumola, Hartman, Lento & Duff, LLC, attorney for Defendant, Randy

Thompson, seeking an Order for Kalavruzos, Mumola, Hartman, Lento & Duff, LLC to be

relieved as Defendant's counsel, on notice to Mr. Thompson, Defendant and Thomas

Fichter, Assistant Prosecutor of the Monmouth County Prosecutor's Office, attorney for the

State, and the Court having considered the papers submitted, the arguments of the counsel,

and good cause having been shown,

IT IS on this _____7th_____ day of _____January_____ 2021;

ORDERED that Kalavruzos, Mumola, Hartman, Lento & Duff, LLC is relieved as

counsel for Defendant in the within matter;

IT IS FURTHER ORDERED that a copy of the within Order shall be served on all

parties within _____7_____ days of the date of such Order.

_____/s/ Lourdes Lucas_____
HONORABLE LOURDES LUCAS, J.S.C.

Motion is granted for the reasons set forth on the record at oral argument on January
6, 2021. Motion was unopposed by the State. The court notes that defendant indicated at the
hearing that he had sent a letter to the court via email to the court's clerk just prior to the

motion hearing.  The email was sent to the court's staff and addressed to the court ex-parte.
As the record reflects the court had not seen the letter prior to the motion hearing.  A copy
of same has been forwarded to all counsel.  The communication from defendant further
highlights the breakdown in the attorney-client relationship as found by the court at the
motion hearing.

# EXHIBIT C

20231214120302

AO 440 (Rev. 06/12) Summons in a Civil Action

## RETURN OF SERVICE

SERVICE OF:     **SUMMONS AND COMPLAINT**
EFFECTED (1) BY ME:  **WILLIAM LAGUER**
TITLE:            **PROCESS SERVER**

DATE: **12/15/2023 4:21:13 PM**

CHECK ONE BOX BELOW TO INDICATE APPROPRIATE METHOD OF SERVICE:

[X] Served personally upon the defendant

KMHL&D LAW OFFICES

Place where served:

3500 QUAKERBRIDGE ROAD, SUITE 202   HAMILTON  NJ  08619

[   ] Left copies thereof at the defendant's dwelling house or place of business with a person of suitable age and discretion then residing therein. Name of person with whom the summons and complaint were left:

ANNA MICROUTSICOS

Relationship to defendant    **PERSON AUTHORIZED TO ACCEPT SERVICE**

Description of Person Accepting Service:

SEX:_F___  AGE:_21-35_  HEIGHT:_5'4"-5'8"_   WEIGHT: _131-160 LBS._   SKIN:_WHITE___   HAIR:_BROWN___  OTHER:_____

[X] To the best of my knowledge, said person was not engaged in the U.S. Military at the time of service

## STATEMENT OF SERVER

TRAVEL$ _____.____           SERVICES $_____.____           TOTAL $_____.____

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in this Return of Service and Statement of Server is true and correct.

**Served Data:**
Subscribed and Sworn to me this

15th day of December, 2023

Notary Signature _____

Rosemary Ramos          September 25th, 2028
Name of Notary             My Commission Expires

*(Notary seal: ROSEMARY RAMOS, NOTARY PUBLIC, STATE OF NEW JERSEY, My Commission Expires September 25, 2028)*

I, WILLIAM LAGUER,
was at the time of service a competent adult, over the age of 18 and not having direct interest in the litigation. I declare under penalty of perjury that the foregoing is true and correct.

_____
Signature of Process Server

_12/15/2023_
Date

ATTORNEY:     RANDY C. THOMPSON, PRO-SE
PLAINTIFF:      RANDY C. THOMPSON
DEFENDANT:   NEW JERSEY ATTORNEY GENERAL, ET AL
VENUE:         DISTRICT
DOCKET:       3 23 CV 20468 ZNQ TJB
COMMENT:

# EXHIBIT D

AO 440 (Rev. 06/12) Summons in a Civil Action

## RETURN OF SERVICE

SERVICE OF: **SUMMONS AND COMPLAINT**
EFFECTED (1) BY ME: **WILLIAM LAGUER**
TITLE: **PROCESS SERVER**

DATE: **12/15/2023 4:21:13 PM**

CHECK ONE BOX BELOW TO INDICATE APPROPRIATE METHOD OF SERVICE:

[X] Served personally upon the defendant

KMHL&D LAW OFFICES

Place where served:

3500 QUAKERBRIDGE ROAD, SUITE 202   HAMILTON  NJ  08619

[  ] Left copies thereof at the defendant's dwelling house or place of business with a person of suitable age and discretion then residing therein. Name of person with whom the summons and complaint were left:

ANNA MICROUTSICOS

Relationship to defendant   **PERSON AUTHORIZED TO ACCEPT SERVICE**

Description of Person Accepting Service:

SEX:F___  AGE:21-35_  HEIGHT: 5'4"-5'8"___  WEIGHT: 131-160 LBS.___  SKIN:WHITE___  HAIR:BROWN___  OTHER:_____

[X] To the best of my knowledge, said person was not engaged in the U.S. Military at the time of service

## STATEMENT OF SERVER

TRAVEL$ _____.____          SERVICES $_____.____          TOTAL $_____.____

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in this Return of Service and Statement of Server is true and correct.

**Served Data:**
Subscribed and Sworn to me this

15th day of December, 2023

Notary Signature _____

Rosemary Ramos          September 25th, 2028
Name of Notary          My Commission Expires

*[Notary seal: ROSEMARY RAMOS — NOTARY PUBLIC — STATE OF NEW JERSEY — My Commission Expires September 25, 2028]*

I, WILLIAM LAGUER,
was at the time of service a competent adult, over the age of 18 and not having direct interest in the litigation. I declare under penalty of perjury that the foregoing is true and correct.

_____
Signature of Process Server

_12/15/2023_
Date

ATTORNEY:   RANDY C. THOMPSON, PRO-SE
PLAINTIFF:   RANDY C. THOMPSON
DEFENDANT:   NEW JERSEY ATTORNEY GENERAL, ET AL
VENUE:   DISTRICT
DOCKET:   3 23 CV 20468 ZNQ TJB
COMMENT:

# EXHIBIT E

GALICKI et al v. STATE OF NEW JERSEY et al    Doc. 123
Case 1:23-cv-20468-ESK-EAP    Document 157-2    Filed 09/19/25    Page 98 of 134
PageID: 2680

<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ZACHARY GALICKI, et al.,<br><br>              Plaintiffs,<br><br>v.<br><br>STATE OF NEW JERSEY,<br><br>              Defendants. | Civil Action No. 14-169 (JLL)<br><br><br>**OPINION** |

| | |
|---|---|
| GW CAR SERVICE, LLC, et al.,<br><br>              Plaintiffs,<br><br>v.<br><br>STATE OF NEW JERSEY, et al.,<br><br>              Defendants. | |

**LINARES, District Judge.**

     This matter comes before the Court by way of Motions to Dismiss Plaintiffs'

Consolidated Amended Class Action Complaint filed by Michael Drewniak, State of New

Jersey, Bill Stepien, the Port Authority of New York & New Jersey, Chris Christie for Governor,

Inc., and Bill Baroni (collectively, "Defendants") pursuant to Federal Rule of Civil Procedure

12(b)(6). [Docket Entry Nos. 84, 86, 87, 88, 89].[1]  The Court has considered the parties'

---

[1]  Also before the Court is a Motion by the State of New Jersey and Michael Drewniak to deny
class certification which the Court will deny as premature at this time [Docket Entry No. 85].

Dockets.Justia.com

submissions and decides this matter without oral argument pursuant to Federal Rule of Civil

Procedure 78.  For the reasons set forth below, Defendants' Motions to Dismiss are granted.

## I.    BACKGROUND[2]

Plaintiffs have filed a proposed Class Action Complaint asserting numerous claims

sounding in tort and civil rights violations as against the State of New Jersey, Chris Christie for

Governor, Inc. ("CCFG"), the Port Authority of New York and New Jersey ("the Port

Authority"), Bridget Anne Kelly, Michael Drewniak, David Wildstein, Bill Baroni, Bill Stepien,

as well as fictitious, and as yet unknown, individuals and corporations.  [Consolidated Class

Action Amended Complaint ("CAC"), at 1-21.]  Plaintiffs' claims, brought on behalf of a

putative class,[3] arise out of the closure of multiple lanes of traffic to the George Washington

Bridge from September 9, 2013 through September 13, 2013.  [*Id*.]

On January 9, 2014, Zachary Galicki, Joy Galicki, Eli Galicki, Robert Arnold, Kim

Joscelyn, Elizabeth Psaltos, Madeline Lobue, Hone Lee, Mark Katz, Liberty News, Inc., Dog On

It Doggie Daycare, Apple Corrugated Box Ltd., and Secaucus Limo Car Service LLP

---

Defendants are invited to renew their motion after Plaintiffs have filed an amended complaint
and discovery has proceeded.

[2]  The following facts are accepted as true solely for the purposes of this motion.

[3]  Plaintiffs propose to represent a class consisting of "all persons who are [United States]
residents . . . who were forced to suffer extreme traffic delays and to be stuck in their cars, waste
gas, and lose time from September 9, 2013 through September 13, 2013, when they traveled in or
around the Borough of Fort Lee, New Jersey and neighboring towns and/or when they attempted
to cross the [GWB]."  [CAC, ¶ 50.]  Plaintiffs also propose to represent two "subclasses," one
consisting of "class members who drove their cars in New Jersey, were stuck in extreme traffic
and delays in New Jersey, and paid a toll for the [GWB] from September 9, 2013 through
September 13, 2013," and a second comprising "class members who were traveling and/or
driving solely in New Jersey from September 9, 2013 through September 13, 2013, and were
stuck in extreme traffic and delays in New Jersey."  [*Id*. at 51-52.]

(collectively "Galicki Plaintiffs"), filed a Complaint against the State of New Jersey; Governor

Christie; Bridget Anne Kelly, a former employee of the Governor's Office; the Port Authority;

former Port Authority employees Bill Baroni and David Wildstein and various other ABC

Corporations and John Does (collectively, "Galicki Defendants"), alleging violations of federal

law and New Jersey common law claims.  [Docket Entry No. 1].

On or about January 13, 2014, Plaintiffs GW Car Service, LLC, Lime Taxi, LLC,

Palisades Enterprises, LLC, Fort Lee Car Service LLC, Vans R Us, Bergen Transportation

Services, Inc., Robert Cohen, Joan Cohen and Victor Cataldo ("GW Car Service Plaintiffs") filed

a Complaint in the Superior Court of New Jersey, Bergen County against the State of New

Jersey; Governor Christie's reelection campaign, Chris Christie for Governor, Inc.; David

Wildstein; Bill Baroni; Bridget Kelly; Michael Drewniak, a current employee of the Governor's

Office; and Bill Stepien, a former employee of the Governor's reelection campaign (collectively,

"GW Car Service Defendants").  [Civil Action No. 14-1319 (WHW), Docket Entry No. 1].  On

February 28, 2014, Defendants the State of New Jersey and Mr. Drewniak (collectively "State

Defendants") removed that matter to this Court.  [*Id*.]

On March 24, 2014, the Galicki Plaintiffs filed a Motion to Consolidate this matter with

GW Car Service and to file a First Consolidated Amended Complaint.  [Docket Entry No. 39].

On August 18, 2014, the Court granted the Galicki Plaintiffs' Motion to Consolidate.  [Docket

Entry Nos. 57 & 58].

On November 14, 2014, Plaintiffs filed a Motion for Leave to file a Consolidated Class

Action Amended Complaint, which the Court subsequently granted.  [Docket Entry Nos. 69 &

70].  On December 19, 2014, Plaintiffs filed the instant CAC.  [Docket Entry No. 71].  The CAC

removed Governor Christie as a defendant and dropped the Galicki Plaintiffs as named plaintiffs.

[CAC at 1-21]. The CAC alleges claims for deprivations of Plaintiffs' federal constitutional rights under 42 U.S.C. §§ 1983, 1985 and 1986, "vicarious liability and/or governmental responsibility;" attorney's fees and costs under 42 U.S.C. § 1988; violations of New Jersey's RICO statute; violations of Plaintiffs' New Jersey Constitutional Rights under the New Jersey Civil Rights Act; common law civil conspiracy; consumer fraud; breach of contract; and respondeat superior against the State of New Jersey, the Port Authority, and CCFG, for the actions of their agents, employees and servants. [*Id*. at 1-21].

Currently before the Court are Motions to Dismiss Plaintiffs' CAC pursuant to Rule 12(b)(6) by Defendants State of New Jersey, Michael Drewniak, Bill Baroni, Bill Stepien, CCFG, and the Port Authority. [Docket Entry Nos. 84, 86, 87, 88, 89].

## II.    LEGAL STANDARD

For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 545 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In determining the sufficiency of a complaint, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). Additionally, in evaluating a plaintiff's claims, generally "a court looks only to the facts alleged

4

in the complaint and its attachments without reference to other parts of the record." *Jordan v.*

*Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994).

## III.    DISCUSSION

Defendants' Motions to Dismiss the CAC will be granted and Plaintiffs will be given the

opportunity to amend most of their claims.  The CAC as it stands now does not satisfy the

mandate of Fed. R. Civ. P. 8(a).  The Court begins its discussion by noting an overarching defect

in Plaintiffs' claims against all Defendants—namely, the lack of any substantive facts concerning

each Defendant's role in the context of the closures and redirection of tollbooth lanes at the

entrance to the GWB from September 9 through September 13, 2013.  The CAC, as currently

pled, fails to provide Defendants with adequate notice of the particular nature of the claims being

asserted against them.  The Court has carefully read through the CAC and finds that nearly every

reference to all Defendants is conclusory and made in the context of a formulaic recitation of the

elements of Plaintiffs' various claims.  Despite the multitude of media coverage and

governmental scrutiny about the facts and circumstances related to the incident giving rise to this

action, Plaintiffs provide only conclusory allegations against Defendants as a group, failing to

allege the personal involvement of any Defendant as is required.  *See Aruanno v. Main*, 467 F.

App'x 134, 137-38 (3d Cir. 2012) (dismissal of § 1983 action was appropriate where Defendants

were collectively sued as "[government] personnel" and failed to allege the personal involvement

of the individual Defendants).  For example, the CAC lacks any meaningful facts which establish

each individual Defendant's liability for the misconduct alleged.  Such vague and conclusory

allegations of unlawful conduct do not satisfy the plausibility standard with respect to any of the

claims asserted against Defendants.  *See Iqbal*, 556 U.S. at 678.

## A.    Count One – Violation of 42 U.S.C. § 1983

A plaintiff may have a cause of action under 42 U.S.C. § 1983 for certain violations of

his constitutional rights.  Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory ... subjects,
> or causes to be subjected, any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and
> laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress....

42 U.S.C. § 1983.  Thus, to establish a cause of action under § 1983, a plaintiff must demonstrate

that:  (1) there was a violation of a right secured by the Constitution and laws of the United

States, and (2) the alleged violation was committed by a person acting under color of state law.

*West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted).

Plaintiffs allege in their CAC that:

> 60. From September 9, 2013, through September 13, 2103,
> plaintiffs and members of the plaintiff class were lawfully driving
> and/or travelling on or near the roads located in the Borough of
> Fort Lee.
> 61. During said time and in the months preceding said time
> period, defendants while acting under the color of state law,
> improperly, illegally, and without authority conspired to close
> roads of travel, toll plazas, toll booths, and access to the George
> Washington Bridge from the Borough of Fort Lee to impose
> punishment against political opponents.
> 62. Said actions and misconduct constitutes a violation of
> the 5th and 14th Amendments to the Constitution of the United
> States of America as defendants caused the plaintiffs and members
> of the plaintiffs class to be deprived of life, liberty, pursuit of
> happiness without due process of law as they were trapped in their
> cars and forced to lose time that cannot be reclaimed, to lose
> money, to be denied their privileges and/or immunities of interstate
> and local travel, to be falsely restrained and/or imprisoned, to be
> denied the equal protection of the laws as other citizens and
> travelers did not have to face such extreme delays and congestion,
> and to suffer emotional damages.

1.  Rule 8(a)

Defendants move to dismiss Count One of Plaintiffs' CAC on the grounds that the § 1983 claim alleged against them fails to state a claim because all of the allegations contained in the CAC are conclusory and lack the factual detail required to state a cognizable claim against Defendants.  For the reasons set forth above, the Court agrees with Defendants and finds that Plaintiffs fail to differentiate their § 1983 claims against the various Defendants, which includes a not-for-profit, two governmental entities and several individuals, with respect to their alleged wrongdoing.  Instead, Plaintiffs simply lump all Defendants together, failing to put Defendants on notice of their own alleged wrongdoing.  Additionally, Plaintiffs' allegations are conclusory, stating nothing more than certain legal terms in an effort to plead their claim, *e.g.*, "negligently," "recklessly," "conspired" and "planned."  Accordingly, Plaintiffs' Count One of the CAC is dismissed *without prejudice*.

2.  State Action

Defendants, the State of New Jersey, Michael Drewniak, CCFG and Bill Stepien, argue that they are not subject to liability under § 1983 either because they are not "persons" within the meaning of § 1983 (the State of New Jersey and Michael Drewniak), *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64, 71 (1989), or because they are not state actors (CCFG and Bill Stepien).

Plaintiffs concede that the State of New Jersey is not a "person" and therefore not subject to suit under this section.  However, while Plaintiffs concede that Michael Drewniak is not a "person" in his official capacity and therefore not subject to suit under this section, they argue that they are suing him in his individual capacity.  Because Plaintiffs are being given leave to amend their § 1983 claims, any amendment should clarify that Michael Drewniak is being sued

in his individual capacity, as well as set forth his personal involvement, in their Amended Class Action Complaint.  Accordingly, Plaintiffs' § 1983 claim against the State of New Jersey is dismissed *with prejudice*.

With respect to the Motions to Dismiss Plaintiffs' § 1983 claims filed by CCFG and Bill Stepien, they argue that because they are not state actors within the meaning of § 1983, to be held liable pursuant to § 1983, there must be factual allegations which establish that they conspired with state actors to deprive Plaintiffs of their constitutional rights and that any such allegation is pled insufficiently.  *See Opoku v. Educ. Comm'n for Foreign Med. Graduates*, 574 F. App'x 197, 201 (3d Cir. 2014) (section 1983 "[l]iability would only attach if a private party conspired with a state actor.").  As the Court has already stated, Plaintiffs' § 1983 allegations are merely conclusory and have not been supported sufficiently by factual allegations.  The same is true of any allegation of a conspiracy between CCFG and Bill Stepien and the state actors.  The sum total of Plaintiffs' allegation is that "defendants . . . conspired."  For these reasons, Plaintiffs will be permitted leave to amend their § 1983 claim.

### 3.  Substantive Constitutional Violations

Because Plaintiffs will be permitted leave to amend their § 1983 claim, the Court notes that Plaintiffs' substantive allegations regarding the constitutional rights of which they have been deprived are deficient for the same reasons, *i.e.*, Plaintiffs' allegations are conclusory, suffer from "collectivized" pleading, fail to allege the requisite elements of each claim as to each defendant, and fail to put each individual defendant on notice of the particular allegations alleged against that defendant.  By way of example, the Court notes that Plaintiffs' Equal Protection claim fails as Plaintiffs have failed to allege any facts whatsoever which would demonstrate that Plaintiffs were subjected to different treatment than those similarly situated.  Accordingly,

Defendants' Motions to Dismiss Plaintiffs' § 1983 claim are granted. Plaintiffs will be permitted to amend their § 1983 claim as against all Defendants but the State of New Jersey.

    **B.**    **Count Two – Violation of 42 U.S.C. § 1985**

Section 1985(3) prohibits conspiracies directed at "depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). "To state a claim under § 1985(3), a plaintiff must allege: (1) a conspiracy; (2) motivated by racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." *See Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997) (citations omitted). "Thus, § 1985(3) defendants must have allegedly conspired against a group that has an identifiable existence independent of the fact that its members are victims of the defendants' tortious conduct." *Farber v. City of Paterson*, 440 F.3d 131, 136 (3d Cir. 2006). The United States Court of Appeals for the Third Circuit has explained:

> This independent existence is necessary to preserve the distinction between two of the requirements of a § 1985(3) claim: that the conspirators be motivated by class-based invidiously discriminatory animus and that the plaintiff be the victim of an injury he or she seeks to remedy by means of § 1985(3). If merely alleging the latter could satisfy the former, "the requirement of class-based animus would be drained of all meaningful content," and would transform § 1985(3) into the "general federal tort law" Congress did not intend to enact.

*Id.* at 136; *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993) ("Whatever may be the precise meaning of a 'class' for purposes of Griffin's speculative extension of § 1985(3) beyond race, the term unquestionably connotes something more than a

group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors.").

    Plaintiffs' CAC fails to allege, with sufficient factual support, Plaintiffs' membership in a class of individuals who have been subjected to "historically pervasive discrimination."  *See Magnum v. Archdiocese of Philadelphia*, 253 Fed. App'x. 224, 230 (3d Cir. 2007) (noting that "§ 1985 protects 'victims of historically pervasive discrimination' and those with 'immutable characteristics'") (quoting *Carchman v. Korman Corp.*, 594 F.2d 354, 356 (3d Cir. 1979)).  Nor does the CAC properly allege any class-based invidious discriminatory animus by any of the Defendants.  *See*, *e.g.*, *Farber*, 440 F.3d at 136 ("In order to ensure that a § 1985(3) class has an independent identifiable existence, a reasonable person must be able to 'readily determine by means of an objective criterion or set of criteria who is a member of the group and who is not.' For example, 'women,' or 'registered Republicans,' may constitute an identifiable 'class' as opposed to a more amorphous group defined by 'conduct that the § 1985(3) defendant disfavors,' such as 'women seeking abortion,' or 'persons who support [political] candidates'").  Having failed to allege, *inter alia*, membership in a group that has been subjected to "historically pervasive discrimination" or any facts even suggesting that Defendants were motivated by class-based invidious discriminatory animus, Plaintiffs have failed to state a viable § 1985(3) claim. *See*, *e.g.*, *Coles v. Carlini*, No. 10–6132, 2012 WL 1079446, at *14 (D.N.J. March 29, 2012) (dismissing § 1985(3) claim after finding that "invidious class-based discrimination is not at issue and there are no allegations involving a protected class.").  This claim is therefore dismissed *with* prejudice.

### C. Count Three – Violation of 42 U.S.C. § 1986

Violations of 42 U.S.C. § 1986 by definition depend on a pre-existing violation of § 1985. 42 U.S.C. § 1986. *See Clark v. Clabaugh*, 20 F.3d 1290, 1295 n.5 (3d Cir. 1994). Since a § 1985 claim has not been, and cannot be, properly alleged, a § 1986 claim likewise does not exist. Accordingly, Plaintiffs' § 1986 claims against Defendants are dismissed *with* prejudice.

### D. Count Four – Vicarious Liability/Governmental Responsibility

In Count Four of the CAC, Plaintiffs bring a claim against Defendants New Jersey, the Port Authority and CCFG for vicarious liability or governmental responsibility, alleging they are responsible for the actions of their agents, employees and servants. However, in their opposition brief, Plaintiffs appear to be pressing this claim solely against the Port Authority for the actions of its employees, Bill Baroni and David Wildstein.

While a governmental entity may not be held liable under a theory of respondeat superior liability for a violation of § 1983 solely because it is the employer of an alleged wrongdoer, *see Monell v. Department of Social Servs.*, 436 U.S. 658 (1978), a governmental entity may be held liable where "the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell*, 436 U.S. 658). A governmental entity's failure to properly train or supervise its employees can amount to a "custom" that will trigger § 1983 liability. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). A governmental entity may also be held responsible for a single decision made by an employee of the governmental entity where that employee had "final policymaking authority." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986).

11

The Court has already determined that Plaintiffs' § 1983 claim is deficient as pled.  In the absence of a valid § 1983 claim, there can be no respondeat superior liability.  The Court notes, however, that had the § 1983 claim proceeded at this time, this claim would nonetheless be subject to dismissal as it merely recites the legal standard via conclusory allegations and provides no facts to substantiate such a claim.  Therefore, Plaintiffs will be permitted leave to amend its claim as to the Port Authority only, as they have abandoned their claims against Defendants the State of New Jersey and CCFG.  Accordingly, Count Four of Plaintiffs' CAC is dismissed *with prejudice* as to the State of New Jersey and CCFG, and *without prejudice* as to the Port Authority.

### E.    Count Five – Violation of 42 U.S.C. § 1988

Plaintiffs assert a cause of action under § 1988, seeking attorney's fees.  Section 1988 provides that "[i]n any action or proceeding to enforce a provision of [various civil rights laws], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs…."  42 U.S.C. § 1988.  However, § 1988 does not create an independent cause of action.  *See Moor v. County of Alameda*, 411 U.S. 693, 702 (1973).  Rather, it is a vehicle for a prevailing party in an action to enforce rights under §§ 1983, 1985 and 1986 to obtain reasonable attorney's fees as part of the costs.  Therefore, Count Five of the CAC is dismissed *with* prejudice.

### F.    Count Six – Violation of New Jersey RICO Statute

Pursuant to New Jersey's RICO statute, N.J.S.A. 2C:41-1 *et seq.*, it is unlawful to be "employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  N.J.S.A. 2C:41-

2(c).  To plead a claim for a violation of New Jersey's RICO statute, a plaintiff must allege:  "(1) the existence of an enterprise; (2) that the enterprise engaged in activities that affected trade or commerce; (3) that the defendant was employed by or associated with the enterprise; (4) that the defendant participated in the conduct of the affairs of the enterprise; (5) that the defendant participated through a pattern of racketeering activity; and (6) that the plaintiff was injured as a result of the conspiracy."  *Slimm v. Bank of Am. Corp.*, No. 12-cv-5846, 2013 U.S. Dist. LEXIS 62849, at *69-70 (D.N.J. May 2, 2013).  A claim brought pursuant to N.J. RICO is subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b).  *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004), *abrogated in part on other grounds by Twombly*, 550 U.S. at 557; *Fimbel v. Fimbel Door Corp.*, 2014 WL 6882004, at *6 (D.N.J. Dec. 10, 2014) ("Courts have held that a claimant pleading a NJ RICO violation must comport with Rule 9(b)'s heightened pleading requirements for fraud.").

"Under the RICO Act, 'enterprise' is an element separate from the 'pattern of racketeering activity,' and the State must prove the existence of both in order to establish a RICO violation."  *State v. Ball*, 141 N.J. 142, 161-62 (1995).  The enterprise requirement under N.J. RICO requires a common purpose and an ascertainable structure "support[ing] the inference that the group engaged in carefully planned and highly coordinated criminal activity."  *Id.* at 162.  In addition, "the pattern of racketeering activity and the activity criminalized under RICO should be, or threaten to be, ongoing. . . . [S]ome degree of continuity, or threat of continuity, is required and is inherent in the 'relatedness' element of the 'pattern of racketeering activity.'"  *Id.* at 167-68.

Defendants move to dismiss Plaintiffs' claim brought pursuant to the N.J. RICO statute, arguing that the CAC fails to meet the heightened pleading requirement of Fed. R. Civ. P. 9(b)

13

and "provides nothing more than unadorned conclusory allegations – identifies no predicate racketeering act, much less a 'pattern' of such conduct that extended beyond the September 2013 lane closures." *See*, *e.g.*, Def. William Stepien Br. p. 16.  Plaintiffs' sum total of allegations in the CAC are as follows:

> 85.    Defendants' improper actions and misconduct constituted racketeering activity as they created an enterprise that affected trade and/or commerce as defined in N.J.S.A. 2C:41-1 et seq.
> 86.    Defendants' improper actions and misconduct constitute a pattern of racketeering activity as there were at least two racketeering activities.
> 87.    In the event that a defendant did not directly participate in a specific racketeering activity, all defendants are a part of each racketeering activity as all defendants conspired to engage in improper actions and misconduct alleged herein.

CAC, ¶¶ 85-87.

As an initial matter, the Court agrees with Defendants that Plaintiffs' N.J. RICO allegations as currently pled in the CAC are very general and conclusory, failing to provide each Defendant with notice of its alleged participation in the racketeering enterprise.  Plaintiffs' N.J. RICO claim will be dismissed because it fails to meet the heightened pleading requirement of Fed. R. Civ. P. 9(b) as it fails to set forth with particularity the circumstances surrounding its N.J. RICO claim.  Based on the totality of the allegations Plaintiffs have made against Defendants, the Court finds that Plaintiffs have failed to set forth any facts which would establish the existence of an enterprise that is separate and apart from the alleged pattern of racketeering activity as they are required under the law.  In addition, Plaintiffs have failed to allege any facts to support an allegation that there is an ongoing RICO pattern.  Further, Plaintiffs' CAC is devoid of any allegation that there were two predicate acts of racketeering as required by N.J.S.A. 2C:41-1(a).

Accordingly, the Court will grant Defendants' Motions to Dismiss Count Six of the CAC for a violation of N.J. RICO. Such dismissal will be *without prejudice* to Plaintiffs' right to amend this claim to plead with particularity the elements necessary to establish that each Defendant violated the statute.

### G.    Count Seven – Violation of New Jersey Civil Rights Act, N.J.S.A. 10:6-1

In addition to bringing claims pursuant to § 1983, Plaintiffs also bring a claim under the New Jersey State Constitution through the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6-1. A person may bring a civil action under the NJCRA in two circumstances: "(1) when he's deprived of a right, or (2) when his rights are interfered with by threats, intimidation, coercion or force." *Felicioni v. Admin. Office of Courts*, 404 N.J.Super. 382, 400 (App. Div. 2008). The NJCRA was modeled after § 1983, and thus courts in New Jersey have generally looked at claims under the NJCRA "through the lens of § 1983." *Trafton v. City of Woodbury*, 799 F.Supp.2d 417, 443–44 (D.N.J. 2011); *see also Chapman v. New Jersey*, No. 08–4130, 2009 WL 2634888, *3 (D.N.J. Aug.25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart...."); *Armstrong v. Sherman*, No. 09–716, 2010 WL 2483911, *5 (D.N.J. June 4, 2010) ("[T]he New Jersey Civil Rights Act is a kind of analog to section 1983 ...."); *see generally Hedges v. Musco*, 204 F.3d 109, 121 n. 12 (3d Cir. 2000) (concluding that New Jersey's constitutional provisions concerning search and seizures are interpreted analogously to the Fourth Amendment).

There is no dispute that Plaintiffs' NJCRA claim and § 1983 claim are based on the same underlying facts and theories. Having concluded that the CAC fails to state a viable §1983 claim, Count Seven will also be dismissed *without prejudice* for the reasons discussed above.

15

### H.    Count Eight – Common Law Civil Conspiracy

A civil conspiracy in New Jersey is defined as "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2005). To state a cause of action, a plaintiff must allege four elements: "(1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means; and (4) proof of special damages." *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 (3d Cir. 2003) (citing *Naylor v. Harkins*, 99 A.2d 849, 855 (N.J. Super. Ct. Ch. Div. 1953), *modified on other grounds*, 109 A.2d 19 (N.J. Super. Ct. App. Div. 1954)).

Here, Plaintiffs' CAC contains merely conclusory allegations with respect to any alleged concerted activity of Defendants and fails to set forth any allegations of fact with respect to Defendants' joint action. While Plaintiffs claim that "Defendants acted in concert to engage in the improper actions and misconduct . . . by agreement between them to inflict a wrong or injury against plaintiffs and members of the plaintiff class," [CAC, ¶ 98], the CAC is devoid of any particularized facts which describe the purported agreements between Defendants, the location and time that the agreement was planned, the nature and extent of the unlawful purpose which formed the basis of the conspiracy, or the means by which the alleged scheme was achieved. Accordingly, Plaintiffs' Count Eight is dismissed *without prejudice* to Plaintiffs' right to amend the Class Action Complaint to set forth a viable common law civil conspiracy claim under New Jersey law which sets forth the who, what, when, where, and how of the conspiracy.

**I.        Count Nine – Violation of New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1**

To state a claim pursuant to the New Jersey Consumer Fraud Act ("CFA"), a plaintiff

must generally allege three elements: (1) unlawful conduct, (2) an ascertainable loss, and (3) a

causal relationship between the defendants' unlawful conduct and the plaintiffs' ascertainable

loss. *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*, 192 N.J. 372,

389 (2007). The broad definition of unlawful practice covers affirmative acts and knowing

omissions, as well as regulatory violations. *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 17 (1994).

When the alleged unlawful act consists of an affirmative act, "intent is not an essential element

and the plaintiff need not prove that the defendant intended to commit an unlawful act.

However, when the alleged consumer fraud consists of an omission, the plaintiff must show that

the defendant acted with knowledge, and intent is an essential element of the fraud." *Id.* at 17–

18. While a "breach of warranty or contract is unfair to the non-breaching party," a breach of

warranty alone is not a *per se* unlawful practice. *Id.* A claim under the NJCFA requires more; it

requires that a plaintiff allege "substantial aggravating circumstances." *Suber v. Chrysler Corp.*,

104 F.3d 578, 587 (3d Cir. 1997); *see also Cox*, 138 N.J. at 18. To meet this standard, a plaintiff

must demonstrate that the business behavior in question "stand[s] outside the norm of reasonable

business practice in that it will victimize the average consumer." *Turf Lawnmower Repair, Inc.

v. Bergen Record Corp.*, 139 N.J. 392, 416 (1995). Additionally, to adequately state a claim

under the CFA, not only must a plaintiff allege facts sufficient to establish the aforementioned

elements, but such allegation must be pled with particularity pursuant to Rule 9(b) of the Federal

Rules of Civil Procedure. *See Rait v. Sears, Roebuck and Co.*, No. 08–2461, 2009 WL 250309,

at * 4 (D.N.J. Feb. 3, 2009); *Parker v. Howmedica Osteonics Corp.*, No. 07–2400, 2008 WL

141628, at *3 (D.N.J. Jan.14, 2008). These requirements may be satisfied "by pleading the date,

17

place or time of the fraud, or through alternative means of injecting precision and some measure of substantiation into [the] allegations of fraud." *Lum*, 361 F.3d at 224 (internal quotations omitted).

In Count Nine of the CAC, Plaintiffs allege a cause of action for consumer fraud solely against Defendants Wildstein, Baroni and the Port Authority. Plaintiffs' sole allegation regarding Defendants' alleged fraud is that "defendants Wildstein, Baroni, and the Port Authority made representations regarding the access roads, toll plazas, and/or toll booths that were false and/or misleading." [CAC, ¶ 108.] Count Nine, as currently pled, is deficient for various reasons. First, the consumer fraud claim, as pled, fails to meet the heightened particularity requirements of Rule 9(b). Plaintiffs have failed to plead the date, time and/or place of the alleged misrepresentations made by Defendants. Plaintiffs have not even pled what were the misrepresentations that were made. In addition, Plaintiffs' claim is deficient as currently pled because Plaintiffs fail to set forth any facts which would establish a causal connection between Defendants' alleged unlawful conduct and Plaintiffs' ascertainable loss. Legal conclusions alone, without substantiating factual allegations, are insufficient to demonstrate the causal nexus required by the NJCFA. *See Dewey v. Volkswagen*, 558 F.Supp.2d 505, 526 (D.N.J. 2008), *modified on other grounds*, 558 F. App'x 191 (3d Cir. 2014). Therefore, Defendants' motions to dismiss this claim are granted. Accordingly, Count Nine is dismissed *without prejudice*.

### J.    Count Ten -- Breach of Contract

To establish a breach of contract claim under New Jersey law, a plaintiff must show that: (1) the parties entered into a valid contract, (2) the defendant did not perform his or her obligations under the contract, and (3) the plaintiff suffered damages as a result. *See Murphy v. Implicito*, 392 N.J. Super. 245, 265 (App. Div. 2007). A "covenant of good faith and fair dealing

is implied in every contract." *See Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 244 (2001) (citation omitted). This covenant requires that no party to a contract "shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Seidenberg v. Summit Bank*, 348 N.J. Super. 243, 254 (App. Div. 2002) (quotation marks and citation omitted). To prevail on a breach of contract claim grounded on an alleged breach of the implied covenant of good faith and fair dealing, a plaintiff must establish that the defendant "1) acted with bad motives or intentions or engaged in deception or evasion in the performance of contract; and 2) by such conduct, denied the plaintiff of the bargain initially intended by the parties." New Jersey Model Jury Charge (Civil), 4.10J "Bilateral Contracts: Implied Terms – Covenant of Good Faith and Fair Dealing" (December 2011) (citing *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Associates*, 182 N.J. 210, 225 (2005)).

In Count Ten of the CAC, Plaintiffs allege claims of a breach of contract and breach of the implied covenant of good faith and fair dealing against the Port Authority. However, Plaintiffs fail to allege any facts in support of these claims. For example, Plaintiffs do not allege any facts which establish that it entered into a contract with the Port Authority, whether it was an express or implied contract, what were the terms of that contract, what were the obligations of each party, whether Plaintiffs performed their duties under the contract and whether Plaintiffs sustained any damages as a result of Defendant's breach. Therefore, the Port Authority's motion to dismiss Count Ten of the Complaint is granted and Plaintiffs' Breach of Contract claim is dismissed *without prejudice*.

### K.    Count Eleven – Respondeat Superior

In addition to the claims against CCFG, the State of New Jersey and the Port Authority for direct liability for various N.J. RICO violations, Plaintiffs also allege a claim against CCFG,

the State of New Jersey and the Port Authority based on vicarious superior liability under N.J.

RICO.  While some courts have applied the doctrine of respondeat superior to N.J. RICO claims,

*see*, *e.g.*, *In re Tyco International, LTD.*, MDK Docket No. 01-1335-B All Cases Opinion No.

2007 DNH 072 (D.N.H. June 11, 2007), the Court will dismiss Plaintiffs' N.J. RICO respondeat

superior claim because Plaintiffs' N.J. RICO claim as pled is deficient.  Accordingly,

Defendants' motion to dismiss Count Eleven will be granted *without prejudice* to Plaintiffs' right

to file an Amended Class Action Complaint that sets forth a sufficient factual basis for claims of

violations of N.J. RICO statute and vicarious liability thereunder.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motions to Dismiss are **granted** and

Defendants' Motion to Deny Class Certification is **denied** as premature.  Counts Two, Three and

Five of the CAC are dismissed *with* prejudice.  An appropriate Opinion accompanies this Order.


DATED:  June 29, 2015

                                         s/ Jose L. Linares
                                         JOSE L. LINARES
                                         U.S. DISTRICT JUDGE

20

# EXHIBIT F

C.A. No. 08-243-ML

United States District Court, D. Rhode Island

# Peabody v. Griggs

Decided Oct 6, 2009

C.A. No. 08-243-ML.

October 6, 2009

## <u>MEMORANDUM AND ORDER</u>

MARY LISI, District Judge

This matter is before the Court on Plaintiffs' response to an order to show cause why their second amended complaint should not be dismissed. Having reviewed the memoranda submitted by the parties, and for the reasons outlined below, this Court finds that Plaintiffs have failed to show cause why the second amended complaint should not be dismissed.

## I. Background and Procedural History

On June 24, 2008, Plaintiffs filed a 19-count, 84-page 535-paragraph complaint in this court seeking both money damages and injunctive relief. Attached to that complaint as "exhibits" were a written statement and an affidavit. The original complaint alleged: (1) a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (2) a *2 violation of 18 U.S.C. 1962(b), (3) a violation of 18 U.S.C. § 1962(d), (4) a violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et. seq., (5) conspiracy to violate 18 U.S.C. § 2510, (6) a violation of R.I. Gen. Laws § 7-15-1 et. seq., (Rhode Island RICO), (7) two claims of a violation of the right of privacy, (8) "tortious interference with expectancy of inheritance," (9) breach of fiduciary duty, (10) "invalidation of real estate deed," (11) conversion, (12) "invalidation of will and codicil," (13) "invalidation of trust," (14)

2

abuse of process, (15) "exploitation," and (16) common law conspiracy. <u>See</u> Complaint (Docket #'s 1 and 2). On June 26, 2008, Plaintiffs filed a motion for a temporary restraining order. This Court denied that motion on June 30, 2008.

On September 8, 2008, Plaintiffs filed their first amended complaint pursuant to Fed.R.Civ.P. 15(a)(1). The first amended complaint is an 18-count, 97-page 538-paragraph document with 7 exhibits[1] attached, totaling an additional 36 pages.[2]

> [1] Two affidavits, two written statements, a photo, copies of nine letters (included as one exhibit) and a copy of a motion filed in the Warwick, Rhode Island Probate Court.

> [2] Plaintiffs dropped the "invalidation of will and codicil" count.

In early December 2008, Defendants filed motions to dismiss the first amended complaint. At oral argument on the motions, this Court directed the parties to address the requirements of Fed.R.Civ.P. 8. After reviewing the papers submitted in the matter, including the first amended complaint and exhibits, and considering the arguments of counsel, this Court determined that the first amended complaint was in violation of the "short and plain statement" requirement of Fed.R.Civ.P. 8. This Court dismissed the amended complaint without prejudice and gave Plaintiffs until May 13, 2009, to file a second amended complaint that complied with the Federal Rules of *3 Civil Procedure.[3]

> [3] Plaintiffs complain that the issue of a Rule 8 violation was not adequately raised in Defendants' memoranda in support of their



Peabody v. Griggs    C.A. No... (D.R.I. Oct. 6, 2009)

motions to dismiss the first amended complaint. (Defendants gave it "short shift. . . ." Plaintiffs' Memorandum Showing Case at 2.) Defendant Gerstein's memorandum in support of the motion to dismiss argued that the amended complaint "does extreme violence" to Rule 8, was an "affront" to Rule 8, and was an "embodiment of a Rule 8 violation." Defendant Gerstein's Memorandum in Support of Motion to Dismiss at 6, 26 n. 64, 46. Defendant Heal also argued that, to "say the least, the Complaint is incomprehensible and is violative of . . . Fed.R.Civ.P. 8. . . ." Defendant Heal's Memorandum in Support of Motion to Dismiss at 2. The Court rejects Plaintiffs' "short shift" argument as Defendants clearly raised the Rule 8 violation in their papers. Moreover, the Court may sua sponte raise a Rule 8 violation. Water Keeper Alliance v. United States Department of Defense, 199 F.R.D. 445 (D.P.R. 2001) (Rule 8 vests the Court with the discretion to enforce the Rule with or without motion).

On May 13, Plaintiffs filed the second amended complaint.[4] In the second amended complaint, Plaintiffs dropped four Defendants (the Griggs Browne companies) and four counts.[5] The second amended complaint includes 13 counts laid out in 380 paragraphs over 73 pages. Additionally, 6 exhibits, totaling 22 additional pages, are attached to the complaint. On May 15, 2009, this Court issued an order directing Plaintiffs to show cause in writing why the [*4] second amended complaint should not be dismissed for failure to comply with Fed.R.Civ.P. 8(a)(2). Plaintiffs filed their response to that order and Defendants have filed their opposition. This matter is now ripe for disposition.

4    The complaint alleges a scheme to gain control over the person and estate of Glenn E. Griggs ("Mr. Griggs") through alleged fraud on Mr. Griggs and upon the Warwick, Rhode Island Probate Court. The complaint chronicles a contentious and long-standing family feud regarding probate matters involving Mr. Griggs, the late patriarch of the Griggs family and former owner of various businesses. The family discord has resulted in significant Rhode Island state court litigation. In October 2000, Plaintiffs Christine Peabody ("Christine") and Lauren Griggs ("Lauren"), daughters of Mr. Griggs, filed a petition with the Probate Court seeking appointment of a guardian for Mr. Griggs. The Probate Court denied the petition. Christine and Lauren unsuccessfully appealed that decision to the Rhode Island Superior Court and to the Rhode Island Supreme Court. See Griggs v. Estate of Griggs, 845 A.2d 1006 (R.I. 2004). In June 2003, Defendant Dan Griggs ("Dan"), a son of Mr. Griggs, filed a petition for limited guardianship of Mr. Griggs in the Probate Court. The Probate Court, among other things, entered a temporary order placing Mr. Griggs in the custody of Defendants David Heal ("Heal") and Dan. Subsequent to that order, Heal was appointed the limited permanent guardian over certain of Mr. Griggs' assets. Courtney Griggs ("Courtney"), another daughter, and Christine and Lauren appealed the Probate Court's decision to the Rhode Island Superior Court. See In re Estate of Griggs, Nos. KP 2005-949, KP 2005-950, KP 2005-951, 2006 WL 3720309 (R.I. Superior Court December 12, 2006) ("Griggs II"). The Superior Court, however, dismissed the appeal for want of jurisdiction. Id. at *9. In that decision, the Superior Court noted that the matter involved "countless hours" of depositions, "numerous hearings," "hundreds of pages of documentary exhibits," and a "voluminous record." Christine and Courtney appealed Griggs II to the Rhode Island Supreme Court. In re Estate of Griggs, No. 07-288-A (R.I. Oct. 25, 2007). The Rhode Island Supreme Court dismissed the appeals based upon the appellants' failure to comply with the



Rhode Island Rules of Appellate Procedure. Id. According to the Defendants, as of September 2008, there were still issues relating to Griggs II pending in the Probate Court. Plaintiffs have now found their way to federal court.

5 Plaintiffs dropped the following counts: (1) conspiracy to violate 18 U.S.C. § 2510, (2) breach of fiduciary duty, (3) invalidation of real estate deed, and (4) invalidation of trust. Plaintiffs also combined two separate counts (declaratory and injunctive relief) in the first amended complaint into one count in the second amended complaint.

## II. Notice Pleading

The Federal Rules of Civil Procedure were originally adopted in 1938. The Federal Rules adopted "notice pleading," a procedural system requiring the pleader to make a "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Notice pleading eliminated pleading complexities, confusion and gamesmanship that arose in the previous pleading systems of common law pleading and code or fact pleading. See generally Mary Margaret Penrose Dace A. Caldwell, A Short and Plain Solution to the Medical Malpractice Crisis: Why Charles E. Clark Remains Prophetically Correct About Special Pleading and the Big Case, 39 Ga. L. Rev. 971 (2005). With the adoption of Fed.R.Civ.P. 8, requirements to use "magic," technical, or cookie-cutter words to properly plead a claim disappeared. Id. at 1006. "Rule 8 was intended to bury the most controversial part of code pleading — facts demonstrating the existence of a cause of action." Christopher M. Fairman, The Myth of Notice Pleading, 45 Ariz. L. Rev. 987, 1007 (2003).

"Notice pleading achieves efficiency through a legal system that compensates for minimal pleading at the outset of the suit by permitting fact gathering during the discovery phase and by allowing for summary adjudication for claims lacking merit, determined once the discovery process is complete." Benjamin W. Cheesbro, A Pirate's Treasure?: Heightened Pleading Standards For Copyright Infringement Complaints After Bell Atlantic Corp. v. Twombly, 16 J. Intell. Prop. L. 241, 245 (2009). The "Federal Rules only require that a complaint provide ample *5 notice to the defendant, enabling the defendant to answer" a complaint. Penrose, 39 Ga L. Rev. at 1006. Thus, the simple premise behind notice pleading is to give notice of the claim being made against an adversary and the grounds upon which a claim rests — rather than alleging in detail the specific facts upon which a claim is based. Plaintiffs in the federal system "need not lard their complaints with facts. . . ." Burns v. Raemisch, 555 F.3d 592, 594 (7th Cir. 2009); see also Hefferman v. Bass, 467 F.3d 596 (7th Cir. 2006) (in notice pleading plaintiff is not required to plead facts or legal theories).

## III. Fed.R.Civ.P. 8 and 9

As noted above, the general rules of pleading provide for a "short and plain statement of the claim showing that the pleader is entitled to relief. . . ." Fed.R.Civ.P. 8(a)(2). The short and plain statement must give "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Gargano v. Liberty International Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). The short and plain statement must give the defendants a "meaningful opportunity to mount a defense. . . ."Conley v. Massachusetts, Civil Action No. 09-11108-NG, 2009 WL 2096207 at *4 n. 5 (D. Mass. July 7, 2009) (internal quotation marks and citation omitted). "What constitutes a short and plain statement must be determined in each case on the basis of the nature of the action, the relief sought, and the respective positions of the parties in terms of the availability of information and a number of other pragmatic matters." 5 Charles A. Wright Arthur R. Miller, Federal Practice and Procedure § 1217 at 240-41 (3d ed. 2004). A plaintiff properly



Peabody v. Griggs    C.A. ... ... ... (D.R.I. Oct. 6, 2009)

pleads a claim for relief by "briefly describing the events" supporting the claim. Sanjuan v. American Bd. Of Psychiatry Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994) (emphasis added). *6

6

Rule 8 requires that each averment be "simple, concise and direct." Fed.R.Civ.P. 8(d)(1). The statement of the claim should be short because "unnecessary length places an unjustified burden on the court and on the party who must respond to it."Laurence v. Wall, No. CA 07-081 ML, 2007 WL 1875794 at *1 (D.R.I. June 27, 2007); see also Wright Miller § 1281 at 709 ("[u]nnecessary prolixity in a pleading places an unjustified burden on the district judge and the party who must respond to it because they are forced to ferret out the relevant material from a mass of verbiage"). "The statement should be plain because theprincipal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted to enable him to answer and prepare for trial." Laurence, 2007 WL 1875794 at *1 (emphasis added). This principle is particularly important in light of the requirement that a defendant "plead one of three alternatives in response to all of the allegations in a complaint, including attached documents or exhibits." Indiana Regional Council of Carpenters Pension Trust Fund, No. 2:06-CV-32-PPS-PRC, 2006 WL 3302642 at *2 (N.D. Ind. Nov. 9, 2006) (emphasis added); see also Calderon-Garnier v. Sanchez-Ramos, 439 F. Supp. 2d 229 (D.P.R. 2006), aff'd, 506 F.3d 22 (1st Cir. 2007); Fed.R.Civ.P. 8(b).

Fed. R. Civ. P. 9(b) requires that a plaintiff's averments of fraud specify the time, place, and content of the alleged false or fraudulent representation. United States ex rel. Duxbury v. Ortho Biotech Products L.P., ___ F. 3d ___, 2009 WL 2450716 (1st Cir. 2009); see also Ahmed v. Rosenblatt, 118 F.3d 886 (1st Cir. 1997) (RICO pleadings of mail and wire fraud must satisfy Rule 9(b)). The purpose of the heightened pleading requirement of Rule 9 is to give notice to a defendant of the plaintiff's claim, to protect defendants against meritless claims, to discourage

"strike suits" and to prevent the filing of suits that hope to uncover relevant information during *7 discovery. Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996). Rule 9(b) "supplements but does not supplant Rule 8(a)'s notice pleading." United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 186 (5th Cir. 2009); see also Tello v. Dean Witter Reynolds, Inc., 494 F.3d 956 (11th Cir. 2007) (Rule 8(a) and 9(b) must be read in conjunction with each other); United States ex rel. Williams v. Martin-Baker Aircraft Co. Ltd., 389 F.3d 1251 (D.C. Cir. 2004) (rule 9 does not abrogate rule 8); Greenberg v. Howtek, Inc., 790 F. Supp. 1181, 1184 (D.N.H. 1992) (in ruling on a motion to dismiss court must "construe Rule 9(b) in conjunction with Rule 8. . . ."); Bailey v. Linsco/Private Ledger Corp., 136 F.R.D. 11, 13 (D. Me. 1991) (Rule 9(b) does not completely trump Rule 8). "Rule 9 does not reflect a subscription to fact pleading and requires only simple, concise, and direct allegations. . . ."Kanneganti, 565 F.3d at 186 (internal quotation marks and citation omitted).

7

## IV. The Second Amended Complaint

At the outset, Plaintiffs argue that Twombly changed the federal pleading landscape by expressly overruling Conley v. Gibson, 355 U.S. 41 (1947), which, Plaintiffs' contend, established the minimal pleading requirements under Fed.R.Civ.P. 8. Plaintiffs contend that Twombly "rejected the traditional pleading sufficiency standard" — Conley's "no set of facts standard" — and adopted a pleading standard where plaintiffs must now plead enough facts to state a claim that is plausible on its face. Plaintiffs' Memorandum Showing Cause at 5. In essence, Plaintiffs contend that Twombly created a "[c]onsiderable uncertainty" about pleading standards and that Twombly indicated the Supreme Court's intent to make "some alteration in the regime of pure notice pleading. . . ." Id. (internal quotation marks and citation omitted).



Although <u>Twombly</u> "retooled federal pleading
standards . . . and retired the oft-quoted" *8
<u>Conley</u> motion to dismiss "no set of facts"
standard, <u>Tamayo v. Blagojevich</u>, 526 F.3d 1074,
1082 (7th Cir. 2008), <u>Twombly</u> did not "supplant
the basic notice-pleading standard." <u>Tomayo</u>, 526
F.3d at 1083. "A plaintiff still must provide only
enough detail to give the defendant fair notice of
what the claim is and the grounds upon which it
rests. . . ." <u>Id.</u> (internal quotation marks and
citation omitted). <u>Twombly</u> "did not signal a
switch to fact-pleading. . . ." <u>Airborne Beepers
Video, Inc. v. AT T Mobility, LLC.</u>, 499 F.3d 663,
667 (7th Cir. 2007). <u>Twombly</u> specifically
provided that "a complaint attacked by a Rule
12(b)(6) motion to dismiss does not need detailed
factual allegations. . . ." <u>Twombly</u>, 550 U.S. at
555. The Supreme Court clarified <u>Twombly</u> when
it stated that Rule 8(a)(2) "requires only a short
and plain statement of the claim showing that the
pleader is entitled to relief. <u>Specific facts are not
necessary</u>; the statement need only give the
defendant fair notice of what the . . . claim is and
the grounds upon which it rests." <u>Erickson v.
Pardus</u>, 551 U.S. 89, 93 (2007) (emphasis added)
(internal quotation marks and citation omitted).

Plaintiffs contend that the complaint is lengthy
because they had to reconcile the requirements of
Rule 8 and Rule 9 and because the facts
underlying the complaint involve a RICO claim.
Plaintiffs stress that the second amended
complaint is "<u>substantially</u> reduced in length" as
compared to the first amended complaint.
Plaintiffs' Memorandum Showing Cause at 4
(emphasis in original).

Plaintiffs' assertion that the second amended
complaint is substantially reduced in length misses
the mark. Length alone is not the issue. This
complaint is simply not a "short and plain
statement of the claim." Fed.R.Civ.P. 8(a)(2). The
second amended complaint contains 380
paragraphs over 73 pages and it specifically
incorporates by reference 6 exhibits (22 additional
*9 single-spaced pages) containing approximately

316 additional factual averments.[6] When viewed
in its totality, the complaint is a rambling, fact-
laden, disjointed "quagmire of minutiae." <u>Kuchay
v. Vetter</u>, No. 06 C 4501, 2007 WL 2410333 at * 1
(N.D. Ill. Aug. 20, 2007) (internal quotation marks
and citation omitted). The complaint is replete
with irrelevant, repetitive, and incomprehensible
factual averments that saddle Defendants with the
unfair task of meeting their obligation to "admit or
deny the allegations asserted . . . by an opposing
party." Fed.R.Civ.P. 8(b)(1)(B). The complaint
also forces this Court to parse countless irrelevant
and wholly unnecessary factual allegations to
attempt to determine what Plaintiffs are alleging
against each Defendant.

> [6] This is a conservative estimate and does
> not take into consideration factual
> averments contained in exhibit E,
> Plaintiffs' chart.

To illustrate Plaintiffs' failure to comply with Rule
8, the Court points to the following excerpts from
the complaint:

> Paragraph 69 of the complaint provides
>
> [u]pon information and belief, <u>Carol</u> then
> hired Gerstein to challenge Christine and
> Lauren's petition on <u>her</u> behalf and/or for
> <u>Defendants'</u> benefit.



8

9

Peabody v. Griggs    C.A. No. _____ (D.R.I. Oct. 6, 2009)

This belief is based upon testimony of Deborah Griggs given on April 2, 2004 and April 19, 2004 (made part of the probate record in <u>In re Estate of Glenn E. Griggs</u>, Probate Ct. Docket No. 2003-249, and copies previously filed by Plaintiffs in this action with an opposition memorandum, <u>See Docket Nos. 81-82)</u> [hereafter, 'Deborah's Deposition']; a 2005 written statement by her (attached hereto as 'Exhibit A' and incorporated herein by reference) [hereafter 'Deborah's 2005 Statement']; a corroborating statement by her boyfriend David Laliberte (attached hereto as 'Exhibit B,' and incorporated herein by reference); other statements by Deborah to one or more of Plaintiffs and/or Patrizia Griggs; Carol's prior pattern of hiring and firing Glenn's professionals and Gerstein's later actions in the Probate Court.

Second Amended Complaint at ¶ 69 (emphasis in original). *10

Paragraph 69 incorporates by reference an unsworn written statement by Deborah.[7] This unsworn statement is a 3 page single-spaced document made up of approximately 21 paragraphs and approximately 57 averments. In this statement, among other things, Deborah alleges that

> [7] The statement has a handwritten date on it of "3/2/05."

[Carol] would come to my home and take my father out without asking me. He would be returned very upset and disgruntled. I objected to this but to no avail as she just had no consideration for either me or my father.

Second Amended Complaint Exhibit A at 2.

My father, who loved his daughters and his ex-wives, and who had made me sole Power of Attorney while he still had his mental faculties, is being held captive by an evil, treacherous woman and those lawyers helping her to her evil ends.

Id. at 3.

Paragraph 69 also incorporates by reference a July 2004 affidavit from Deborah's boyfriend, David Laliberte ("Laliberte"). The Laliberte affidavit is a 4-page 21 paragraph single-spaced document that includes approximately 81 averments. Laliberte alleges that he

started to notice a significant decline in Glenn Griggs' mental abilities and ability to take care of himself in the last few years. In or around December 2000, I obtained tickets to a Patriots game and invited Glenn to accompany me. I arranged to pick him up at his house . . . in Warwick Rhode Island. When I arrived there, Glenn invited me in insisting that I look at his Christmas tree. When I went in the house I observed the gas stove in the kitchen with the two back burners burning in full flame on the high setting. There was nothing on the stove and there were no pans visible. I said to Glenn, 'You're stove is on' and he didn't really appear to show any concern or awareness. Instead he insisted on me looking at the Christmas tree. I turned off the burners and after that we locked up the house and went to the game.

Id. at Exhibit B at ¶ 7.



Peabody v. Griggs    C.A. No. ... (D.R.I. Oct. 6, 2009)

On many occasions, I would get up in the morning and would make a pot of coffee and I would try to get Glenn to try to help himself. Glenn would stand there looking confused not knowing what to do to prepare a cup of coffee. On many *11 occasions, Glenn would take the sugar bowl, pour coffee in it, stir it and sit at the table and drink it. On other several occasions, I would get up and find it freezing in the house because the doors were wide open. Glenn would have his clothes spread out on the porch and have his clothing on hangers hanging in the bushes or the tree out front. When asked why the doors were open and his clothes outside, Glenn would appear confused, mutter and just say 'yeah, yeah, yeah.' We would put the clothes back in his room for him. On many occasions, he would be inappropriately dressed in partial clothing. He would even come through the house when we had company over, dressed only in a tee shirt. On another occasion he sat in the house with feces in his pants and didn't seem to be aware of it despite the fact that the smell was overwhelming. He would also wet his bed on occasion. In my opinion, I came to the conclusion that his mental state had declined dramatically since first meeting him.

<u>Id.</u> at ¶ 14.

Glen would also drive up the grass hill and park his car right outside the front door on my front lawn for no reason and it was clearly not a place where you would park.

<u>Id.</u> at ¶ 15.

Standing alone, paragraph 69 places an unfairly onerous burden upon Defendants, that is, to sort through and <u>comprehend</u> the allegations contained in paragraph 69, and the documents incorporated by reference, in order to draft a response that is consistent with Defendants' obligations under

Fed.R.Civ.P. 8(b). Fed. R. Civ. P. 8(b)(1) provides that in "responding to a pleading, a party must: (A) state in short and plain terms its defenses to each claim asserted against it; and (B) admit or deny the allegations asserted against it by an opposing party." Fed.R.Civ.P. 8(b)(1). Paragraph 69 forces Defendants not only to parse and review the accusations in paragraph 69 itself, but also to do the same to the factual allegations contained in the two exhibits incorporated by reference which themselves contain approximately 40 paragraphs and 138 *additional* averments. Paragraph 69 is certainly "lard[ed] . . . with facts. . . ."<u>Burks</u>, 555 F.3d at 594. *12

Plaintiffs further allege that in

July 2003, the Warwick Probate Judge conducted an in camera interview of Glenn to assist in resolving the representation challenge and later stated that Glenn expressed that he 'preferred' Gerstein as his attorney.

Glenn's expressed 'preference' was the result of manipulation by Carol and Gerstein (<u>and perhaps others</u>); and there is <u>no indication that the Warwick Probate Judge had any training or expertise to recognize any signs of undue influence or otherwise such that he could investigate whether this 'preference' was the product of anything other than 'brainwashing' activity.</u>

Second Amended Complaint at ¶¶ 142-143 (emphasis added). These factual averments compel Defendants to reply to an accusation that the probate judge did not have any training or experience in recognizing the signs of undue influence or "brainwashing." <u>Id.</u> at ¶ 143. The averment as to the probate judge's training or lack thereof is wholly irrelevant, adds nothing of import to the allegations against Defendants and is but one example of Plaintiffs' fact-laden inflammatory discourse.



Peabody v. Griggs    C.A. No. ___ (D.R.I. Oct. 6, 2009)

Some of the allegations in the second amended complaint are based on information received from one of Mr. Griggs' "caregivers," Sally Mello ("Mello"). Paragraph 159 of the complaint provides that "[o]n or about January 12, 2008, Mello signed a three-page statement, the contents of which are incorporated herein by reference and restated upon information and belief. (Copy attached as 'Exhibit C')." Second Amended Complaint ¶ 159. The unsworn statement, titled "Statement of Sally A. Mello," is a 6 page 30 paragraph single-spaced disjointed declaration of a self-described "companion/homemaker" to Mr. Griggs.[8] Id. at Exhibit C at 1.

> [8] The statement, signed by a witness, ends with the statement that Mello has "read and signed all pages of this statement and . . . received a copy. I have not been promised anything of value for sharing this information and have done so of your [sic] own free will." Second Amended Complaint at Exhibit C at 6.

The incorporation by reference of the Mello statement is particularly burdensome on *13 Defendants and this Court. The statement contains approximately 126 unnumbered factual averments. The statement begins with the averment, that Mello, a licenced practical nurse had her license suspended as a result of being "falsely accused of taking medication. . . ."[9] Id. Additionally, the statement includes the following sampling of factual averments:

> [9] Mello does not identify her accuser or accusers. Mello also acknowledges "another false accusation" while working at West Shore Health Center in Warwick, Rhode Island. Mello does not however, identify the type of accusation nor the accuser or accusers.

> At the beginning I was paid in cash. Later, I was paid from a checking account in Mr. Griggs' name and my pay was directly deposited into my account.

Id. at 1.

> Lorrie [another caretaker] did mostly grocery shopping.

Id.

> I believe Carol Griggs is quite clever.

Id. at 2.

> More recently, Hospice has been involved. Some of the changes in the skilled nursing providers were apparently due to changes in Mr. Griggs' [health] insurance coverage.

Id.

> After . . . visits [from some of Mr. Griggs' children], Lori [another one of Mr. Griggs' caretakers] would tell me that the visits took place and say things like 'oh they came in with the stilettos and walked by me like I was dirt.'

Id. at 3.

> In December, 2007, I took a vacation and when I returned I was told by my sister Sylvia that Carol told her that David Heal wanted to take one of my nights away from me and give it to Sylvia and that David Heal was going to fire me if I didn't do a better job taking care of Mr. Griggs. I confronted Mr. Heal and he told me that none of these statements by Carol to my sister were true. He told me he would confront Carol the following day. I told Mr. Heal that Carol had commented that his (Heal's) wife was 'big, fat and ugly" and eventually Mr. Heal *14 told my sisters that Carol Griggs had lied about my hours and my getting [sic] to be fired.

Id. at 4.

> I also remember Carol bragging that someone in a boat outside the house in the water was able to tell me what kind of clothes I was wearing.



<u>Id.</u> at 5.

> David Heal told me that Carol was upset
> about missing items from the house. I told
> him that I took the coffee pot because I
> purchased it. This was my own coffee pot
> and Carol has no right to the pot.

<u>Id.</u> at 6.

> Finally, Danny told me that he was going
> to ask Carol where his father's gold Rolex
> watch was and I have been told since that
> Dan Griggs asked Carol about this and that
> Carol supposedly said that one of the
> caregivers 'stole it' a long time ago. I was
> also told that Dan has asked whether there
> was a police report. I have no idea whether
> an insurance claim was ever submitted for
> a lost or missing Rolex watch. I never saw
> a Rolex watch when I was employed.

<u>Id.</u>

> I am fearful that due to her nature, Carol
> will call the Board of Licensing and falsely
> accuse me of acting as an LPN, when, in
> fact, I never did so.

<u>Id.</u> at 2.

The Court is struck by the amount of time it would
take Defendants to parse, review and comprehend
the allegations (and their relevance, if any) in the
Mello statement and the costly task of
constructing a meaningful and proper response in
accordance with the requirements of Fed.R.Civ.P
8(b). See generally Infanti v. Scharpf, No. 06 CV
6552 (ILG), 2008 WL 2397607 at *2 (E.D. N.Y.
June 10, 2008) (noting that defendants "may be
understandably hard put to respond to these
allegations in any meaningful way, and requiring
them to answer such a pleading would fly in the
face of the very purposes for which Rule 8 exists")
(internal quotation marks and citation
omitted).

In paragraph 176 Plaintiffs incorporate by
reference a 3 page single-spaced 20 paragraph
affidavit of David J. Aubin, Jr. ("Aubin") dated
September 7, 2008. This document contains
approximately 39 separate averments. Among
other things, Aubin states that

> While Glenn's divorce from Carol was
> pending (which would have been in 1996
> or early 1997), I had lunch with Glenn and
> Carol wherein Glenn stated that 'I married
> her, but she never said she loved me.'
> Carol responded that 'I told you once.'
> When Glen asked 'When?," Carol could
> not respond.

Second Amended Complaint Exhibit D ¶ 8.

> After Glenn's divorce from Carol Griggs, I
> met Glenn on a Friday for lunch or dinner
> in East Greenwhich and convinced Glenn
> to go on another golfing trip, which he
> seemed very happy about.

<u>Id.</u> at ¶ 9.

> Matthew Tierney, a Griggs Browne
> employee, accompanied Glenn to the
> luncheon. My impression, based upon
> Tierney's conduct, was that Tierney was
> acting as some sort of 'bodyguard.' A
> company underling had never
> accompanied Glenn to previous meetings
> of this social type, and Glenn had no
> reason himself to have Tierney there.

<u>Id.</u> at ¶ 10.

> I was disgusted by the fact that I was not
> being allowed to talk to my old friend and
> that he seemed to be under Carol Griggs'
> control, [sic] that I removed my picture
> from the company's 'wall of fame.'

<u>Id.</u> at ¶ 13 (emphasis added). Among other things,
Plaintiffs appear to attach apparent significance to
a former employee of the Griggs' companies
removing his own picture from the Griggs'
business' "wall of fame." <u>Id.</u> The Court, yet again,



Peabody v. Griggs    C.A. No. 05-2702-... (D.R.I. Oct. 6, 2009)

wonders the import of, and how Defendants would properly respond to, such a wholly irrelevant averment.

Paragraph 244 incorporates by reference Exhibit E which Plaintiffs describe as "a chart . . . of other correspondence deposited in the U.S. Mails — or with a 'private or commercial interstate *16 carrier' within the meaning of 18 U.S.C. § 1341 — in furtherance of the Defendants' scheme to defraud." Second Amended Complaint ¶ 244. The chart is a 4 page document separated into 4 columns titled "Date," "Sender," "Recipient," and "Description of Mailing." Id. at Exhibit E. The document purports to "descri[be]" 25 mailings. Id.

Exhibit E, however, goes beyond merely describing the mailings and includes further factual averments that Defendants must respond to. As an example, the chart describes a letter sent by Defendant Heal to Patrizia Griggs, in the Spring of 2000, in the following manner:

> [w]ithin days after [Mr. Griggs] promised Patrizia (as a gift) that he would install a new tile floor in her kitchen, this letter provided a check of $1000.00 and Heal — fraudulently purporting to be acting on Glenn's behalf, indicated the [sic] that tile floor would not be paid for.

Id. at 1. Plaintiffs also describe other letters sent by Heal as "discussing that Griggs Browne [would] repair Glenn's daughters' vehicles at no labor charge (contrary to prior letter)," and "[e]xplaining that 'Courtney' Monica Griggs would not receive health [insurance] coverage from Griggs Browne after 12/31/00 if she was not in school (despite Glenn's intent to the contrary)." Id. at 2.

Once again, Defendants are left to respond to wholly extraneous factual allegations concerning whether or not Mr. Griggs "promised" he would pay for the installation of a tile floor, whether the Griggs and Brown company would pay for Mr.

Griggs' daughters' automobile repair costs, and the health insurance and education status of one of Mr. Griggs' daughters.

The complaint alleges that

> [u]pon information and belief-based upon information received from Sally Mello regarding her personal observations — during or after Glenn was hospitalized in September 2007, and his death appeared imminent, Carol removed the hidden cameras and cables (and also destroyed a sheet of photographs which she had used to reinforce negative ideas about Glenn's family).

*17

> The actions alleged in the preceding paragraph taken by Carol, and others acting in concert with her, constitute and comprise spoliation of evidence; accordingly an adverse inference should be drawn against Carol and/or any person having counseled or assisted her in taking such actions.

Id. at ¶¶ 287-88. Plaintiffs' allegation of "spoliation of evidence" is clearly legal argument and merely adds more useless information to an already overdone complaint.[10]

> [10] Suffice it to say there are many other excerpts from the second amended complaint, and the exhibits incorporated by reference, that are replete with unnecessary and wholly irrelevant factual allegations. This Court need not discuss every irrelevant allegation in order to adequately address Plaintiffs' Rule 8 violation. At some point it must be said that "[e]nough is enough." Federal Election Commission v. Wisconsin Right to Life, Inc., 551 U.S. 449, 478 (2007).

The second amended complaint is a chaotic pastiche of irrelevant, confusing disconnected averments. When read as a whole, the complaint,



and its tangled web of exhibits incorporated by reference, represent what can only be described as fact pleading run amok. This is Plaintiffs' *third* attempt, by very able counsel, at drafting a complaint that complies with the Federal Rules of Civil Procedure. "[F]ederal courts are far less charitable when one or more amended pleadings already have been filed with no measurable increase in clarity." Wright Miller, § 1217 at 260-63. As noted, the second amended complaint is 73 pages long and contains 380 paragraphs and 6 exhibits incorporated by reference. The five exhibits (excluding the chart) incorporate by reference 22 additional single-spaced pages made up of approximately 96 paragraphs and 316 additional factual averments. See generally Destifino v. Kennedy, No. CV-F-08-1269 LJO DLB, 2008 WL 4810770 (E.D. Cal. Nov. 3, 2008) (allegations in complaint which incorporate by reference information, regardless of relevancy, violates Rule 8 and interferes with the court's ability to administer justice); Loube v. Chrysler Corp., Civil Action No. J-81-724, 1982 WL 1924 at *5 (D. Md. June 1, 1982) ("indiscriminate use of the device of incorporation by reference only leads to confusion"). *18

[18] "[T]he purpose of Rule 8 is that the adversary party or parties have sufficient notice to prepare their defense and the court is sufficiently informed to determine the issue[s] presented."916 Radio v. Federal Communications Commission, No. 05-0719 FCD DAD, 2005 WL 2114187 at * 2 (E.D. Cal. August 31, 2005) (internal quotation marks and citation omitted). "Each allegation must be simple, concise, and direct." Fed.R.Civ.P. 8(d)(1). Read together, rules 8(a) and 8(e)(1) "underscore the emphasis placed on clarity and brevity by the federal pleading rules." Wright Miller, § 1217 at 246 (emphasis added).

Plaintiffs argue that the second amended complaint is necessarily long because of the RICO claim and Rule 9's requirements. Although Rule 9 requires Plaintiffs to plead a RICO claim with particularity, rule 9 is not a license to submit to the Court an unrestrained fact inundated opus. See Infanati, 2008 WL 2397607 at *3 (simply because Plaintiffs assert a RICO claim does not justify "a verbose complaint") (internal quotation marks and citation omitted).

The "mash of allegations [in this complaint] read more like a novel than a legal pleading and frequently digress into improper argumentative detail." Lease v. Fishel, No. 1:07-CV-0003, 2009 WL 922486 at *2 (M.D. Pa. April 3, 2009) (emphasis added); see also Fritz v. County of Kern, No. CV-F-07-377 OWW/TAG, 2009 WL 382741 at *2 (E.D. Cal. Feb. 13, 2009) (a "complaint is not a novel — background allegations and evidentiary detail are simply unnecessary and violate Rule 8(a)(2)"); In re Electronic Data Systems Corp., 305 F. Supp. 2d 658 (E.D. Tex. 2004) (rule 8 is violated when plaintiffs choose to plead excessive facts). The overdose of fact-laden surplusage in the second amended complaint places an "unjustified [and unduly prejudicial] burden" on Defendants because, in order for them to respond, they would be "forced to select relevant material from a mass of verbiage."Miranda v. United States, 105 F. App'x 280, 281 (1st *19 Cir. 2004) (quoting Wright Miller, § 1281 at 522 (2d ed. 1990)). As a result, Defendants are left to tilt at windmills in order to comply with Rule 8's requirements that Defendants state their defenses in "short and plain terms" and "admit or deny the allegations" asserted against them by Plaintiffs. Fed.R.Civ.P. 8(b)(1).

Additionally troubling for the Court is that in light of Fed.R.Civ.P. 8(b)(6)'s maxim that an allegation that is not denied is admitted, responding to this complaint is akin to "crossing a mine field with a faded [and incoherent] map as a guide." Hatco Corp. v. W.R. Grace Co-Conn., 849 F. Supp. 931, 938 (D.N.J. 1994). The time and expense involved for Defendants and this Court to decipher and parse this overly detailed and unduly cumbersome complaint is wholly unjustified. "Complaints which ramble, which needlessly speculate, accuse,



and condemn, and which contain circuitous diatribes far removed from the heart of the claim do not comport with [the goals of the federal rules of civil procedure and] such complaints must be dismissed." Prezzi v. Berzak, 57 F.R.D. 149, 151 (S.D.N.Y. 1972).

This Court is cognizant of its obligation to decide cases on the merits. However, as noted, this is Plaintiffs' third bite at the apple and this Court most certainly "telegraphed" to Plaintiffs the serious Rule 8 shortcomings of the first amended complaint. See Kuehl v. Federal Deposit Insurance Corporation, 8 F.3d 905, 908 (1st Cir. 1993) (dismissing an amended complaint with prejudice on Rule 8 violation where plaintiffs had been adequately warned of deficiencies by magistrate judge).

This complaint is in no way, shape, or form a short and plain statement of the claim; rather, it is a conglomeration of allegations made unintelligible by its volume, morass of irrelevancies, lack of clarity and its incorporation-by-reference information overload. The *20 complaint does not give Defendants fair notice of the claims and clearly will cause Defendants to expend significant and unnecessary effort to separate the wheat from the chaff in order to draft a reasoned response.

A complaint with hundreds of averments generates tens of thousands of dollars in discovery and motions expenses. Even answering the complaint is an expensive and unjustified burden, because Rule 8(b) requires the defendants to state their defenses to 'each' claim, and worse, in a complaint with hundreds of averments, to 'admit or deny the allegations asserted against it by an opposing party.' One experienced in litigation knows how time consuming for the lawyer and expensive for the client it is to search out documents and personnel and get people on the phone, in order to file a good faith answer to hundreds of averments.

Hearns v. San Bernardino Police Department, 530 F.3d 1124, 1138 (9th Cir. 2008) (Kleinfeld, J., concurring in part and dissenting in part).

The Federal Rules of Civil Procedure are "administered to secure the just, speedy, and inexpensive determination of every action" brought in the federal courts. Fed.R.Civ.P. 1. Plaintiffs have utterly disregarded the most basic principles of the notice pleading provisions of the Rules, even after having been warned by the Court and afforded an opportunity to amend their complaint. Instead of seizing the opportunity to bring their complaint into compliance with Rule 8, Plaintiffs have seen fit to file yet another abusive pleading which has caused the Court and opposing counsel to expend precious resources to properly address its shortcomings. The Court therefore dismisses this complaint; such dismissal is without prejudice. Should Plaintiffs elect to file a new complaint they may do so only upon the condition that Plaintiffs first pay a counsel fee *21 to Defendants to make them whole for the time and effort spent in responding to the first and second amended complaints.

For the reasons outlined above, Plaintiffs second amended complaint is DISMISSED for failure to comply with Fed.R.Civ.P. 8(a)(2).



Peabody v. Griggs    C.A. No. 09-320-L (D.R.I. Oct. 6, 2009)

SO ORDERED

casetext
Part of Thomson Reuters

# EXHIBIT G

Civil Action No. 99-1228, 99-1229

United States District Court, E.D. Pennsylvania

# Wesley v. Vaughn

Decided Jun 4, 2002

Civil Action No. 99-1228, 99-1229

June 4, 2002

## <u>MEMORANDUM ORDER</u>

J.M. KELLY, Judge.

Presently before the Court is a Motion To Dismiss Plaintiff's Amended Complaint in Civ. A. No. 99-1229 filed by Defendants and pro se[1] Plaintiff Ronald Wesley's response, misnamed, "Plaintiff's Motion In Opposition to Defendants' Motion to Dismiss Plaintiff's Amended Complaint." Wesley, a prisoner currently incarcerated at the State Correctional Institution at Graterford ("Graterford"),[2] filed separate civil suits, Civ. A. No. 99-1228 and Civ. A. No. 99-1229, against numerous prison officials, alleging civil rights violations and failure to reasonably accommodate his medical condition in violation of the American Disabilities Act (ADA). The procedural history of these two cases is lengthy. It is sufficient to say that the two actions were consolidated for all purposes, including discovery and trial, on April 3, 2001.

[1] Wesley has had at least two Court appointed attorneys that have represented him at various stages of this case, but for various reasons, he became dissatisfied with their legal assistance. Although the Court directed the Clerk of Court to find another attorney to represent Wesley, those efforts have not yet been fruitful.

[2] Presently, Plaintiff is housed in Graterford's L-unit, the Restricted Housing Unit ("RHU"), serving disciplinary time until April 21, 2003.

The only remaining claim in Civ. A. No. 99-1228 is Plaintiff's ADA claim, based on Graterford's policy of locking the showers at the end of scheduled shower period which resulted in an aggravation of Plaintiff's asthmatic condition. In Civ. A. No. 99-1229, Plaintiff asserted that the Defendants violated his rights under the Constitution and the ADA by placing him in a cell that lacked proper ventilation and assigning him cellmates who were heavy smokers even though the Defendants knew of his asthmatic condition.

On February 6, 2002, Plaintiff filed an Amended Complaint in civil action number 99-1229, a handwritten document totaling 125 pages with exhibits. In this document, Plaintiff names additional Defendants, not previously mentioned in either Civ. A. No. 99-1228 or Civ. A. No. 99-1229, asserting new claims relating to prison disciplinary proceedings and the decision of the Pennsylvania Board of Probation and Parole to deny Wesley parole. Plaintiff also complains about the failure of the prison medical staff to diagnose and timely inform him that he has Hepatitis C. Plaintiff argues these new claims are related to his original complaints because the events described in the amended complaint are a result of a conspiracy to retaliate against him for filing the lawsuits.

In response to the Amended Complaint, Defendants first filed a motion to dismiss the Plaintiff's Amended Complaint because it violates



1

Federal Rule of Civil Procedure 8(a) which provides that complaints should be a "short and plain statement . . . showing that the pleader is entitled to relief." After having received copies of the original Complaint in Civ. A. no. 99-1229, Defendants suggest instead that the Court dismiss Wesley's Amended Complaint and re-institute the original Complaint. Upon reviewing Plaintiff's Amended Complaint, the Court agrees with Defendants that the Amended Complaint violates Fed.R.Civ.P. 8(a) and should, therefore, be dismissed without prejudice. Fed.R. of Civ. P. 15(a) allows parties to amend pleadings once as a matter of course at any time before responsive pleading is served. As such, Wesley has the right to amend his complaint in Civ. A. No. 99-1229, but not in Civ. A. No. 99-1228, a case which has already progressed beyond the point of amendments. Therefore, Plaintiff is precluded from naming new defendants or asserting new claims in Civ. A. No. 99-1228.

While it is not too late for Wesley to file an amended complaint in Civ. A. No. 99-1229, Fed.R.Civ.P. 8(a) requires that the complaint be a short and plain statement upon which relief may be granted. Wesley's amended complaint certainly does not conform to Rule 8(a). Rather, it is a lengthy and rambling pleading consisting of 125 pages of narrative. The complaint should be short, concise and intelligible, not full of excruciating details which tends to confuse the reader. Accordingly, the Court **DIRECTS** the clerk of the Court to enter the following:

1. Defendants' Motion to Dismiss Plaintiff's Amended Complaint (Doc. No. 62 in Civ. A. No. 99-1228) is **GRANTED**. Plaintiff's Amended Complaint (Doc. No. 26 in Civ. A. No. 99-1229) is **DISMISSED** without prejudice.

Plaintiff may file, within thirty (30) days from the date of this Order, an amended complaint in Civ. A. No. 99-1229 that conforms to Federal Rule of Civil Procedure 8(a).

Plaintiff may not assert new claims or name additional Defendants related to Civ. A. No. 99-1228 in his amended complaint.

2. Plaintiff's Motion In Opposition to Defendants' Motion to Dismiss Plaintiff's Amended Complaint (Doc. No. 64 in Civ. A. No. 99-1228; Doc. No. 28 in Civ. A. No. 99-1229) is **DENIED**.

casetext
Part of Thomson Reuters